## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DON'T SHOOT PORTLAND,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

WALL OF MOMS,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

BEVERLEY BARNUM,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

SABRINA CERQUERA,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

DEMETRIA HESTER,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

DANIALLE JAMES,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

LISA KIPERSZTOK,
c/o Perkins Coie LLP,
1120 N.W. Couch Street, Tenth Floor,
Portland, OR 97209,

Plaintiffs,

Civil Action No.

v.

CHAD F. WOLF, in his official capacity as
the purported Acting Secretary of Homeland
Security,
2707 Martin Luther King Jr. Ave., SE,
Washington, DC 20528,

KEN CUCCINELLI, in his official capacity
as the purported Senior Official Performing
the Duties of the Deputy Secretary of
Homeland Security and the purported Senior
Official Performing the Duties of the Director
of U.S. Citizenship and Immigration Services,
2707 Martin Luther King Jr. Ave., SE,
Washington, DC 20528,

MARK A. MORGAN, in his official capacity
as the purported Acting Commissioner for
U.S. Customs and Border Protection,
1300 Pennsylvania Ave., NW,
Washington, DC 20229,

MATTHEW T. ALBENCE, in his official
capacity as the purported Deputy Director and
Senior Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement,
500 12th St., SW,
Washington, DC 20536,

L. ERIC PATTERSON, in his official
capacity as the Director of the Federal
Protective Service,
2707 Martin Luther King Jr. Ave., SE,
Washington, DC 20528,

U.S. DEPARTMENT OF HOMELAND
SECURITY,

2707 Martin Luther King Jr. Ave., SE,
Washington, DC 20528,

U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Ave., NW,
Washington, DC 20229,

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St., SW,
Washington, DC 20536,

FEDERAL PROTECTIVE SERVICE,
2707 Martin Luther King Jr. Ave., SE,
Washington, DC 20528,

WILLIAM BARR, in his official capacity as
the Attorney General of the United States,
950 Pennsylvania Avenue, NW,
Washington, DC 20530,

DONALD W. WASHINGTON, in his official
capacity as the Director of the U.S. Marshals
Service,
950 Pennsylvania Avenue, NW,
Washington, DC 20530,

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW,
Washington, DC 20530,

U.S. MARSHALS SERVICE,
950 Pennsylvania Avenue, NW,
Washington, DC 20530,

                    Defendants.

## COMPLAINT

1.　　Plaintiffs are a diverse group of women-founded organizations and individual women in Portland, Oregon, who are leading, participating, and standing in solidarity with historic lawful protests against police brutality and in support of Black Lives Matter. Since the police killing of George Floyd on May 25, 2020, Plaintiffs have joined together to exercise their First Amendment rights to call for social change and an end to systemic racism. Plaintiff Don't Shoot Portland, a Black-led community-driven organization, has coordinated mutual aid to support peaceful protesters in the city. Plaintiff Wall of Moms sprang to life to participate in lawful protests and protect others from being injured by federal law enforcement. Individual Plaintiffs Bev Barnum (organizer of Wall of Moms), Sabrina Cerquera, Demetria Hester, Danialle James, and Dr. Lisa Kipersztok have all participated in peaceful protests.

2.　　The movement for Black lives of which Plaintiffs are part has gained broad support across the United States, due to the power of the protesters' message and the courage of their actions. Plaintiffs' exercise of their First Amendment rights to speak and assemble to advocate for a more just and equal country epitomizes the highest values of our constitutional democracy.

3.　　Defendants are the Department of Homeland Security, its purported leaders, its components, and other agencies of the federal government. Rather than protect and defend Plaintiffs' constitutional rights, as they are bound to do by law and their Oaths of Office, Defendants have implemented an unlawful policy to quash Plaintiffs' speech and end their protests.

4.　　Beginning on or around July 4, 2020, Defendants launched "Operation Diligent Valor": an unprecedented deployment of federal agents to (in Defendants' words) "quell"

protests against police brutality by "tak[ing] over" Portland. At Defendants' direction, federal agents—dressed in military fatigues and toting military gear—have tear-gassed peaceful protesters, including Plaintiffs; made unlawful arrests without probable cause; and otherwise used violence in an effort to stamp out peaceful and constitutionally protected protests.

5.  Plaintiffs who have been exercising their lawful rights have been repeatedly injured by U.S. Department of Homeland Security ("DHS") agents on the streets of their city. They have been tear-gassed night after night, left vomiting and unable to eat or sleep because of the toxic poison blasted at them. They have been shot at over and over—with rubber bullets, bean bags, pepper spray, and a range of other projectiles fired at close range and with brutal effect. They have had flash-bang explosive devices detonated right in front of them. They have been forced to speak and assemble in fear of not just bodily harm, but the possibility of sudden arrest without probable cause.

6.  In addition to violating Plaintiffs' well-established constitutional rights to freedom of speech and assembly, freedom from unreasonable seizures, and due process, Defendants' actions betray a foundational principle of American democracy: that the federal government exercises only the powers the Constitution authorizes. Other powers, including the general police power, are reserved to the states and their subdivisions. The U.S. Constitution does not permit a federal domestic security or police force. Consistent with those limits, Congress has authorized federal law enforcement officials to fulfill only limited functions, where there is a tight nexus to a specific federal interest.

7.  As set forth below, Operation Diligent Valor exceeds the bounds of what the law authorizes. According to the White House press secretary and other sources, the asserted authority for the DHS agents' presence and actions in Portland is 40 U.S.C. § 1315, which allows

federal officials to protect federal property. But Defendants' statements, a recently revealed internal DHS memorandum, and the conduct of DHS officers on the ground far from the federal courthouse make clear that Operation Diligent Valor actually furthers a separate DHS policy: to intimidate and silence protesters because of their message. Because Defendants' policy is not in furtherance of protecting federal property, their invocation of § 1315 is purely pretextual.

8.     Defendants' unlawful policy has been directed by Defendant Wolf, who purports to be Acting Secretary of Homeland Security but is not legally serving in this role. He has not received Senate confirmation, and, indeed, President Trump has not even nominated him—reflecting his preference for "acting" officials and avoiding the oversight and accountability that the confirmation process ensures.

9.     Plaintiffs ask this Court to protect them and vindicate their constitutional rights by declaring unlawful and enjoining Defendants' unlawful policy.

## PARTIES

10.     Plaintiff Don't Shoot Portland is a nonprofit nonpartisan organization with a mission of providing community support for activists and organizers working to eradicate gross inequalities in our society. It was founded in 2014. In furtherance of its mission, it provides "mutual aid" to activists and organizers through education and facilitating the collection and distribution of community resources. It has 501(c)(3) status under the Internal Revenue Code.

11.     Plaintiff Wall of Moms is an unincorporated association with a mission to end racism, heal historic and ongoing wrongs, and do the hard work of healing society from the legacies of colonialism, racism, and white supremacy. It was founded in July 2020.

12.     Plaintiff Bev Barnum is a resident of Portland, Oregon. She organized Wall of Moms in July 2020 and has regularly attended Black Lives Matter demonstrations in Portland since July 18, 2020.

13.     Plaintiff Sabrina Cerquera is a resident of Portland, Oregon. She has joined many demonstrations throughout Portland in May, June, and July 2020.

14.     Plaintiff Demetria Hester is a resident of Gresham, Oregon. She has been attending protests almost every night since late May 2020.

15.     Plaintiff Danialle James is a resident of Portland, Oregon. She has been attending protests almost every night since May 27, 2020.

16.     Plaintiff Lisa Kipersztok is a resident of Portland, Oregon, who demonstrated peaceably before federal law enforcement agents were deployed to Portland.

17.     Defendant Chad F. Wolf is the purported Acting Secretary of DHS and is sued in his official capacity. Defendant Wolf is responsible for "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property" under 40 U.S.C. § 1315.

18.     Defendant Kenneth T. Cuccinelli is the purported Acting Deputy Secretary of the DHS and Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services ("USCIS"), and is sued in his official capacity.

19.     Defendant Mark A. Morgan is the purported Senior Official Performing the Duties of Commissioner for U.S. Customs and Border Protection ("CBP"), and is sued in his official capacity.

20.     Defendant Matthew T. Albence is the purported Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement ("ICE"), and is sued in his official capacity.

21.     Defendant L. Eric Patterson is the Director of the Federal Protective Service ("FPS"), and is sued in his official capacity.

22.     Defendant the Department of Homeland Security is the executive branch agency of which FPS, CBP, and ICE are part. DHS is an "agency" within the meaning of the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 551(1), and its headquarters are in Washington, D.C.

23.     Defendant U.S. Customs and Border Protection is an operational component of DHS, and is responsible for enforcing laws concerning the flow of goods and persons entering or exiting the United States. *See* 6 U.S.C. § 211. CBP is an "agency" within the meaning of the APA, *see* 5 U.S.C § 551(1), and its headquarters are in Washington, D.C.

24.     Defendant U.S. Immigration and Customs Enforcement is an operational component of DHS, and is responsible for preventing cross-border crime and illegal immigration. *See* 8 U.S.C § 1357. ICE is an "agency" within the meaning of the APA, *see* 5 U.S.C § 551(1), and its headquarters are in Washington, D.C.

25.     Defendant the Federal Protective Service is an operational component of DHS, and is responsible for protecting federal property. *See* 40 U.S.C. § 1315. FPS is an "agency" within the meaning of the APA, *see* 5 U.S.C § 551(1), and its headquarters are in Washington, D.C.

26.     Defendant William Barr is the Attorney General of the United States. He is sued in his official capacity.

27.     Defendant Donald W. Washington is the Director of the U.S. Marshals Service ("USMS"), and is sued in his official capacity.

28.     Defendant the Department of Justice ("DOJ") is the executive branch agency of which the U.S. Marshals Service is a part. The Department of Justice is an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1), and its headquarters are in Washington, D.C.

29.     Defendant the U.S. Marshals Service is a federal agency within the Department of Justice that provides security for the federal courts, *see* 28 U.S.C. §§ 561, 566(a). Defendant USMS is an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1), and its headquarters are in Arlington, Virginia.

30.     For clarity, we refer to defendants Wolf, Cuccinelli, Morgan, Albence, Patterson, Barr, and Washington as "individual Defendants," and defendants DHS, CBP, ICE, FPS, DOJ, and USMS as "agency Defendants."

## JURISDICTION AND VENUE

31.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, the Administrative Procedure Act ("APA"), and other federal statutes.

32.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, the APA, 5 U.S.C. § 706, and its equitable powers.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (e)(1). Defendants DHS, CBP, ICE, FPS, and DOJ reside in the District of Columbia. 28 U.S.C. § 1391(c)(2).

## FACTUAL ALLEGATIONS

**A. Led by Plaintiff Don't Shoot Portland, Plaintiffs and the Portland Community Lawfully Engage in Black Lives Matter Protests**

34.     After the police killing of George Floyd on May 25, Portland organizers began to mobilize to protest in support of Black Lives Matter. Portland protesters have shown up, night after night amid the staggering COVID-19 pandemic, to exercise their First Amendment rights to call for social change that ends systemic racism. Since July 4, they have been repeatedly attacked by an army of over 100 camouflage-clad federal agents.

35.     Don't Shoot Portland, a Black-led and community-driven organization that is the lead Plaintiff in this lawsuit, has a crucial role in sustaining the movement for Black lives in Portland. Don't Shoot Portland was founded in 2014 by Teressa Raiford, building upon years of work organizing to facilitate care and support for families who had lost loved ones and to help people become civically engaged to further the Black Lives Matter movement with inclusivity.

36.     Don't Shoot Portland's mission is to support the Black Lives Matter movement by providing "mutual aid" to activists, organizers, and other individuals wishing to exercise their First Amendment rights to organize, protest, and create art for social change. "Mutual aid" is the voluntary reciprocal exchange of resources for the benefit of all involved. It is how Don't Shoot Portland expresses its support for Black Lives Matter; it is the organization's free speech.

37.     Since George Floyd's murder, Don't Shoot Portland has organized mutual aid to support the Black Lives Matter protests in Portland and the Black community enduring trauma from the event. Public health and safety have been the focus of its mutual aid. Don't Shoot Portland distributes protective equipment like face masks and hand sanitizer, first aid kits, baking soda, and other resources that provide relief from tear gas, along with water, food, and assistance with hotel and temporary housing costs and transportation.

10

38.     Don't Shoot Portland understands, based on scientific research that it facilitated, that tear gas is extraordinarily dangerous to deploy during a pandemic outbreak of a respiratory virus like COVID-19. Because of racism and its impact on economic and health disparities, Black people, Indigenous people, and people of color are more likely to develop, suffer, and face complications from COVID-19 than their white counterparts.

39.     Since Operation Diligent Valor started, federal officers have harmed Don't Shoot Portland's mission by destroying its mutual aid supplies with tear gas and through other means.

40.     Plaintiff "Wall of Moms" was organized by Bev Barnum.

41.     On July 17, 2020, Ms. Barnum watched from her home, in horror, a video on social media showing unidentified and armed federal officers in military uniforms grabbing a protester and putting them in an unmarked van. She saw news coverage of the federal officers beating, gassing, and shooting protesters with "less-lethal" weapons. She never thought something like that could happen in the United States of America. She felt compelled to do something as a mother, as a Portlander, and as an American who believes in the right to protest.

42.     Ms. Barnum wrote a post in a working moms Facebook group, calling for moms to join the protests the next day and to form a "Wall of Moms" to protect protesters, especially the youth, from the federal officers' assaults. Within an hour, seventy moms had responded and were eager to stand up for those protesting police violence against Black Americans. The number kept growing.

43.     Ms. Barnum reached out to Don't Shoot Portland for guidance on organizing the beginning of a movement of moms standing for racial justice.

44.     The first night that Wall of Moms formed, July 18, the Moms attended a vigil organized by Don't Shoot Portland for Shai'India Harris, a young Black woman whose murder was never investigated because Portland police claimed they were too busy policing the protests.

45.     Wall of Moms then went to the street outside the Mark O. Hatfield U.S. Courthouse to form a human barrier for the young protesters who were giving speeches. The Moms did not throw anything or threaten officers in any way; they just shouted, "Leave the kids alone!" They hoped that the presence of mothers in regular clothing would remind the federal officers that these protesters were young people calling for social change. That hope met a brutal reality when federal officers, dressed for war, blasted everyone, including Ms. Barnum and Wall of Moms linked arm-in-arm, with tear gas, flash-bang grenades, and other munitions.

46.     No matter how much harm her body suffers each night, Ms. Barnum goes back to the protests to exercise her First Amendment rights and protect others doing the same to further the movement for Black lives. Wall of Moms attends the protests in solidarity with Portlanders calling for racial justice, withstanding violence from federal law enforcement every night.

47.     Among the protesters peacefully exercising, or wishing to exercise, their free speech rights in Portland are Plaintiffs Sabrina Cerquera, Demetria Hester, Danialle James, and Lisa Kipersztok.

48.     Ms. Cerquera is a 22-year-old Brown woman who has witnessed and experienced systemic racism. She feels strongly compelled to stand up for her Black and Brown peers to end police brutality and white supremacy. After police officers killed George Floyd on May 25, she joined demonstrations in Portland to protest the violence and death Black Americans disproportionately suffer. Between May 29 and June 23, Ms. Cerquera protested eight times. She was tear-gassed by Portland police for the first time on May 31, and was traumatized by the

experience. Having seen the assault of federal officers on protesters, Ms. Cerquera's fear for her safety restrained her from participating in protests for a full month, but the killings of Black Portlanders Dominque Dunn and Shai'India Harris inspired her to rejoin the protests.  Over multiple nights, she has been hit with pepper spray that federal agents deploy to violently disperse gathered demonstrators.

49.     Ms. Hester is a Black mother and grandmother who has been joining protests to fight against the legacy of white supremacy. George Floyd's killing came almost three years exactly after Ms. Hester was assaulted in Portland by Jeremy Christian, who made racist statements during the assault. The day after that assault, Christian stabbed and killed two men who were protecting two young Black women from Christian's attacks on a Portland light rail train. Ms. Hester has suffered injury from the federal officers' teargassing.

50.     Ms. James is a Black mother who has been peacefully demanding justice and accountability not only for the death of George Floyd, but the innumerable other victims of police brutality in Portland, since late May. Ms. James has suffered injury from the federal officers' use of tear gas and projectile munitions such as paint balls, pepper-spray balls, and rubber bullets.

51.     Dr. Kipersztok is a Portland family physician who cares for underserved community members facing personal discrimination. She is motivated to join the Black Lives Matter protests out of a desire to dismantle the structural racism against Black Americans in healthcare and throughout our society. Dr. Kipersztok participated in peaceful demonstrations for racial justice in June. In mid-July, Dr. Kipersztok learned that the federal government had dispatched federal law enforcement agents in Portland, and that the federal agents were deploying tear gas to disperse crowds—mere weeks after protesters had won a court victory

restricting local police officers' ability to use the chemical weapon. Dr. Kipersztok initially intended to exercise her right of protest against this show of federal force against fellow Portlanders. After watching live feeds of the downtown protests and reading reports, however, she feared that she could only attend these demonstrations at serious risk of debilitating injury at the federal agents' hands.

**B. President Trump Seeks to Create a Federal Police Force**

52.     The brutality that Plaintiffs have faced at the hands of federal agents is the result of an unlawful policy that Defendants have established to quell lawful protest and intimidate protesters.

53.     This reflects President Trump's desire, dating back to the earliest days of his administration, to "take over" America's cities. Five days after his inauguration, he threatened on Twitter to "send in the feds" to Chicago to deal with rising homicide rates there. This year, President Trump, in consultation with Defendant Barr, Defendant Wolf, and others, has seized on nationwide civil rights protests against police brutality as an opportunity to use federal forces—not to defend civil rights, but to quell the protests.

54.     On May 29, three days after protests began in Minneapolis, the president Tweeted: "Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the National Guard & get the job done right."[1] He continued, "These THUGS are dishonoring the memory of George Floyd, and I won't let that happen. . . . Any difficulty and we will assume control but, when the looting starts, the shooting starts."[2]

---

[1] Donald J. Trump (@realDonaldTrump), Twitter (May 29, 2020, 12:53 a.m.), https://twitter.com/realDonaldTrump/status/1266231100172615680.
[2] Donald J. Trump (@realDonaldTrump), Twitter (May 29, 2020, 12:53 a.m.), https://twitter.com/realDonaldTrump/status/1266231100780744704 ("This Tweet violated the

55.     President Trump's response to the civil rights protests, and specifically his insistence that they be shut down, stands in sharp contrast to his response to anti-quarantine protesters earlier this year. When armed protesters objecting to COVID-19 quarantine measures rallied in the Michigan state house, President Trump called them "very good people" and urged Michigan Governor Gretchen Whitmer to "give a little" in response to the protesters' objections.

56.     Throughout the next month, President Trump, with backing by Attorney General Barr and others, continued to reinforce his willingness to override local law enforcement, notably during his address to the nation on June 1: "I am your President of law and order . . . . If a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."

57.     Minutes later, the president previewed his strategy at Lafayette Square, near the White House. Just after the speech, federal law enforcement and the D.C. National Guard forcibly removed thousands of peaceful protesters from Lafayette Square with pepper-spray balls, smoke canisters, flash-bang grenades, shields, and horses. After the protesters were cleared, President Trump, Attorney General William Barr, Secretary of Defense Mark Esper, and others walked from the White House through Lafayette Park for a photo opportunity at St. John's Episcopal Church.

58.     It is not coincidental that the president's threats to deploy the military and armed federal officers have been aimed at liberal and progressive cities that he views as home to his political opponents.

---

Twitter Rules about glorifying violence. However, Twitter has determined that it may be in the public's interest for the Tweet to remain accessible.").

59.     On June 3, he claimed that "super-liberal mayors" in cities like Minneapolis were undermining local law enforcement, requiring his administration to bring in the National Guard to "[take] care of it."

60.     And on July 20, President Trump told reporters his administration was taking action "[b]ecause we're not going to let New York and Chicago and Philadelphia and Detroit and Baltimore and all of these—Oakland is a mess. We're not going to let this happen in our country. All run by liberal Democrats. All run, really, by the radical left."

C.  **President Trump Unlawfully Places Allies in Leadership Roles at the Department of Homeland Security Without Senate Confirmation**

61.     The Department of Homeland Security is the nation's largest law enforcement agency, with more than 60,000 law enforcement agents working under its auspices.

62.     But President Trump has installed an unprecedented number of top officials at DHS without seeking the advice and consent of the Senate, as the Constitution and federal law require. Instead, his hand-picked individuals lead this crucial agency without any opportunity for Congress to vet or approve their selection.

63.     The last Senate-confirmed DHS Secretary, Kirstjen Nielsen, resigned in April 2019. The current purported Acting Secretary of the Department of Homeland Security, Defendant Wolf, is the second consecutive person to serve in that role in an acting capacity, without going through Senate confirmation for the post. There has been no Senate-confirmed Secretary of Homeland Security for nearly 500 days. During that time, President Trump has not nominated a candidate to serve as the Secretary.

64.     As detailed in paragraphs 125-151 below, Defendant Wolf's appointment as Acting Secretary violates federal law.

65.     Defendant Cuccinelli is the Senior Official Performing the Duties of the Deputy Secretary of Homeland Security and the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services. Cuccinelli has never been confirmed by the Senate to any senior position within DHS.

66.     A judge in the U.S. District Court for the District of Columbia recently held that Cuccinelli's appointment at USCIS violates the Federal Vacancies Reform Act ("FVRA"), one of the federal laws governing the use of acting officials. *See L.M.-M. v. Cuccinelli*, __ F. Supp. 3d __, No. 1:19-cv-02676(RDM), 2020 WL 985376 (D.D.C. Mar. 1, 2020).

67.     Defendant Morgan is the Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection. Morgan has never been confirmed by the Senate to any senior position within DHS.

68.     Defendant Albence is the Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement. Albence has never been confirmed by the Senate to any position within DHS. ICE has not had a Senate-confirmed director during the entirety of President Trump's time in office.

69.     The large number of acting officials at DHS, and throughout the Trump administration, is part of a deliberate strategy, as the president explained in 2019: "I like 'acting' because I can move so quickly. It gives me more flexibility."

70.     But the president's reliance on acting officials deprives Congress of its constitutional role to oversee appointments to key positions within the government, and removes a crucial check on the president's exercise of power. The consequences are now playing out on the streets of Portland.

**D. Defendants Develop a Pretextual Scheme to Deploy Federal Agents as a National Police Force in Portland and Other Cities to Quash Protests for Black Lives**

71.     As President Trump made repeated threats to send federal law enforcement to "take over" American cities in June and July, Defendants sprang into action to carry them out.

72.     On June 26, President Trump issued an executive order on "Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Activity." The executive order purports to respond to "[s]tate and local public officials' abdication of their law enforcement responsibilities" with respect to the nationwide protests against police brutality. The order directs the Secretary of Homeland Security to provide "personnel to assist with the protection of Federal monuments, memorials, statues, or property."

73.     Pursuant to President Trump's executive order, Defendant Wolf announced on July 1 the formation of the Protecting American Communities Task Force (PACT) within DHS. PACT was charged with "conduct[ing] ongoing assessments of potential civil unrest or destruction and allocat[ing] resources to protect people and property," including "potential surge activity to ensure the continuing protection of critical locations."

74.     Defendants selected Portland, Oregon, for the first deployment of PACT resources.

75.     On or about July 4, Defendant Wolf ordered federal officers from FPS, ICE, and CBP—all components of the DHS—to Portland, in what Defendants have termed Operation Diligent Valor. Since the protests began in May, the Hatfield courthouse and other nearby buildings have had graffiti written on them and suffered property damage such as broken windows. This damage would become the purported justification for the deployment of more than one hundred federal agents to Portland—an unprecedented use of DHS agents to police an American city.

76.     Ordinarily, responsibility for protecting federal property lies with the FPS, which has over 1,000 law enforcement officers and investigators.

77.     In addition, the Secretary of Homeland Security may transfer other DHS employees to the Federal Protective Service specifically "for duty in connection with the protection of" federal property. 40 U.S.C. § 1315(b)(1). DHS employees designated as FPS agents and officers are limited to actions only "to the extent necessary to protect the property and persons." *Id.*

78.     Defendant Wolf designated approximately 114 ICE and CBP agents as FPS agents for purposes of Operation Diligent Valor.

79.     Those agents include members of the Border Patrol Tactical Unit ("BORTAC"), an elite unit that typically serves high-risk warrants and raids stash houses. BORTAC agents are trained to use weapons ranging from pistols to sniper rifles, but they are not trained to police mass protests protected by the First Amendment.

80.     Upon information and belief, as part of Operation Diligent Valor, DHS established a policy bore little connection to the limited purpose of the protection of federal property. Specifically, DHS established a policy to intimidate and deter protesters because of their views and beliefs through a number of means: surveillance; the use of militarized and unidentified force; the excessive deployment of crowd-control measures such as tear gas, pepper-spray balls, and less-lethal munitions; and warrantless arrests or custodial detentions without probable cause ("the Policy").

81.     U.S. Marshals Service officers were also present in Portland, operating side-by-side with DHS agents. Upon information and belief, Defendants Barr and Washington directed USMS agents to follow the DHS Policy.

82.     Statements by White House and administration officials reveal that Operation Diligent Valor and the Policy are intended to quell lawful protests, not to protect federal property.

83.     At a White House event on July 13, President Trump claimed that "[f]ar-left mayors are escalating the anti-cop crusade, and violent crime is spiraling in their cities." He pledged to be "very strong on law enforcement" by sending federal officers to "liberally run" jurisdictions—"even if we have to go in and take over cities."

84.     President Trump admitted that federal agents were deployed to Portland specifically to quell protests: "We've done a great job in Portland. Portland was totally out of control, and they went in and, I guess, we have many people right now in jail. And we very much quelled it. And if it starts again, we'll quell it again very easily."

85.     In a Fox News interview on July 17, Defendant Cuccinelli asserted that President Trump is determined "to help restore peace to these beleaguered cities," including Portland.

86.     On July 20, Defendant Cuccinelli told CNN, "We will maintain our presence," and admitted, "When that violence recedes and those threats recede, that is when we would ratchet back down to what I would call normal presence defending and protecting federal facilities."

87.     At times, federal officials have suggested that they need permission from local and state governments to send agents to the cities. At his July 13 event, President Trump acknowledged that the federal government is "supposed to wait for [cities] to call, but they don't call."

88.     Similarly, in a Fox News interview on July 6, Defendant Wolf reiterated that DHS needed "to be invited and have those state and local authorities ask for the federal government's help."

89.     But Portland officials did not request the deployment of federal law enforcement officers, and have demanded that they leave the cities.

90.     On July 14, Oregon Governor Kate Brown asked Defendant Wolf to withdraw the federal officers from the city, saying that "it's like adding gasoline to a fire."

91.     Five days later, Portland Mayor Ted Wheeler said that the federal presence in the city is exacerbating the situation. Federal officers "are not wanted here," he said. "We haven't asked them here. In fact, we want them to leave."

92.     Portland City Commissioner Jo Ann Hardesty also called on federal officers to leave, saying that they had "escalated tensions and put countless Portlanders exercising their First Amendment rights in greater danger."

93.     Not only have Defendants refused to end the deployment of federal agents to Portland, they have promised to send federal agents from DHS and DOJ to a number of other cities, including Seattle and Chicago. Senior administration officials reportedly told reporters that they expect to send federal agents anywhere there is unrest, and that they expect the unrest to last until the November 2020 presidential election.

**E.  Federal Agents Attempt to "Quell" Lawful Protests in Portland**

94.     Pursuant to the Policy, since on or around July 4, federal agents have engaged in an all-out effort to "quell" the Portland protests in violation of the First, Fourth, and Fifth Amendments. This conduct demonstrates that their mission far exceeds the stated purpose of protecting federal property.

95.     In accordance with the Policy, DHS personnel have engaged in a program of surveillance, unlawful arrests, and excessive force designed to intimidate and deter protesters.

96.     Federal agents have extended their operations far from the immediate vicinity of the courthouse. Plaintiff James has seen the federal agents drive the protesters as far as five blocks away from the courthouse, using clubs and batons to force them to move.

97.     On July 24, federal agents assaulted protesters outside the federal courthouse with tear gas, flash grenades, and pepper-spray balls, and drove the crowd more than two blocks away from the courthouse, declaring, "This is an unlawful assembly." When the agents' advance stopped, the courthouse was out of view.

98.     According to a Department of Homeland Security briefing memorandum prepared for Defendant Wolf, the DHS personnel assigned to Operation Diligent Valor "do not specifically have training in riot control or mass demonstrations. *Moving forward*, if this type of response is going to be the norm, specialized training and standardized equipment should be deployed to responding agencies" (emphasis added).

*Widespread Surveillance of Protesters*

99.     As referenced above, in connection with President Trump's June 26 executive order, DHS launched an expansive program of domestic surveillance that goes far beyond the limited need to protect federal property. Pursuant to an internal unclassified DHS policy document, the DHS Office of Intelligence & Analysis has authorized its intelligence officers to surveil protesters if the agency determines that they pose "[t]hreats to damage or destroy an

public monument, memorial, or statue"—"*regardless of whether such structures are situated on Federal property*" (emphasis added).[3]

100.    The DHS intelligence directive further indicates that DHS analysts can collect information about "individuals or groups" whom they "reasonabl[y] belie[ve]" threaten to damage or destroy any public monument, including "their tactics, techniques, or procedures," and "information that otherwise informs an overall assessment that threats to [monuments] will materialize."

101.    In other words, Defendants are operating under a directive that minor property damage to a non-federal monument or statue—a "threat" the agency for the first time characterizes as a matter of homeland security—justifies a significant expansion of the sweep of the federal government's authority to collect intelligence on its residents.

*Unlawful Warrantless Arrests*

102.    Upon information and belief, the Policy authorizes agents to arrest or detain protesters without probable cause, in retaliation for their participation in protests against police brutality. Many of these arrests have been made by agents in unmarked military-style camouflage uniforms, operating out of unmarked vans. That bears no resemblance to the usual *modus operandi* of federal courthouse protective services.

103.    For example, at approximately 2 a.m. on Wednesday, July 15, Mark Pettibone and Conner O'Shea were walking home from a peaceful protest in Portland when an unmarked van stopped near them, two blocks away from the Mark O. Hatfield federal courthouse.

---

[3] Steve Vladeck & Benjamin Wittes, *DHS Authorizes Domestic Surveillance to Protect Statues and Monuments*, Lawfare (July 20, 2020), https://www.lawfareblog.com/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments.

104.    According to O'Shea, agents "in camo jump[ed] out and start[ed] charging at [them]." The men were not wearing badges or other identifying insignia on their uniforms.

105.    The men, who have since been identified as CBP officers, arrested Pettibone, searched him, and took him to the Hatfield courthouse, where he was detained in a holding cell. Officers read him his Miranda rights. After he declined to answer their questions, he was released. Officers never charged Pettibone with a crime or explained why he had been stopped.

106.    In its own account of one such warrantless arrest on July 15, the federal government admitted that the federal agents never had probable cause.

107.    The video of the July 15 arrest shows two combat-uniformed, masked, and helmeted federal officers grabbing a man from a sidewalk outside of federal property and pushing him into an unmarked van, which the officers then drive away.

108.    As FPS Deputy Director Richard "Kris" Cline described in a July 21 press conference, the two CBP officers had followed the man and forcibly removed him to another location to question him.

109.    Cline admitted that the officers were interested in the man because they had seen him among a crowd that included an individual aiming a laser at officers' eyes. But they had no specific reason to believe that he had aimed the laser pointer.

110.    The officers never had probable cause to detain the man. Standing near another individual who may have broken the law cannot provide reasonable grounds for law enforcement officers to arrest someone. And, indeed, after nearly twenty minutes of interrogation, Cline admitted that the officers "released the individual because they did not have what they needed"—namely, probable cause.

*Use of Excessive Force Against Peaceful Protesters*

111.    Also pursuant to the Policy, federal agents have committed physical assaults against peaceful protesters who pose no threat to federal property, including the repeated use of tear gas, flash-bang grenades, and other munitions against groups of protesters in downtown Portland.

112.    Tear gas causes irritation to the area of contact within seconds of exposure, including eye burning, excessive tearing, blurred vision, and redness; runny nose and nasal burning and swelling; mouth burning, irritation, difficulty swallowing, and drooling; chest tightness, coughing, choking sensation, wheezing, and shortness of breath; and burns and skin rash. Some people experience nausea and vomiting. All of these symptoms can last for weeks after exposure.

113.    The use of tear gas is, by its very nature, indiscriminate. Anyone in the area will breathe it in and be harmed by the gas.

114.    Federal agents in Portland use tear gas in a predictable pattern. In her near-nightly attendance at the protests, Plaintiff James has observed that federal agents begin to fire tear gas between 11:30 p.m. and 1:00 a.m. to disperse the crowd, even when there has been no indication of protester violence or property damage, and even when federal agents are located safely behind a fence outside the courthouse. She has witnessed federal agents shoot protesters with rubber bullets, pepper-spray balls, and other munitions even when they have not been engaged in acts of violence and even when they have stood blocks away from the federal courthouse and posing no threat to the courthouse.

115.    Federal agents have also assaulted multiple protesters directly, on several occasions leading to serious injuries.

116.    For example, on July 11, federal officers from the U.S. Marshals Service shot and severely injured a protester, Donovan LaBella, with a less-lethal impact munition while he was peacefully protesting across the street from the Hatfield federal courthouse. LaBella was rendered unconscious and bleeding from the assault.

117.    LaBella was only recently released from the hospital. His skull was fractured, and he underwent facial reconstructive surgery in the hours after the encounter. LaBella also had a tube in his skull to drain blood and had vision problems in one eye from the injuries sustained. He continues to have difficulty with impulse control, which may be a permanent brain injury.

118.    In another incident in the early hours of July 18, a wall of heavily armed federal agents, wearing gas masks and helmets, fired pepper-spray balls at an unarmed and unprotected nude protester.

119.    So-called "pepper-spray balls" are projectiles that release a powdered substance that has effects similar to pepper spray. They therefore carry the dangers inherent in any projectile that is shot at someone, as well as the dangers of pepper spray.

120.    At least one graphic video shows a dozen federal agents shooting pepper-spray balls in quick succession at the unnamed protester, dubbed "Naked Athena," as she walked toward the agents standing guard at an intersection in downtown Portland. "Athena" was wearing nothing but a face mask and stocking cap.

121.    Later the same day, U.S. Naval Academy graduate Christopher David attended his first-ever protest in front of the Hatfield federal courthouse. He planned to ask the officers about the oaths they had sworn to the Constitution, which he believed they were violating.

122.     As David approached the U.S. Marshals in front of the courthouse, he stayed in the middle of the street and did not step onto federal property. Nonetheless, federal officers pushed him back, and when he did not retreat, they began beating him with batons.

123.     An officer pepper-sprayed his face from point-blank range. The pepper spray burned David's eyes and blurred his vision. As he sought shelter, he walked into a cloud of gas that "made him cough and retch." David, a former member of the Navy's Civil Engineer Corps, believes that he "was walking through a giant cloud of CS gas."

124.     David later learned at the hospital that the officers had broken his right hand in two places. He will need reconstructive surgery and as a result of the beating is no longer going out to protest.

### F.  Defendant Wolf Was Unlawfully Purporting to Serve as Department of Homeland Security Secretary When He Enacted the Policy and Ordered the Deployment of Federal Agents

125.     Defendant Wolf has enacted the Policy and designated ICE and CBP agents as FPS agents for purposes of Operation Diligent Valor despite the fact that he has no legal authority to do so. Defendant Wolf's exercise of the functions and duties of the Office of the DHS Secretary violates the Constitution and other applicable federal laws.

126.     Defendant Wolf has purported to be Acting Secretary of the Department of Homeland Security since November 13, 2019, but he has no legally valid claim to that title. He therefore lacked authority to promulgate the Policy or to designate and deploy DHS employees as FPS agents. Those actions are thus illegal and void.

*Legal Background*

127.     The Appointments Clause of the U.S. Constitution provides that the president

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme

Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

128.     The Secretary of Homeland Security is a "principal" (rather than "inferior") Officer, and thus the Appointments Clause requires that the person holding that office be appointed by the President "with the Advice and Consent of the Senate." *Id.*

129.     And federal statutory law explicitly requires the Secretary of Homeland Security to be nominated by the president and confirmed by the Senate. *See* 6 U.S.C. § 112(a)(1).

130.     The Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.* ("FVRA"), is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless a statute provides otherwise. 5 U.S.C. § 3347(a). Among its many provisions, the FVRA limits the time during which an office may be filled by an acting official. In general, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs." *Id.* § 3346.

131.     The misuse of acting officials, in violation of the Advice and Consent Clause, has been a chronic abuse of the Trump administration, including at the U.S. Department of Justice.

132.     In the case of the DHS, an agency-specific statute—the Homeland Security Act ("HSA")—rather than the FVRA, governs the order of succession for the position of Acting Secretary of Homeland Security when the office of the Secretary is vacant. *See* 6 U.S.C.

§ 113(a)(1)(A), (g). Thus, when the Office of the DHS Secretary is vacant, the president lacks the authority to select an acting officer under the FVRA.

133.    Specifically, the HSA provides that vacancies in the Office of the Secretary of Homeland Security are to be filled by the Deputy Secretary of Homeland Security and then, if that Office is likewise vacant, by the Under Secretary for Management. *Id.* § 113(a)(1)(A), (g)(1). Where the Offices of both the Deputy Secretary of Homeland Security and Under Secretary for Management are vacant, the HSA provides the option of a secretary-established order of succession. *Id.* § 113(g)(2).

134.    The DHS has established multiple orders of succession and/or delegations pertaining to the Office of the Secretary and other DHS positions. Those documents are contained in a broader directive, entitled *DHS Orders of Succession and Delegations of Authorities for Named Positions*, Dep't of Homeland Sec., Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) ("DHS Orders").

135.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.A of the DHS Orders stated in full that: "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, *the orderly succession of officials is governed by Executive Order 13753*, amended on December 9, 2016." *Id.* (emphases added).

136.    Executive Order 13753, in turn, set the order of succession at DHS in cases of resignation of the Secretary. That order establishes that succession to the Acting Secretary role must be, in order:

      i.        Deputy Secretary of Homeland Security;

      ii.       Under Secretary for Management;

      iii.      Administrator of the Federal Emergency Management Agency;

iv.      Under Secretary for National Protection and Programs;

v.      Under Secretary for Science and Technology;

vi.      Under Secretary for Intelligence and Analysis; and

vii.      Commissioner of U.S. Customs and Border Protection.

137.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.B of the DHS Orders additionally provided: "I [Secretary of Homeland Security] hereby delegate to the officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*." DHS Orders § II.B (emphases added).

138.    As of April 10, 2019, Annex A, which applied *only* when the Secretary is "unavailable to act during a disaster or catastrophic emergency," placed the Commissioner of U.S. Customs and Border Protection third, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management. DHS Orders, Annex A. If, however, the Secretary of Homeland Security resigned, the Commissioner of U.S. Customs and Border Protection remained seventh in the standard order of succession. *See* Exec. Order No. 13753 § 1.

*Secretary Nielsen's Resignation and Installation of*
*Kevin McAleenan as Purported Acting Secretary*

139.    The last Senate-confirmed Secretary of Homeland Security, Kirstjen Nielsen, resigned her position effective no later than April 10, 2019.

140.    On or about April 9 or 10, 2019, Nielsen issued an amendment to Annex A of the DHS Orders ("April 2019 Amendment"). Again, by its explicit terms Annex A only applies when the Secretary is "unavailable to act *during a disaster or catastrophic emergency*." The only action directed by the April 2019 Amendment was to "strik[e] the text of such Annex [A] in its

entirety and insert" a different list of positions "in lieu thereof." The inserted text listed the Commissioner of U.S. Customs and Border Protection third behind the Deputy Secretary of Homeland Security and Under Secretary for Management. The Amendment to Annex A labeled and identified the Annex not as an "order of succession," but instead as an "order for delegation of authority."

141.    Annex A did not—and does not—apply to succession in the case of resignation of the Secretary of Homeland Security. The April 2019 Amendment did not direct any changes to the text of Section II.A of the DHS Orders. Thus, after faithfully and fully applying the April 2019 Amendment, Section II.A of the DHS Orders still required following the order of succession specified in Executive Order 13753 in the event of a Secretary's resignation.

142.    Despite the order of succession, on April 11, 2019, Kevin McAleenan, who was then serving as CBP Commissioner, purported to assume the position of Acting Secretary.

143.    Under the DHS Orders, however, two other Senate-confirmed individuals were ahead of McAleenan to succeed to that Office: Christopher Krebs, who then served as the Senate-confirmed Under Secretary for National Protection and Programs, and David Glawe, who then served as the Senate-confirmed Under Secretary for Intelligence and Analysis.

144.    Because McAleenan's purported succession was unlawful under the HSA and DHS Orders of Succession and Delegations, he had no valid legal claim to the Office of Acting DHS Secretary and could not lawfully exercise the authority of that office.

*McAleenan's Resignation and Defendant Wolf's Purported Succession
to the Office of Acting DHS Secretary*

145.    On November 8, 2019, the 211th day of McAleenan's purported tenure, he issued a directive attempting to amend the order of succession for the Secretary of Homeland Security to elevate Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency.

31

Unlike Secretary Nielsen's April 2019 Amendment, Mr. McAleenan *did* purport to change Section II.A of the DHS Orders such that, like Section II.B, it would now rely upon Annex A to establish the order of succession; thus Annex A for the first time would apply in the case of resignation by the Secretary of Homeland Security. *See* Amendment to the Order of Succession for the Secretary of Homeland Security. Mr. McAleenan's attempted change would have been superfluous if Annex A had otherwise already applied in the case of resignations.

146.    Mr. McAleenan likewise purported to change the order of the positions listed in Annex A, moving the position of Under Secretary for Strategy, Policy, and Plans to fourth in line, behind only the then-vacant Offices of Deputy Secretary of Homeland Security and Under Secretary for Management, as well as the Office then held by Mr. McAleenan, Commissioner of U.S. Customs and Border Protection. *Id.*

147.    Mr. McAleenan's attempted directive was without force of law because Mr. McAleenan was invalidly serving under the applicable DHS order of succession. Furthermore, even if McAleenan was appointed under the FVRA, he had exceeded the 210-day time limit for acting-official service set forth in that statute.

148.    Mr. McAleenan thereafter resigned. On November 13, 2019, relying on Mr. McAleenan's invalid succession directive, Defendant Wolf, who had been confirmed as Under Secretary for Strategy, Policy, and Plans on that same day, purported to become Acting Secretary of Homeland Security.

149.    Mr. Wolf could not have served as Acting Secretary of Homeland Security, however, because Mr. McAleenan was without authority to make changes to DHS's succession order.

150.   Furthermore, Mr. Wolf could not have served as Acting Secretary under the FVRA because the 210-day limit on such service expired before he purported to assume the Office. On November 6, 2019, the Office of the DHS Secretary had been vacant for 210 days since April 10, 2019, the date that former Secretary Nielsen purported to leave office. After November 6, 2019, at the latest, the FVRA required the office to "remain vacant" until the president submitted a new nominee for Senate confirmation. 5 U.S.C. § 3348(b)(1). Defendant Wolf began serving as Acting DHS Secretary on November 13, 2019, after the 210-day period under the FVRA had passed. Defendant Wolf has never been nominated by the president to serve as Secretary of Homeland Security.

151.   After November 6, 2019, at the latest, and continuing to today, no officer or employee could perform the functions and duties of the Office of the DHS Secretary under the FVRA, unless and until the president submitted a new nominee for Senate confirmation. Since Secretary Nielsen left office, and as of the filing of this Complaint, President Trump has not submitted a new nominee for the position of DHS Secretary to the Senate for confirmation.

**G.  The Unlawful Policy Directed by Defendant Wolf and other Defendants Has and Continues to Injure Plaintiffs**

152.   Defendants' unlawful policy has injured each of the Plaintiffs in concrete ways. Defendants have frustrated Don't Shoot Portland's core organizational mission of advocating for its views about police mistreatment of Black people. Defendants have also forced the organization to divert resources in order to address and respond to the challenged federal policy. In addition, the members of Wall of Moms and individual Plaintiffs have suffered actual bodily injury from Defendants and continue to fear additional bodily injury. They have suffered economic injury in required expenses to protect themselves from Defendants and medical costs.

And they have suffered constitutional injury through violation of their First, Fourth and Fifth Amendment rights.

*Don't Shoot Portland's Mission Is Frustrated and It Is Forced to Divert Substantial Resources*

153.     As set forth above, the mission of Don't Shoot Portland is to advocate and provide support for individuals wishing to exercise their First Amendment rights to organize, protest, and create art for social change. In addition, a substantial activity of Don't Shoot Portland is to provide mutual aid and support to Black Lives Matter protesters to enable them to engage in First Amendment activity in safe and healthy ways.

154.     A particular focus of the organization has been to supply Black Lives Matter organizers with materials to protect protesters during the COVID-19 pandemic. In particular, it provides organizers with personal protective equipment like facemasks and hand sanitizer; first aid kits; baking soda and other items to provide relief from tear gas; as well as food, water, temporary shelter, and transportation. The supplies provided by Don't Shoot Portland are all lawful and used to protect the health of peaceful protesters.

155.     The unlawful deployment of federal officers has made it substantially more difficult for Don't Shoot Portland to advance its mission of facilitating and supporting First Amendment activity in support of Black lives. As a result of the Policy, participating in lawful protests has become more difficult and dangerous.

156.     Defendants' unlawful policy has also caused the damage and destruction of Don't Shoot Portland's property. Since federal troops have come to Portland, Don't Shoot Portland receives calls from organizers at the protest at least twice per week requesting that supplies be replenished because they have been destroyed by federal officers, either directly or through the

excessive use of tear gas and other chemical munitions contaminating supplies and rendering them unusable.

157.    In addition, Don't Shoot Portland has been required to divert and expend thousands of dollars of funds and extensive time as a result of the Policy. Additional purchases and labor are required to find and replace supplies destroyed by Defendants.

*Wall of Moms Members and Other Individual Plaintiffs*
*Suffer Physical, Economic, and Constitutional Harms*

158.    The Policy has also injured the members of Wall of Moms and other individual plaintiffs.

159.    While Ms. Barnum and other Wall of Moms members have been engaged in peaceful protest, federal officials acting pursuant to the Policy have attacked Wall of Moms members on multiple consecutive nights. In particular, Ms. Barnum and others have been shot with flash-bangs at a close distance; repeatedly tear-gassed; and shot at with additional projectiles (including rubber bullets, bean bag rounds, and rock salt).

160.    These attacks on Ms. Barnum by Defendants have caused severe and prolonged bodily injury and trauma. Federal agents' tear gas has made Ms. Barnum repeatedly vomit (including on herself and others) and caused burning eyes. Even a day after being gassed, she feels like she is in a toxic cloud, and the after-effects of tear gas prevent eating and sleeping in more than two-hour increments. The weapons that federal agents have shot at Ms. Barnum have caused pain in her jaw, ears, neck, and skin. These attacks have also caused substantial trauma and fear of repeated injury for exercising her lawful rights to peacefully protest.

161.    Ms. James has also been assaulted by federal agents implementing the Policy including through being shot at with paint balls and pepper-spray balls, and then shot with rubber

bullets on different days. Being shot directly with these items caused Ms. James substantial pain. It has also caused emotional distress, as she fears she will be kidnapped by federal agents.

162.    Ms. Hester has been repeatedly subjected to tear gas from federal agents at the protests, which have caused her face and skin to burn for hours after she returns home. She feels nauseated and congested the days after she protests, and her symptoms from the previous night do not subside before the next night of protests arrives.

163.    Ms. Cerquera has suffered similar injuries from being tear-gassed and sprayed with pepper-spray balls. The federal agents' presence at the protests has also caused emotional distress, as she fears she will be kidnapped by federal agents.

164.    In addition to these physical and emotional injuries, Plaintiffs have suffered economic harm. They have been forced to purchase protective and medical supplies to mitigate their injuries. They have also had substantial personal property damaged or destroyed by federal agents acting pursuant to the Policy.

165.    In addition to the physical and economic injuries they have suffered, Wall of Moms members and individual Plaintiffs have all been deprived of or chilled in the exercise of their constitutional and civil rights. Plaintiffs have been forced by federal agents' use of tear gas and other munitions to leave the lawful protests. Federal agents have thus violated Plaintiffs' First and Fourth Amendment rights. Each fears that they will be shot, tear-gassed, or otherwise assaulted for participating in peaceful speech and association protected by the First Amendment, because of the viewpoint they espouse. Plaintiffs also fear they will be subject to unlawful and arbitrary arrest without probable cause. Notwithstanding the Policy to silence them, most of Plaintiffs have continued to place themselves at risk of further injury to continue to engage in First Amendment protected activity.

166. But not all. Dr. Kipersztok is being denied her right to participate in peaceful protest because Defendants' Policy has created a chilling effect. Before the arrival of federal agents, Dr. Kipersztok, an obstetrician and family physician, participated in lawful protest. After federal agents were deployed under Operation Diligent Valor, she intended to continue to exercise her right of protest against this show of federal force against fellow Portlanders. However, after watching reports of the federal agents' use of force, she reasonably fears that attending these demonstrations would put her at serious risk of debilitating injury from federal agents. News coverage has made clear to her that the federal officers have used tear gas and less-lethal weapons indiscriminately at the crowd—even against peaceful protesters who are not on federal property. Dr. Kipersztok understands that she risks being shot or tear-gassed by federal agents, which could lead her to be hospitalized and therefore unable to care for her patients. Dr. Kipersztok cannot risk her own health—and therefore the health of so many others—in this way.

167. Dr. Kipersztok also fears that by attending a protest in federal officers' presence, she would be arrested without probable cause and taken away in an unmarked van, which would both prevent her from caring for her patients and would cause professional and reputational harm. Dr. Kipersztok wishes to continue to attend in-person demonstrations to stand up for equal rights for all and fight for her patients' right to live—but she cannot do so for fear of serious physical injury or unlawful arrest.

168. In sum, the Policy has caused serious and ongoing injuries, in many forms, to each of the organizational and individual Plaintiffs. They come to this Court seeking relief for these ongoing harms so that they may exercise their constitutional rights without fear of physical injury, arrest—or worse.

## CLAIMS FOR RELIEF

### COUNT I

**(Violation of the Administrative Procedure Act by Violations of 40 U.S.C. § 1315 — DHS, CBP, ICE, FPS, Wolf, Cuccinelli, Morgan, Albence, Patterson)**

169.     Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

170.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

171.     An agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

172.     Defendants DHS, FPS, CBP, ICE, Wolf, Cuccinelli, Morgan, Albence, and Patterson (the "DHS Defendants") have acted outside of their statutory authority in violation of 40 U.S.C. § 1315 and therefore in violation of the APA.

173.     Under 40 U.S.C. § 1315(b)(1), the Secretary of Homeland Security

may designate employees of the Department of Homeland Security, including employees transferred to the Department from the Office of the Federal Protective Service . . . as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

174.     The statute does not authorize these "designate[d] employees" to act as officers or agents to act beyond "the extent necessary" to protect federal property and persons on the property.

175.     Upon information and belief, the DHS Defendants have deployed these employees "designate[d]" as FPS "officers and agents" according to a policy to intimidate and

deter protesters because of their views and beliefs through surveillance; the use of militarized

and unmarked force; the excessive deployment of crowd-control measures such as tear gas,

pepper-spray balls, and less-lethal munitions; and warrantless arrests or custodial detentions

without probable cause ("the Policy"). This policy exceeds statutory authority, which permits the

deployment of DHS employees as FPS officers and agents only "to the extent necessary to

protect the property and persons on the property." 40 U.S.C. § 1315(b)(1).

176.    Defendant Wolf's establishment of the Policy, designation of ICE and CBP

employees to serve as FPS officers, and deployment of those officers to Portland, are final

agency actions in excess of statutory authorities.

177.    These "officers and agents" have conducted arrests and seizures—including

warrantless arrests and seizures without probable cause—that are not "in connection with the

protection of property owned or occupied by the Federal Government and persons on the

property."

178.    Statements from government officials, including the president, have made it clear

that these arrests are in accordance with the Policy and intended to intimidate and deter

protesters because of their views and belief, not to protect federal property. The president stated

in a press conference, in reference to Portland, "We very much quelled it, and if it starts again,

we'll quell it again very easily. It's not hard to do, if you know what you're doing."[4]

179.    The DHS Defendants have therefore acted outside of their lawful authority, in a

manner "not in accordance with law" in violation of 5 U.S.C. § 706(2)(A) and "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of

5 U.S.C. § 706(2)(C).

---

[4] Katie Shepherd and Mark Berman, *'It Was Like Being Preyed Upon': Portland Protesters Say Federal Officers in Unmarked Vans Are Detaining Them*, Wash. Post (July 17, 2020), https://www.washingtonpost.com/nation/2020/07/17/portland-protests-federal-arrests/.

180.     Through their actions as described in this Complaint, the DHS Defendants have violated the substantive requirements of the APA. The DHS Defendants' violations inflict ongoing harm upon Plaintiffs.

## COUNT II

### (Violation of the Administrative Procedure Act by Arbitrary & Capricious Agency Action — DHS, CBP, ICE, FPS, Wolf, Cuccinelli, Morgan, Albence, Patterson)

181.     Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

182.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

183.     The DHS Defendants have acted arbitrarily and capriciously and therefore in violation of the APA.

184.     Under 40 U.S.C. § 1315(b)(1), the designation of DHS employees as FPS officers and agents is limited to duty "in connection with the protection of" federal property and persons on that property.

185.     The DHS Defendants intend to, by deploying officers who are operating pursuant to the Policy, quell protests against police brutality and systemic racism.

186.     The only justification that DHS Defendants have put forth for adoption of the Policy is a pretext, and therefore their adoption of the policy is arbitrary and capricious, and therefore in violation of the APA.

187.     Through their actions as described in this Complaint, Defendants have violated the substantive requirements of the APA by acting arbitrarily and capriciously. Defendants' violations inflict ongoing harm upon Plaintiffs.

**COUNT III**
**(Violation of the First Amendment Freedoms of Speech, Assembly, and Petition — All Individual Defendants)**

188.    Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

189.    Defendants' practice of deploying physical force against demonstrators to remove them from places in which they have gathered with others to express their political opinions, as manifest by their actions against Plaintiffs and other protesters in Portland in July 2020 and by their repeated threats to deploy violence against protesters demonstrating against racial injustice generally and in Portland specifically, and by President Trump's statements at ¶¶ 54, 56, 83-85, violates Plaintiffs' First Amendment rights of freedom of speech and assembly.

190.    First, the individual Defendants have threatened violence against protesters engaged in public demonstrations, a form of core First Amendment-protected conduct; the retaliatory violence would be sufficient to deter a person of ordinary firmness in Plaintiffs' positions from speaking again; and the threatened violence would be causally related to Plaintiffs' exercise of their constitutional rights. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Among other things, Defendants have enacted a policy of arresting protesters without probable cause in retaliation for their First Amendment-protected activity. *See Nieves v. Bartlett*, 139 S. Ct. 1715 (2019); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).

191.    Second, Defendants' violent actions, and threats of future violent actions, are based on the viewpoint being expressed by the demonstrators—namely, opposition to police brutality and systemic racism. *See Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015).

41

192.    By depriving Plaintiffs of the opportunity to express their views, retaliating against them for their expressive activities, and discriminating against them on the basis of their viewpoints, Defendants have violated Plaintiffs' First Amendment rights and are imposing ongoing irreparable harm upon those Plaintiffs.

**COUNT IV**
**(Violation of the Fourth Amendment Right to Freedom from Unreasonable Seizure — All Individual Defendants)**

193.    Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

194.    Defendants have adopted a practice of deploying physical force, without provocation or legal grounds to do so, to compel demonstrators to move.

195.    The use of physical force, including but not limited to tear gas and pepper-spray balls, to force Plaintiffs to leave the protest area without a warrant or probable cause to arrest them, violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizures.

196.    Through their actions as described in this Complaint, the individual Defendants have violated the Fourth Amendment. Defendants' violations inflict ongoing harm upon Plaintiffs.

**COUNT V**
**(In the Alternative to Count IV, Violation of the Fifth Amendment Right to Due Process — All Individual Defendants)**

197.    Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

198.    In the alternative to the Plaintiffs' claims under the Fourth Amendment, through their actions as described in this Complaint, the individual Defendants have violated the Fifth Amendment.

199.    Defendants have adopted a practice of deploying physical force, without provocation, warning, or legal grounds to do so, against peaceful protesters.

200.    Using physical force, including but not limited to tear gas and pepper-spray balls, against Plaintiffs while they are engaged in peaceful protests, including for the purpose of forcing Plaintiffs to leave the protest area, violates Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution to be free from arbitrary government action. *See City of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

201.    Defendants' violations inflict ongoing harm upon Plaintiffs.

**COUNT VI**
**(Violation of the Administrative Procedure Act by Violation of the Constitution — All Defendants)**

202.    Plaintiffs reallege and incorporate by reference all other paragraphs as if set forth fully herein.

203.    The APA requires courts to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

204.    Upon information and belief, the DHS Defendants have adopted a Policy of deploying these employees "designate[d]" as FPS "officers and agents" in a manner not authorized by statute: namely, to intimidate and deter protesters because of their views and beliefs through surveillance; the use of militarized and unmarked force; the excessive deployment of crowd-control measures such as tear gas, pepper-spray balls, and less-lethal munitions; and warrantless arrests or custodial detentions without probable cause.

205.    Defendants have made clear they intend to continue following this Policy, including the extreme and obvious ongoing Fourth Amendment violations of unlawful warrantless arrests without probable cause. The Fourth Amendment permits warrantless arrests or "detention for custodial interrogation—regardless of its label"—only where the arresting officer has probable cause to believe that the person being arrested or detained has committed a crime. *Dunaway v. New York*, 442 U.S. 200, 216 (1979).

206.    Similarly, upon information and belief, Defendants DOJ, USMS, Barr, and Washington have adopted a policy of deploying U.S. Marshals to intimidate and deter protesters because of their views and beliefs through surveillance; the use of militarized and unmarked force; the excessive deployment of crowd-control measures such as tear gas, pepper-spray balls, and non-lethal munitions; and warrantless arrests or custodial detentions without probable cause, which is not authorized by statute, 28 U.S.C. § 566.

207.    Defendants' adoption of these policies are final agency actions.

208.    These final agency actions violate the First, Fourth, and Fifth Amendments, as explained in paragraphs 188-201 above.

209.    The Agency Defendants' actions are therefore "contrary to constitutional right, power, privilege, or immunity" in violation of the APA. 5 U.S.C. § 706(2)(B).

210.    Through their actions as described in this Complaint, all agency Defendants have violated the substantive requirements of the APA by violating the U.S. Constitution. Defendants' violations inflict ongoing harm upon Plaintiffs.

**COUNT VII**
**(Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2 — Defendant Wolf)**

211.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

212.     The Secretary of Homeland Security is a principal officer of the United States whose appointment requires presidential nomination and Senate confirmation.

213.     Defendant Wolf is performing the functions and duties of the Secretary even though he has not been confirmed by the Senate to hold that office and there is no legal basis for him to exercise the functions and duties of that office.

214.     Defendant Wolf's exercise of those functions and duties without having been confirmed by the Senate or otherwise having the legal authority to exercise them violates the Appointments Clause. His purported change to DHS policy is therefore invalid and void.

**COUNT VIII**
**(Unlawful Appointment Under 6 U.S.C. §§ 112-113 and/or the Federal Vacancies Reform Act — Defendant Wolf)**

215.     Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

216.     The Secretary of Homeland Security may be appointed by the president only with the advice and consent of the Senate. 6 U.S.C. § 112(a)(1).

217.     When the Office of the Secretary is vacant, the order of succession is governed by 6 U.S.C. § 113 and relevant agency succession orders.

218.     Pursuant to those authorities, Defendant Wolf is not legally authorized to hold the position of Acting Secretary or perform the functions and duties of that office.

219.     Furthermore, even if the FVRA governed—which it does not—Defendant Wolf would still not be legally authorized to hold the position of Acting Secretary or perform the functions and duties of that office, because the applicable time limit has expired (and had already expired at the time that Defendant Wolf purported to assume the role of Acting Secretary).

220.    Because Defendant Wolf is performing the functions and duties of the Secretary of Homeland Security without having been nominated by the president or confirmed by the Senate, and without any other legal authority to do so, his purported change to DHS policy is invalid and void.

## COUNT IX
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) — Defendant Wolf)

221.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

222.    Because Defendant Wolf has been unlawfully serving as Acting Secretary of Homeland Security since November 13, 2019, and has had no authority to take any actions in that capacity, his purported change to DHS policy violates the APA and is invalid and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.    Declare that

a.    Congress has only authorized DHS to operate pursuant to specific statutory authorities, as relevant here to protect federal property as set forth in 40 U.S.C § 1315;

b.    DHS policies, orders, and directives that purport to direct DHS assets deployed to Portland under the auspices of the Federal Protective Service to operate pursuant to a policy to intimidate and deter protesters because of their views and beliefs through surveillance; the use of militarized and unmarked force; the excessive deployment of crowd-control measures such as tear gas, pepper-spray balls, and less-

lethal munitions; and warrantless arrests or custodial detentions without probable cause are unlawful; and

c.  USMS policies, orders, and directives that purport to direct U.S. Marshals to operate for purposes other than those laid out in 28 U.S.C. § 566 and in a manner not authorized by the Constitution are unlawful; and

d.  Defendant Wolf is not lawfully serving as Secretary of the Department of Homeland Security and any policies, orders, or directives he issues are void;

B.  Enter such preliminary and permanent injunctive relief as is necessary to ensure compliance with the Constitution and laws; and

C.  Award such additional relief as the interests of justice may require.

[Signature Block on Following Page]

Dated:  July 27, 2020

By: /s/ David A. O'Neil

Deana K. El-Mallawany (MA Bar No. 674825)*
Justin G. Florence (D.C. Bar No. 988953)
Benjamin L. Berwick (D.D.C. Bar No. MA0004)
The Protect Democracy Project, Inc.
15 Main Street, Suite 312
Watertown, MA 02472
T: (202) 579-4582 | F: (929) 777-8428
deana.elmallawany@protectdemocracy.org
justin.florence@protectdemocracy.org
ben.berwick@protectdemocracy.org

Jessica A. Marsden (NC Bar No. 50855)*
The Protect Democracy Project, Inc.
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
T: (202) 579-4582 | F: (929) 777-8428
jess.marsden@protectdemocracy.org

Christine Kwon (CA Bar No. 319384)*
The Protect Democracy Project, Inc.
555 W. 5th St.
Los Angeles, CA 90013
T: (202) 579-4582 | F: (929) 777-8428
christine.kwon@protectdemocracy.org

Rachel F. Homer (D.C. Bar No. 1045077)
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW, #163
Washington, DC 20006
T: (202) 579-4582 | F: (929) 777-8428
rachel.homer@protectdemocracy.org

*Counsel for Plaintiffs*

*Motion for admission pro hac vice forthcoming.

David A. O'Neil  (D.C. Bar No. 1030615)
DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 383-8000
daoneil@debevoise.com

Matthew Forbes (NY  Bar No. 56643540)*
Natascha Born (NY Bar No. 5444849)
Morgan A. Davis (NY Bar No. 5444161)
William Mattessich (NY Bar No. 5532551)
Joshua B. Pickar (NY Bar No. 5579768)
Ashley V. Hahn (NY Bar No. 5673298)
Marissa MacAneney (NY Bar No. 5755418)
Debevoise & Plimpton, LLP
919 Third Ave.
New York, NY  10022
T: (212) 909-6000
mforbes@debevoise.com

P. Derek Peterson (AZ Bar No. 025683)*
Perkins Coie LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ  85012
T: (602) 351-8000
pdpetersen@perkinscoie.com

Thomas Johnson (OR Bar No. 010645)
C. Rian Peck (OR Bar No. 144012)
Kevin Schock (OR Bar No. 181889)
Holly Martinez (OR Bar No. 192265)
Perkins Coie LLP
1120 N.W. Couch St., 10th Fl.
Portland, OR  97209
T: (503) 727-2000
trjohnson@perkinscoie.com