**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DON'T SHOOT PORTLAND *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>CHAD F. WOLF, in his official capacity as<br>purported Acting Secretary of Homeland Security,<br>*et al.*,<br><br>    Defendants. | Civil Action No. 1:20-cv-02040-CRC |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

STANDARD OF REVIEW ............................................................................................... 8

ARGUMENT ................................................................................................................... 8

I.      Don't Shoot Portland and the Individual Plaintiffs all have standing. ............... 9

        A.      *The Individual Plaintiffs have standing to sue.* ................................... 10

        B.      *Organizational Plaintiff Don't Shoot Portland has standing to sue.* .................. 14

II.     The challenged Policy is reviewable agency action under the APA. .............. 16

        A.      *Plaintiffs have adequately alleged the existence of the Policy, and facts must be construed in Plaintiffs' favor.* ................................... 16

        B.      *The Policy is reviewable final agency action under APA § 704.* ......................... 19

III.    Plaintiffs have stated nine claims for which relief may be granted. ................ 23

        A.      *The alleged Policy violates the APA because it has no statutory basis and is not justified by 40 U.S.C. § 1315.* ................................... 23

        B.      *The Policy violates the First Amendment.* ......................................... 26

        C.      *The Policy violates the Fourth and Fifth Amendments.* ..................... 31

        D.      *The Policy is null and void because Defendant Wolf cannot lawfully act as DHS's secretary.* ................................... 32

CONCLUSION ............................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps;">Cases</span>

*Abay v. City of Denver*, 445 F.Supp.3d 1286 (D. Colo. 2020) .......................................33

*Alfifi v. Lynch*, 101 F.Supp.3d, 90 (D.D.C. 2015). ........................................................21

*Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615 (D.C. Cir. 2020) ............................10

*Am. Farm Bureau v. U.S. EPA*, 121 F.Supp.2d 84 (D.D.C. 2000)...................16, 17, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................8, 18

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ...............................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................16

*Bell v. Hood*, 327 U.S. 678 (1946)...................................................................................9

*Bennett v. Spear*, 520 U.S. 154 (1997) .....................................................................20, 22

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299 (W.D. Wash. June 12, 2020) .................................30, 33

*Buck v. City of Albuquerque*, No. CV 04-1000, JP/DJS, 2007 WL 9734037 (D.N.M. Apr. 11, 2007) .......................................................................................................................30

*Burson v. Freeman*, 504 U.S. 191 (1992) .....................................................................28

*California v. Hodari D.*, 499 U.S. 621 (1991).................................................................31

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603 (2020) ...............................26

*Camfield v. United States*, 167 U.S. 518 (1897)............................................................24

*Carter v. District of Columbia*, 795 F.2d 116 (D.C. Cir.1986) ....................................16

*CASA de Maryland, Inc. v. Wolf*, No. 20-cv-2118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) .............................................................................................................................38

*Citizens for Responsibility & Ethics in Wash. v. FEC*, 243 F.Supp.3d 91 (D.D.C. 2017) ............16

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................13

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984).........................27, 28

*Cnty. of Los Angeles v. Davis*, 440 U.S. 625 (1979)......................................................11

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ....................................................32

*Corr. Servs. Corp. v. Malesko,* 534 U.S. 61 (2001) ......................................................9

*CREW v. U.S. Dep't of Justice*, 436 F.Supp.3d 354 (D.D.C. 2020) ............................8

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011) ......................................................12

*Doe v. Dist. of Columbia*, 796 F.3d 96 (D.C. Cir. 2015) ...........................................30

*Don't Shoot Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2020 WL 3078329
    (D. Or. June 9, 2020) ...............................................................................................33

*Edmond v. United States*, 520 U.S. 651 (1997) .........................................................43

*Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) .........................................................29

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d
    371 (D.C. Cir. 2017) ................................................................................................14

*Emergency Coal. to Def. Educ. Travel v. U.S. Dep't of Treasury*, 545 F.3d 4 (D.C. Cir.
    2008) .........................................................................................................................12

*Erby v. United States*, 424 F.Supp.2d 180 (D.D.C. 2006) ..........................................8

*Ex parte Young*, 209 U.S. 123 (1908) .........................................................................9

*FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449 (2007) ..............................................11

*Flores v. District of Columbia*, 437 F.Supp.2d 22 (D.D.C. 2006) ..............................8

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ...............................................22

*Fraternal Order of Police, D.C. v. Rubin,* 26 F.Supp.2d 133 (D.D.C. 1998) .............13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .....................9

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ....................................................18

*Harrell v. The Fla. Bar*, 608 F.3d 1241 (11th Cir. 2010) ..........................................12

*Hartman v. Moore*, 547 U.S. 250 (2006) ...................................................................30

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................14, 16

*Humane Soc'y of U.S. v. USPS*, 609 F.Supp.2d 85 (D.D.C. 2009) .............................22

*Hurd v. D.C., Gov't*, 864 F.3d 671 (D.C. Cir. 2017) ................................................25

*Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................................................................................38, 44

*In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019) ...........................36, 37

*In re Navy Chaplaincy*, 170 F.Supp.3d 21 (D.D.C. 2016) ...............................16, 18, 19

*In re Navy Chaplaincy,* 323 F.Supp.3d 25 (D.D.C. 2018) ............................................19

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012) .......................................10, 19

*Index Newspapers LLC v. City of Portland*, No. 20-cv-1035, 2020 WL 4883017 (D. Or. Aug. 20, 2020) ........................................................................................11

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) ...............................................................24

*L.M.-M. v. Cuccinelli*, 442 F.Supp.3d 1 (D.D.C. 2020) .........................................34, 46

*La Clínica de La Raza v. Trump*, No. 19-cv-4980, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ......................................................................................................38

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................10, 13

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ......................................................16

*Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258 (D. Or. Sept. 8, 2003) ......................................................................................................27

*McCullen v. Coakley*, 573 U.S. 464 (2014) .................................................................27

*Minn. Voters All. v. Mansky*, 138 S.Ct. 1876 (2018) ..............................................28, 25

*Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017) ..............................................................32

*Morrison v. Olson*, 487 U.S. 654 (1988) ......................................................................43

*NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77 (D.C. Cir. 2012) ......................9, 11, 12, 13

*Nieves v. Bartlett*, 139 S.Ct. 1715 (2019) ....................................................................30

*NLRB v. S.W. Gen., Inc.*, 137 S. Ct. 929 (2017) (Thomas, J. concurring) ...............43, 45

*Nucor Steel-Ark. v. Pruitt*, 246 F.Supp.3d 288, 304 (D.D.C. 2017) ............................12

*Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ..........................................................................................35, 36, 37

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ....................................................................13

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 140 F Supp. 2d 37 (D.D.C. 2001) ...........19

*OCONUS DOD Employee Rotation Action Grp. v. Cohen*, 144 F.Supp.2d 1 (D.D.C. 2000) ..................................................................................................................18, 19

*PDK Labs, Inc. v. Ashcroft*, 338 F.Supp.2d 1 (D.D.C. 2004)........................................23

*Pa. R. Co. v. Dillon*, 335 F.2d 292 (D.C. Cir. 1964) ...................................................22

*People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015) ............14

*Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ...............................13

*Quraishi v. St. Charles Cnty.*, No. 4:16-CV-1320 NAB, 2019 WL 2423321 (E.D. Mo. June 10, 2019)..................................................................................................32

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...........................................................28

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731-32 (D.C. Cir. 2003) ..................................................................................................21

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ............................10

*Scahill v. Dist. of Columbia*, 909 F.3d 1177 (D.C. Cir. 2018)................................30, 31

*Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) ...............................28

*Screws* v. *United States,* 325 U.S. 91 (1945) (plurality opinion)....................................24

*Seeger v. U.S. Dep't of Def.*, 306 F.Supp.3d 265 (D.D.C. 2018) ...........................20, 22

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ............................................................10

*Snyder v. Phelps*, 562 U.S. 443 (2011)....................................................................30

*Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016) ........................................................10

*SW General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015)............................................47

*Tenacre Found v. I.N.S.*, 78 F.3d 693 (D.C. Cir. 1996)................................................16

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S.Ct. 2449 (2019) .....................42

*Texas v. Johnson*, 491 U.S. 397 (1989) ..................................................................29

*Tooley v. Napolitano*, 556 F.3d 836 (D.C. Cir. 2009) ..................................................9

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.) ...........13, 14

*United States v. Delaney*, 955 F.3d 1077 (D.C. Cir. 2020) ........................................31

*United States v. Eaton*, 169 U.S. 331 (1898) ........................................................43

*United States v. Evans*, 581 F.3d 333 (6th Cir. 2009) ...............................................25

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................................24

*United States v. Morrison*, 529 U.S. 598 (2000) ...................................................24

*United States v. Smith*, 962 F.3d 755 (4th Cir. 2020) ..............................................42

*United States v. W.T. Grant*, 345 U.S. 629 (1953) .................................................11

*United States v. Zagorovskaya*, No. CR 13-583 PA, 2014 WL 12665158 (C.D. Cal. Oct. 8, 2014), *aff'd on other grounds*, 628 F. App'x 503 (9th Cir. 2015).......................25

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...............................................27

*Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977).....................32

*Weiss v. United States*, 510 U.S. 163 (1994) (Souter, J., concurring) ...........................44

*Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006) .................................................10

*Young v. City of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ....................................32

*Young v. U.S. Dep't of Labor*, No. CV 17-2428 (JDB), 2020 WL 1557170 (D.D.C. Apr. 1, 2020) ..........................................................................................18, 22

## STATUTES & RULES

5 U.S.C. § 702.............................................................................................20

5 U.S.C. § 704.............................................................................................20

5 U.S.C. § 706.....................................................................................9, 19, 26

5 U.S.C. § 3345.......................................................................................34, 46

5 U.S.C. § 3346...................................................................................42, 45, 46

5 U.S.C. § 3347.............................................................................34, 35, 36, 40

5 U.S.C. § 5546...........................................................................................42

5 U.S.C. § 5548...........................................................................................46

5 U.S.C. § 5549...........................................................................................44

6 U.S.C. § 113 ...................................................................................34, 35, 36, 40, 42

28 U.S.C. § 508 ...........................................................................................................37

40 U.S.C. § 1315 .................................................................1, 23, 24, 25, 26, 46

Fed. R. Civ. P. 8 .......................................................................................................16

Fed. R. Civ. P. 12 ............................................................................................*passim*

Fed. R. Evid. 201 .........................................................................................7, 8, 24, 25

## Other Authorities

Chad Wolf (DHS_Wolf), Twitter (Oct. 18, 2020 10:43 AM),
https://twitter.com/DHS_Wolf/status/1317884109964910592
........................................................................................................................8

Executive Order 13753 .........................................................................38, 39, 41, 45

Executive Order 13933 .................................................................................4, 5, 6

Press Release, DHS, "Acting Secretary Wolf Condemns the Rampant Long-Lasting
Violence in Portland" (July 16, 2020), *available at*
https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-
long-lasting-violence-portland ....................................................................7

Press Release, Dep't of Homeland Sec., DHS Announces New Task Force to Protect
American Monuments, Memorials, and Statues (July 1, 2020),
https://perma.cc/2DYE-FTE4 .................................................................17, 25

S. Rep. No. 105-250 (1998) ..................................................................................45

Steve Vladeck & Benjamin Wittes, DHS Authorizes Domestic Surveillance to Protect
Statues and Monuments, Lawfare (July 20, 2020), https://perma.cc/96CB-RVTV ..............25

U.S. Const., amend. IV .......................................................................................31

U.S. Const. art. II, § 2, cl. 2 .........................................................................33, 34

U.S. Const., art. IV, § 3, cl. iv.............................................................................24

U.S. Gov't Accountability Office, B-331650, Legality of Service of Acting Secretary of
Homeland Security and Service of Senior Official Performing the Duties of Deputy
Secretary of Homeland Security (Aug. 14, 2020), https://perma.cc/NBR5-2S3D .................36

**INTRODUCTION**

There is no general federal police power, and federal law enforcement may not be used to crack down on lawful speech and assembly that the President dislikes. Lacking autocratic powers, the President and Defendants have attempted to manufacture a legal means to do what the Constitution and federal law prohibit: Defendants have instituted a Policy to quell and punish the lawful speech and assembly of those advocating a particular viewpoint under the banner of federal property protection. This summer the Policy was implemented in brutal fashion in Portland, Oregon, where Defendants dispatched at least 114 federal agents in military fatigues under the label of "Operation Diligent Valor." Since late July, these federal agents have fired tear gas and rubber bullets at protesters. Defendants used reports of minor damage to federal property as pretext to implement the Policy and escalate events with armed force, even where force was used far from federal property. It should be no surprise that when Defendants deescalate their presence, the tenor of the protests calms, too. Defendants are causing violence, not protecting against it.

Plaintiffs – a diverse group of women and organizations engaged in peaceful First Amendment activity – filed this action on July 27, 2020, in the midst of Defendants' most aggressive tactics in Portland.[1] The Complaint seeks to enjoin Defendants from continuing to implement the Policy of deterring and intimidating protesters who are advocating for the Black Lives Matter ("BLM") movement and against the current Administration. The Complaint alleges three categories of claims: *First*, the Policy exceeds the Department of Homeland Security

---

[1] Plaintiff Wall of Moms was an unincorporated association that Plaintiffs' counsel is informed no longer exists. A separate non-profit entity has been incorporated with the same name, but is not a party to this case. For that reason, Plaintiffs do not oppose Wall of Moms' dismissal, though they reject all of Defendants' arguments for Wall of Moms' dismissal. The voluntary dismissal of Wall of Moms does not affect Plaintiff Barnum's standing.

("DHS") Defendants' statutory authority under 40 U.S.C. § 1315. Consistent with federalism limitations inherent in the Constitution's Property Clause, Congress has provided DHS with narrow and carefully circumscribed authority to protect federal property, including federal courthouses. That authority may not be exercised except as necessary to accomplish its limited purpose. Defendants' Policy has no rational relation to this purpose, because the Policy is not aimed at protecting federal property; its purpose is to quell and punish protesters with whom Defendants and the President disagree.

*Second*, the Complaint alleges the Policy violates the First, Fourth, and Fifth Amendments. In violation of the First Amendment, Defendants have sought to quell protests because of the protesters' viewpoints and expression of their First Amendment rights. No such "Operation" has been launched against protesters conveying messages that the President approves, such as the armed protesters who occupied government property to oppose coronavirus lockdown measures in various states. In violation of the Fourth and Fifth Amendments, Defendants have approved and directed arbitrary, unreasonable, and unnecessary seizures through a Policy that embraces indiscriminately firing tear-gas canisters and rubber bullets into crowds – regardless of whether they pose a threat to federal property – and arresting individuals based on association or mere presence.

*Third*, Defendant Chad Wolf lacked authority to issue the Policy because he does not lawfully occupy the position of Acting Secretary. His predecessor was improperly appointed and lacked authority to alter the DHS succession hierarchy on which Wolf's authority depends.

The grounds on which Defendants have moved to dismiss the Complaint lack merit. Defendants argue Plaintiffs lack standing, but each Plaintiffs stands to suffer injury if the Policy remains in force. Defendants also contend the alleged Policy does not exist, or is not final. But

those are quintessential factual disputes that cannot be adjudicated in this motion. Last, Defendants argue Plaintiffs have failed to state a claim in their three groups of legal claims. But each claim is sound, and none may be dismissed as a matter of law on the pleadings. Defendants' Motion to Dismiss should be denied.

## BACKGROUND

Plaintiffs filed this lawsuit to vindicate their right to protest in support of Black lives and against white supremacy. The Complaint details how Defendants, pursuant to a policy purporting to protect federal property, have made every effort to "quell" the protests, in violation of the law.

After the police killing of George Floyd on May 25, 2020, Portland organizers began to mobilize protests in support of BLM, a movement of people from all backgrounds coming together to affirm the dignity of Black persons and to demand an end to police brutality and systemic racism. *See* Compl. ¶¶ 1-2, 34, July 27, 2017, ECF No. 1. Over the recent months, Plaintiffs have been leading, participating in, and standing in solidarity with these historic lawful protests. *Id.* ¶¶ 34-51.

Plaintiff Don't Shoot Portland, which advocates for accountability to create social change, plays a crucial role in supporting protesters exercising their rights. *Id.* ¶¶ 34-38. Its core mission is to provide "mutual aid" to individuals wishing to exercise their First Amendment rights to organize, protest, and create art for social change. *Id.* ¶ 36. Don't Shoot Portland has distributed supplies to allow protesters to express their views as safely as possible amid a global pandemic. *Id.* ¶ 37.

Plaintiffs Demetria Hester and Danialle James are Black mothers who have been organizing and peacefully participating in BLM protests in Portland at least since George Floyd's murder. *Id.* ¶¶ 49-50. They are protesting for the victims of police brutality, to rebuild the Black community, and to ensure that Black children can walk down the street freely, without

worrying about someone killing them because of their skin color. *Id.* Plaintiff Sabrina Cerquera is a 22-year-old Brown woman who has peacefully joined at least ten demonstrations since late May to stand up to end police brutality and white supremacy. *Id.* ¶ 48. Plaintiff Beverley Barnum organized a group of mothers in support of the BLM protesters, under the banner of "Wall of Moms." *Id.* ¶ 42. Ms. Barnum stood with these patriotic mothers in a row, linked arm in arm, wearing plain clothing and imploring the federal agents clad in military fatigues to "Leave the kids alone!" *Id.* ¶ 44-45. Finally, Plaintiff Lisa Kipersztok is a family physician whose right to peacefully protest has been chilled by the actions of federal law enforcement in Portland because she fears that she can now only attend demonstrations at serious risk of debilitating injury as a result of Defendants' Policy. *Id.* ¶ 51.

Plaintiffs' harms stem from an unlawful policy Defendants instituted to quell and chill protesters' lawful First Amendment activity because of their views and beliefs. *Id.* ¶¶ 52, 80. To quell Plaintiffs' protected speech, Defendants have used surveillance; militarized and unidentified forces; excessive deployment of indiscriminate weapons such as tear gas, pepper-spray balls, and other less-lethal munitions; and warrantless arrests or custodial detentions without probable cause. *Id.*

This Policy reflects President Trump's desire to create a federal police force to "take over" progressive American cities he politically disfavors. *Id.* ¶¶ 53-60, 71. On June 26, the President signed Executive Order 13,933, "Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence," purporting to respond to "[s]tate and local public officials' abdication of their law enforcement responsibilities" with respect to the civil rights protests in Portland and across the nation. *Id.* ¶ 72.

In response to the executive order, the Department of Homeland Security established a

"Protecting American Communities Task Force (PACT)" to "conduct ongoing assessments of potential civil unrest or destruction and allocate resources to protect people and property." Compl. ¶ 73. Pursuant to Defendants' Policy, beginning on or around July 4, federal agents were deployed to Portland for the stated purpose of protecting federal property. *Id.* ¶¶ 75-81. But the way in which the agents were deployed demonstrates that the purpose and mission of their deployment was instead to silence the Portland protests. *Id.* ¶ 4.

First, carrying out the Policy's direction, DHS and USMS agents have engaged in violent crowd-control measures that are not related to, let alone necessary for, the protection of federal property. *Id.* ¶¶ 94-98, 111-24. These measures have harmed individual protesters who posed no threat to federal property. *Id.* Second, DHS authorized a widespread program of surveilling protesters regardless of whether they pose a threat to *federal* property. *Id.* ¶¶ 99-101. Third, DHS has engaged in both unlawful arrests without probable cause and excessive force to intimidate and deter protesters. *Id.* ¶¶ 102-24.  The federal agents' operations have extended far from the immediate vicinity of federal property. *Id.* ¶ 114.

Throughout this time, the top leadership of the Department was serving without having been nominated, let alone Senate-confirmed, *id.* ¶¶ 62-68, reflecting President Trump's preference for loyal "acting" officials who give him "more flexibility," *id.* ¶ 69. Defendant purported Acting DHS Secretary Chad Wolf's appointment, in particular, violates federal law. *Id.* ¶¶ 125-51.

The Policy has injured individual Plaintiffs. *Id.* ¶ 158-68. While Plaintiffs and other protesters have been engaged in peaceful protest, federal officials acting pursuant to the Policy have repeatedly attacked them. Ms. Barnum and others have been shot with flash-bangs at a close distance; repeatedly tear-gassed; and shot at with additional projectiles including rubber

bullets. *Id.* ¶ 159. Defendants' attacks on Ms. Barnum have caused severe and prolonged bodily injury and trauma. *Id.* ¶ 160. Federal agents executing the Policy have also shot Ms. James directly with paint balls, pepper-spray balls and rubber bullets, causing her substantial pain. *Id.* ¶ 161. Ms. Hester has been repeatedly subjected to tear gas from federal agents at the protests, which has caused her to feel nauseated and congested for hours after she returns home. *Id.* ¶ 162. Ms. Cerquera has suffered similar injuries by federal agents implementing the Policy, including being shot with pepper-spray balls. *Id.* ¶ 163. The federal agents' presence at the protests has also caused emotional distress; Ms. James and Ms. Cerquera fear they will be kidnapped, detained, or attacked by federal agents. *Id.* ¶¶ 161, 163, 165.[2]

In addition to the physical and economic injuries they have suffered, individual Plaintiffs have all been deprived of or chilled in the exercise of their constitutional and civil rights. Plaintiffs have been forced, as a result of the Policy's direction for federal agents to use tear gas and other munitions, to either leave the lawful protests or pay the price of their physical and mental health to exercise their constitutional rights. *Id.* ¶ 165. Notwithstanding the Policy to silence them, most of Plaintiffs have continued to place themselves at risk of further injury to continue to engage in First Amendment protected activity.

But not all. Dr. Kipersztok has been denied her right to participate in peaceful protest because Defendants' Policy has created a chilling effect. Before the arrival of federal agents, Dr. Kipersztok, a family physician, participated in lawful protest. *Id.* ¶ 166. After federal agents were deployed, she intended to continue to exercise her right of protest. *Id.* After watching reports of

---

[2] Plaintiffs have also suffered economic harm. They have been forced to purchase protective and medical supplies to mitigate their injuries. Compl. ¶ 164. They have also had personal property damaged or destroyed by federal agents acting pursuant to the Policy. *Id.*

the federal agents' use of force, however, she reasonably fears that attending these demonstrations would put her at serious risk of debilitating injury from federal agents. *Id.* ¶ 167. Dr. Kipersztok understands that she risks being shot or tear-gassed by federal agents, and that could lead to hospitalization and make her unable to care for her patients. *Id.* ¶¶ 166-67.

Defendants' Policy has also frustrated Don't Shoot Portland's core organizational mission of supporting protests to further the BLM movement through mutual aid. *Id.* ¶ 152-57. Federal agents have destroyed the supplies that Don't Shoot Portland provides to protect and support those wishing to exercise their First Amendment rights. *Id.* ¶ 156. Having to replenish the supplies that federal agents have destroyed before protesters can use them requires Don't Shoot Portland to divert and expend thousands of dollars of funds and extensive time. *Id.* ¶ 157.

The Policy remains in effect. *Id.* ¶ 93; *see also* Br. at 5-6, 10, 22-24, 26. Plaintiffs have alleged they continue to engage in lawful protest. *Id.* ¶¶ 12-15, 46-48, 163-65. Don't Shoot Portland will continue to devote resources and time to ensuring protesters' right to express their First Amendment rights. *Id.* ¶¶ 152-57; 168.  Purported Acting Secretary Wolf, for his part, has indicated that the Department has no plan to cease implementing the Policy until the protests are quelled: "This siege can end if state and local officials decide to take appropriate action instead of refusing to enforce the law. DHS will not abdicate its solemn duty to protect federal properties and those within them. Again, I reiterate the Department's offer to assist local and state leaders to bring an end to the violence perpetuated by anarchists."[3] He reaffirmed that sentiment just a little over one week ago: "Yet again last night in Portland a 'peaceful protest' turned into a violent mob & attacked a federal facility. Make no mistake, the men & women of @DHSgov

---

[3] Press Release, DHS, "Acting Secretary Wolf Condemns the Rampant Long-Lasting Violence in Portland" (July 16, 2020), *available at* https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland.

will not be intimidated & will uphold their sworn statutory duty to protect federal facilities & the people who work in them."[4] Because the Department interprets "protecting" federal property as quelling peaceful protests, Plaintiffs' harm is ongoing for as long as the Policy remains in effect.

## STANDARD OF REVIEW

Defendants have moved to dismiss under Rule 12(b)(1) and (6). A Rule 12(b)(1) motion "may raise either a 'facial' or a 'factual' challenge" to the court's subject matter jurisdiction. *Erby v. United States*, 424 F.Supp.2d 180, 182 (D.D.C. 2006). "If a defendant mounts a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party." *Id.*

A Rule 12(b)(6) motion may be granted only if the allegations in the complaint fail to provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "[W]hen considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor." *CREW v. U.S. Dep't of Justice*, 436 F.Supp.3d 354, 357-58 (D.D.C. 2020).

## ARGUMENT

Plaintiffs seek injunctive and declaratory relief against the illegal Policy, which is alleged in detail in the Complaint and was implemented to frightening effect in Portland this summer. The Court has the power and obligation to set aside the Policy both under the APA and the Court's general equity jurisdiction. Under the APA, courts must "hold unlawful and set aside agency action" that is arbitrary, capricious, contrary to law, or in excess of statutory authority and limitations. 5 U.S.C. § 706(2)(A)-(C). In addition, the Court's inherent equity jurisdiction

---

[4] Chad Wolf (DHS_Wolf), Twitter (Oct. 18, 2020 10:43 AM),
https://twitter.com/DHS_Wolf/status/1317884109964910592.

"has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (considering plaintiffs' "Appointments Clause" claim for declaratory and injunctive relief without an express cause of action, because an implied cause of action existed just like for "every other constitutional claim"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *Ex parte Young*, 209 U.S. 123, 149 (1908).

Defendants' motion to dismiss must be denied because (I) Don't Shoot Portland and the Individual Plaintiffs all have standing, (II) the alleged Policy is a reviewable final agency action, and (III) Wolf's improper appointment deprived him of authority to issue the Policy.

## I.     Don't Shoot Portland and the Individual Plaintiffs all have standing.

Defendants argue that because their conduct was lawful, Plaintiffs don't have standing to sue. But that is obviously not how standing is analyzed. *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) ("At this stage of the litigation standing 'in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.'"); *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) ("In assessing plaintiffs' standing, 'we must assume they will prevail on the merits' of their claims."). All Plaintiffs, including the individual Plaintiffs and the organizational Plaintiff, have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). They therefore have standing to assert their claims.

And because all Plaintiffs seek the same relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for*

*Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619-20 (D.C. Cir. 2020).

### A.     *The Individual Plaintiffs have standing to sue.*

The individual Plaintiffs – Beverley Barnum, Sabrina Cerquera, Demetria Hester, Danialle James, and Lisa Kipersztok – have standing. The individual Plaintiffs here have alleged that Defendants have an official policy, as well as a pattern and practice, of engaging in unlawful conduct. This is sufficient to allege an injury-in-fact that is current and ongoing. *See, e.g.*, *In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012). Plaintiffs further allege future injury that is sufficiently "imminent" to be a cognizable injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs have sufficiently alleged that Defendants have a policy of unlawful conduct. *See* Part A.2, *supra*. Defendants' policy of unlawful conduct is a reviewable agency action under the Administrative Procedure Act, *see* Part B, infra, but Plaintiffs' standing does not depend on that conclusion. When a Plaintiff sufficiently alleges that their injury was pursuant to defendants' "concrete and consistently-implemented polic[y] to produce [] injury," that is a cognizable injury-in-fact for Article III standing. *In re Navy Chaplaincy*, 697 F.3d at 1177; *cf. Shays v. FEC*, 414 F.3d 76, 85 (D.C. Cir. 2005) ("[W]hen agencies adopt procedures inconsistent with statutory guarantees, parties who appear regularly before the agency suffer injury to a legally protected interest in fair decisionmaking." (internal quotation marks omitted)).

Here, Plaintiffs have alleged that Defendants repeatedly injured Plaintiffs at the Portland protests pursuant to Defendants' ongoing policy. Ms. Barnum has been "repeatedly tear-gassed" and hit with flashbangs and other projectiles. Compl. ¶¶ 159-60. Ms. James has, on several different days, been shot at with paint balls, pepper-spray balls, and rubber bullets. *Id.* ¶ 161. Ms. Hester has been "repeatedly" injured by tear gas, which caused her "face and skin to burn for

hours." *Id.* ¶ 162. Ms. Cerquera has been tear-gassed and shot at with pepper-spray balls. *Id.* ¶ 163. Indeed, none of this is surprising, as Defendants' direction to use tear gas and other tactics was "indiscriminate" and ubiquitous at Portland protests. *See id.* ¶¶ 111-24.

There is no "doubt that [plaintiffs'] allegations are sufficient to establish an ongoing or imminent threat of injury." *Peacock*, 682 F.3d at 83. Indeed, Defendants themselves have given every indication they intend to continue the challenged conduct in the future. *See* Br. at 5-6 (claiming plaintiff's experiences are "entirely consistent with lawful use of force"); *see also id.* at 10, 22-24, 26. Defendants have not even attempted to argue that Plaintiffs' claims are moot.[5]

Moreover, regardless of the existence of an ongoing injury, Plaintiffs have certainly alleged "facts that establish an imminent threat of *future* injury." *Peacock*, 682 F.3d at 83. "[W]here, as here, a plaintiff's assertion of injury depends on the plaintiff's own future plans, courts examine whether the injury is imminent from two angles: the firmness of the plaintiff's future plans, and the likelihood that the challenged government action will implicate those plans." *Nucor Steel-Ark. v. Pruitt*, 246 F.Supp.3d 288, 304 (D.D.C. 2017). Plaintiffs have repeatedly engaged in protests over the course of several months, and alleged their intention to continue to do so. Compl. ¶¶ 12-15, 46-48, 163-65. This is certainly sufficient to conclude that

---

[5] Plaintiffs' claims are not moot because the policy is still in effect. Even if mootness were a concern, however, two separate exceptions to mootness would apply. First, Plaintiffs' claims would not be moot under the voluntary cessation doctrine. "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.'" *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Otherwise, "[a] defendant [would be] free to return to his old ways" as soon as the case is dismissed as moot, thereby thwarting judicial review. *United States v. W.T. Grant*, 345 U.S. 629, 632 (1953); *see also Index Newspapers LLC v. City of Portland*, No. 20-cv-1035, 2020 WL 4883017, at *14-*15 (D. Or. Aug. 20, 2020) (holding claims against federal defendants in Portland not moot, due to voluntary cessation). Second, Plaintiffs' claims would not be moot under the doctrine regarding claims capable of repetition yet evading review, because "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 462 (2007).

Plaintiffs' own conduct will subject them to Defendants' ongoing actions. *See, e.g.*, *Peacock*, 682 F.3d at 83 (concluding that plaintiff who had alleged that he needs two inhalers per month "is virtually certain" to engage in the conduct in the future that would subject him to injury); *Dearth v. Holder*, 641 F.3d 499, 502-03 (D.C. Cir. 2011) (holding that plaintiff's "stated intent to return regularly to the United States" and purchase firearms made the injury that he would suffer in those circumstances "sufficiently real and immediate to support his standing" at the pleading stage); *Emergency Coal. to Def. Educ. Travel v. U.S. Dep't of Treasury*, 545 F.3d 4, 10 (D.C. Cir. 2008) (holding plaintiff had adequately alleged his future plans to lead a study-abroad program, where he described "the consistent annual repetition of the . . . program over several years" and his "concrete plans for the content and focus of the [upcoming year's] program").

And Plaintiffs have alleged Defendants' conduct is ongoing, pursuant to a policy, and likely to continue. Indeed, Defendants themselves defend their conduct as lawful and indicate they are likely to continue it as the protests in Portland continue. *See* Br. at 5-6 (claiming that plaintiff's experiences are "entirely consistent with lawful use of force"); *see also id.* at 10, 22-24, 26; *cf. Harrell v. The Fla. Bar*, 608 F.3d 1241, 1267 (11th Cir. 2010) (when a defendant "still maintain[s] that the challenged rule [is] constitutional," that "fairly leaves open the possibility" that defendant will engage in the challenged conduct again). Thus, while "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," these "[p]ast wrongs" are "evidence bearing on whether there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (alteration and internal quotation marks omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury");

*Peacock*, 682 F.3d at 84. Plaintiffs here have made "a reasonable showing that [they] will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.

There is no merit to Defendants' assertion that Plaintiffs were injured only incidentally, rather than intentionally, by the use of force carried out under Defendants' direction. The causality prong has no intent requirement; it asks only whether injury is "fairly . . . trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. at 561 (1992). Defendants' assertion is irrelevant to the merits as well. *See supra* §§ C.1, 2, and 3.

Defendants also fail in specifically challenging Dr. Kipersztok's standing. She has alleged a fear she will be subject to harm from Defendants' unlawful conduct if she engages in the core protected speech activity of protesting. Compl. ¶¶ 51, 166-67. This fear is "objectively reasonable," and in the First Amendment confer's Article III standing. *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). When "the government engages in discretionary actions resulting in threatened injury 'for specifically contemplated First Amendment activity,' the threatened harm will support standing if it satisfies the Article III injury-in-fact requirement." *Fraternal Order of Police v. Rubin,* 26 F.Supp.2d 133, 141 (D.D.C. 1998) (quoting *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (Scalia, J.)).

Dr. Kipersztok is not asserting the interest of someone who, as the government dismissively asserts, simply "watches the news." Br. at 11. Rather, she "specifically contemplated First Amendment activity" but was chilled from doing so. *United Presbyterian Church*, 738 F.2d at 1380. She participated in protests in June but ceased in mid-July when she "learned that the federal government had dispatched federal law enforcement agents to Portland," specifically because she had learned of Defendants' threatening conduct. Compl. ¶ 51.

She wanted – and intended – to protest Defendants' unlawful conduct. She was chilled from doing so, however, because she reasonably believed that Defendants' conduct would cause her grave physical harm. *Id.*. Dr. Kipersztok has a cognizable injury-in-fact because she has been chilled from exercising her First Amendment rights. *Id.*. ¶¶ 166-67.

   **B.    *Organizational Plaintiff Don't Shoot Portland has standing to sue.***

Don't Shoot Portland has organizational standing because Defendants have frustrated its core organizational mission and forced the organization to expend and divert resources to counteract the harmful effects of Defendants' Policy. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), an organization has standing to bring suit if a challenged action has "perceptibly impaired" the organization's non-abstract interests and caused "concrete and demonstrable injury to the organization's activities." *Id.* at 379. An organizational plaintiff must show, *first*, "that the defendant's action or omission to act injured the organization's interest," and *second*, that the plaintiff "used its resources to counteract that harm." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal quotation marks and citations omitted); *see also People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

Here, Don't Shoot Portland's core organizational mission is to support activists, protesters, and organizers exercising their First Amendment rights toward eradicating gross inequalities in society through "mutual aid." Compl. ¶¶ 10, 36, 153. The Complaint alleges that Defendants' harmful and unlawful Policy against protesters has injured Don't Shoot Portland's organizational mission. Defendants' Policy of excessive force, unlawful arrests, and surveillance is designed to intimidate and deter protesters, and that directly impairs Don't Shoot Portland's core interest in supporting and advocating for BLM protesters' First Amendment activity. *Id.* ¶¶ 39, 80, 94-124, 155. Defendants' Policy to silence protesters frustrates Don't Shoot Portland's

central efforts to facilitate the very protests Defendants are attempting to quell. *See id..* ¶ 36. Defendants' Policy of damaging and destroying the supplies Don't Shoot Portland provides protest organizers *before* protesters have an opportunity to use them impedes Don't Shoot Portland's work to enable BLM protesters to safely exercise their First Amendment Rights during the COVID-19 pandemic. *Id.* ¶¶ 153, 155-56.

The Complaint also alleges that Don't Shoot Portland has been forced to expend and divert its own resources to counteract the effects of Defendants' harms. Federal officers acting at Defendants' direction have destroyed the essential supplies that Don't Shoot Portland provides protesters. *Id.* ¶¶ 154, 156. To counteract Defendants' damage and destruction, Don't Shoot Portland has deviated from its core value of accepting and distributing *donated* supplies – a tenet fundamental to the concept of mutual aid – and instead has spent thousands of additional dollars and extensive time to directly purchase personal protective equipment, first aid kits, items to provide relief from tear gas, and food and water. *Id.* ¶¶ 154, 157.

Defendants do not contest that they directed the destruction of donated items. Br. at 8. Instead, Defendants assert that because the donated supplies were "consumable" and were destroyed after Don't Shoot Portland donated them, they were no longer Don't Shoot Portland's property, and thus, their alleged destruction cannot injure the organization. Br. at 8. Defendants' theory is unsound. The "concrete and demonstrable injury to the organization's activities," *Havens Realty Corp.*, 455 U.S. at 379, is not a proprietary one; as described above, Defendants' destruction of these donated supplies before they could be "consumed" as intended required Don't Shoot Portland to expend and divert additional resources to fulfill its core organizational mission. Defendants are also wrong to suggest that Don't Shoot Portland made these expenditures "in the normal course of [its] operations." Br. at 8. But for Defendants' Policy of

15

excessive force against protesters and destruction of supplies, Don't Shoot Portland would not need to expend the extra time and money to replace supplies Defendants' rendered unusable.

## II.     The challenged Policy is reviewable agency action under the APA.

### A.     *Plaintiffs have adequately alleged the existence of the Policy, and facts must be construed in Plaintiffs' favor.*

Defendants' assertion that the Policy doesn't exist raises the quintessential kind  of factual dispute that cannot be resolved on the pleadings, and does not affect Plaintiffs' standing. *See* Br. at 11-16. Rule 8's standard pleading rules apply, despite Defendants' contentions,[6] and under those standards all plausible factual allegations must be construed as true, "even if doubtful in fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). That is equally true in APA cases. *See CREW  v. FEC*, 243 F.Supp.3d 91, 98 (D.D.C. 2017). As a result, "[w]hether . . . an unofficial policy exists is an issue of fact" that cannot be resolved at the pleadings stage. *In re Navy Chaplaincy*, 170 F.Supp.3d 21, 37 (D.D.C. 2016). When pleadings present "highly fact-bound" questions of "whether an agency action is subject to judicial review," the facts alleged in the complaint control. *Am. Farm Bureau v. U.S. EPA*, 121 F.Supp.2d 84, 105-06 (D.D.C. 2000). If the Government wishes to dispute factual allegations about the Policy and its existence, it must do so with evidence at a later stage of the proceedings. *Id.*

Here, the Complaint thoroughly alleges that the Policy exists. Compl. ¶¶ 71-124. The Complaint alleges "DHS established a policy to intimidate and deter protesters because of their views and beliefs." *Id.* ¶ 80. It alleges DHS implemented this Policy "through a number of means:  surveillance; the use of militarized and unidentified force; the excessive deployment of

---

[6] *See id.* at 15-16 n.8 (strangely arguing for Rule 12 dismissal based on citations to a preliminary injunction case, *Tenacre Found v. I.N.S.*, 78 F.3d 693, 696 (D.C. Cir. 1996); a summary judgment  case, *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987); and a directed verdict case, *Carter v. Dist. of Columbia*, 795 F.2d 116, 123 (D.C. Cir.1986)).

crowd-control measures such as tear gas, pepper-spray balls, and less-lethal munitions; and warrantless arrests or custodial detentions without probable cause." *Id.* It also alleges "Defendants Barr and Washington directed USMS agents to follow the DHS Policy." *Id.* ¶ 81.

The Complaint also alleges several subsidiary orders have been issued and implemented by Defendants and officials acting under the Policy.  For example, the Complaint contains allegations about Wolf's announcement of the PACT task force, which is meant to deploy law enforcement assets against people who are protesting against white supremacist and Confederate monuments. *See id.* ¶¶ 73-75.[7] Also alleged are orders under the Policy to designate and deploy ICE and CBP agents as FPS agents, and DHS memoranda that authorize the use of surveillance tactics against protesters in support of the Policy. *Id.* ¶¶ 78-89, 99-101. The Complaint further alleges in detail how the Policy was implemented against Plaintiffs and other BLM and anti-Trump protesters through the use of rubber bullets, tear gas, pepper spray, batons, rock salt, bean bag rounds, and flash bangs. *See id.* ¶¶ 39, 45-50, 153-68, 188-201.

Defendants appear to contend these federal agents were acting of their own accord, without direction from an overarching Policy. Br. at 18-19. But that is not what the Complaint says. This suit is not against individual federal officers. Instead, the Complaint alleges that Defendants – heads of federal agencies in the Nation's capital – placed on-the-ground officers in an untenable position, directing them pursuant to a Policy to deploy excessive and unlawful force for impermissible reasons. These detailed and specific allegations – which must be presumed as true – are more than sufficient to indicate that the Policy exists.

Defendants misread the scant precedent they cite to imply that any policy that isn't formally published or released can't be challenged under the APA. This is wrong. Courts

---

[7] *See also* Press Release, Dep't of Homeland Sec., DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues (July 1, 2020), https://perma.cc/2DYE-FTE4.

routinely consider APA claims alleging the existence of unpublished policies, and regularly find

that allegations of past agency practices can support a plaintiff's claim that a policy exists.[8]

While of course the allegations of a policy must be "more than" merely "nebulous

assertion[s]," *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) – in the same way

allegations in a complaint must contain more than "naked assertions devoid of further factual

enhancement," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) – that standard is easily met here.

Plaintiffs have alleged detailed and specific coordinated conduct by federal officials, numerous

statements by the President and by the federal officials commanding DHS and DOJ regarding

this specific issue, and identified the relevant policies that have been made publicly available.

Compl. ¶ 7, 82-87, 98. All of this supports the conclusion that the allegation of a policy is

"plausible on its face." *Iqbal*, 556 U.S. at 678.

If Defendants want to dispute the scope and existence of the alleged Policy, they must

produce an administrative record (and if appropriate, go through discovery) and then move for

summary judgment.  *See* 5 U.S.C. § 706 (stating "the court shall review the whole record or

those parts of it cited by a party" when evaluating an APA claim); *Am. Farm Bureau*, 121

F.Supp.2d at 105-06 (holding that even if the EPA could "prove, after discovery, that its science

policies do not qualify as final agency action or are not binding rules," the Court must accept the

allegations as true for the purposes of a 12(b)(6) Motion.  Indeed, the Government must know

---

[8] *See, e.g.*, *OCONUS DOD Employee Rotation Action Grp. v. Cohen*, 144 F.Supp.2d 1, 6
(D.D.C. 2000) (denying agency motion to dismiss and finding plaintiffs sufficiently alleged the
existence of a policy in part based on past "personnel decisions," and other past anecdotal
actions); *In re Navy Chaplaincy*, 170 F.Supp.3d at 37 (same, where plaintiffs supported their
policy allegation with descriptions of past actions that the Navy argued reflected only "situation-
specific decisions by Navy command"); *Young v. U.S. Dep't of Labor*, No. CV 17-2428 (JDB),
2020 WL 1557170, at *10 (D.D.C. Apr. 1, 2020) (similar, where plaintiffs' identification of
"several agency documents" implying the existence of a policy was sufficient to overcome a
motion to dismiss, where the government argued no policy existed).

this is the appropriate path forward, because this is the routine procedure it follows.  For example, in *OCONUS,* the Government argued in its motion to dismiss that the policy that plaintiffs had alleged did not exist.  144 F.Supp.2d at 5-6.  The court, however, denied the Government's motion to dismiss, holding that the complaint alleged that the agency "informally adopted and implemented" the disputed policy, and those allegations "must be taken as true" at the pleadings stage.  *Id.* at 6.  Notably, a year later the Government came back and dismissed the case on summary judgment based on actual evidence that contradicted the complaint's factual allegations. *OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 140 F Supp. 2d 37, 44 (D.D.C. 2001).  The same pattern was followed in the *In re Chaplaincy* case.  *Compare In re Navy Chaplaincy*, 170 F.Supp.3d at 37 (denying motion to dismiss claims regarding informal policy of preferring certain Navy chaplains where plaintiffs "allege[d] that the facts, taken together, are indicative of a de facto policy," which the court was obligated to "accept . . . as true."), *with In re Navy Chaplaincy,* 323 F.Supp.3d 25, 43-4 (D.D.C. 2018) (granting summary judgment for Navy). The *OCONUS* and *Navy Chaplaincy* cases are emblematic of the appropriate next steps in this case: if Defendants wish to dispute Plaintiffs' factual allegations, discovery and summary judgment provide that opportunity.  But at this stage, the Court must accept the Complaint's allegations of the Policy's existence and scope as true.

**B.**    ***The Policy is reviewable final agency action under APA § 704.***

The Policy is also a reviewable "final agency action" under the APA. *See* 5 U.S.C. §§ 702, 704.[9] Agency action is considered "final" and therefore reviewable under § 704 when two conditions are met: (1) the agency action "mark[s] the consummation of the agency's

---

[9] Defendants do not contend Plaintiffs will not suffer a "legal wrong," be "adversely affected or aggrieved," 5 U.S.C. § 702, or that they possess another "adequate remedy in a court," *id.* § 704.

decision-making process" and is not "of a merely tentative or interlocutory nature"; and (2) the

agency action is one "by which rights or obligations have been determined, or from which legal

consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 176-78 (1997) (internal citations and

quotations omitted).  This is "a pragmatic and flexible inquiry," and "[t]he possibility that a

decision may later be revised based on new information does not render an otherwise definitive

decision nonfinal." *Seeger v. U.S. Dep't of Def.*, 306 F.Supp.3d 265, 285-87 (D.D.C. 2018)

(denying motion to dismiss where complaint adequately alleged final agency action,

"[p]articularly when viewed within the pragmatic and flexible framework of the inquiry and the

acceptance given to a plaintiff's fact allegations").

The alleged Policy satisfies each of *Bennett*'s two conditions. *First*, the Policy marks the

consummation of the agency's decision-making process. The Government asserts that all of the

disputed actions have been merely "incremental steps toward managing an unfolding law-

enforcement crisis," Br. at 17, but there is nothing "tentative" or "interlocutory" about the Policy

as alleged in the Complaint. *See Bennett*, 520 U.S. at 177-78; *see, e.g.*, Compl. ¶ 80 ("DHS

*established* a policy to intimidate and deter protesters because of their views and beliefs.")

(emphasis added). Defendants have already determined the scope and details of the Policy;

Defendants have issued multiple memoranda setting forth the Policy,[10] made numerous public

statements about the Policy and actually dispatched more than 100 federal agents to the streets of

Portland to carry out the Policy. *See* Compl. ¶¶ 7, 72-80, 94, 99.

The Policy is not at all tentative like the non-final agency actions in the cases cited by

Defendants. Br. at 19. For example, in *Afifi v. Lynch*, the challenged agency action was a single

---

[10] The publicly known existence of the PACT task force and the surveillance memo in the possession of *Lawfare* together credibly indicate the administrative record will likely contain further written orders and memoranda relating to the Policy.

discrete instance of FBI agents attaching a GPS device to the plaintiff's car without a warrant, 101 F.Supp.3d, 90, 102 n.14 (D.D.C. 2015). Whereas here, Plaintiffs allege that Defendants instituted a Policy, designated employees of multiple federal agencies as FPS agents pursuant to that Policy, then deployed agents from multiple federal agencies to take actions against protesters in Portland, Oregon. This is neither a mere investigative step nor the actions of a single rogue officer. *See* Br. at 18-19 & n. 10.

Similarly, in *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Commission*, the agency action was not final because the agency "ha[d] not yet made *any* determination or issued *any* order . . . denying any right of [Plaintiff]." 324 F.3d 726, 731-32 (D.C. Cir. 2003) (emphasis added). Here, by contrast, numerous orders have been issued pursuant to the Policy, including the establishment and deployment of the PACT Force, the designation and deployment of ICE and CBP agents as FPS agents, and DHS memoranda that authorize the use of surveillance tactics. Compl. ¶¶ 7, 72-80, 94, 99. And of course, the Complaint alleges that the Policy directed the federal agents' use of rubber bullets, tear gas, pepper spray balls, batons, rock salt, bean bag rounds, and flash bangs against Plaintiffs. *See id*. ¶¶ 39, 45-50, 153-68, 188-201. Defendants are not *considering* the Policy; they have adopted it and implemented it. The fact that Defendants might consider amending or changing the Policy in the future does not render the Policy non-final. "[A] policy can be final even if it is a policy within a larger decision-making process" and "even if it is made to inform another agency's decision." *Young,* 2020 WL 1557170, at *10-12 (finding an "unnamed and unidentified policy" was final agency based on agency documents and publics statements made by the agency).

Addressing *Bennett*'s second condition, Defendants argue that they have not taken "action by which rights or obligations have been determined, or from which legal consequences

will flow." *Bennett*, 520 U.S. at 176-78. That contention "does not withstand even casual

scrutiny," *Humane Soc'y of U.S. v. USPS*, 609 F.Supp.2d 85, 93 (D.D.C. 2009). Defendants

designated more than 114 ICE and CBP agents as FPS agents, and deployed more than 100

federal agents to Portland under the Policy. Compl. ¶¶ 74-79. The designation and deployment

orders certainly "determined obligations" for the federal agents. And the actions that the officers

took at Defendants' direction – firing tear gas and rubber bullets at protesters pursuant to the

Policy, for example – are obvious legal wrongs suffered by Plaintiffs and protesters due to the

Policy, from which legal consequences have already flowed. *See Fogarty v. Gallegos*, 523 F.3d

1147, 1161 (10th Cir. 2008) (permitting anti-war protester's Fourth Amendment claims relating

to police officers' "use of pepper balls and tear gas"); *Seeger*, 306 F.Supp.3d at 287 (finding

*Bennett*'s two conditions met where the "decision . . . places Plaintiffs' health at risk, according

to their pleadings"); *Pa. R. Co. v. Dillon*, 335 F.2d 292, 294 (D.C. Cir. 1964) (defining "[l]egal

wrong" as "the invasion of a legally protected right").

     Defendants' remaining arguments against finality are similarly unavailing. Defendants

argue that "actions taken by individual agents do not qualify as final agency action." Br. at 18.

But the *individual agents' acts* are not the agency actions that Plaintiffs challenge; Plaintiffs seek

to enjoin the named Defendants – all high-ranking government officials and government

agencies – from further implementing the Policy.[11] Compl. ¶¶ 9, 17-29. Responsibility lies not

with individual federal agents, but rather with Defendants who deployed them into a situation in

which their mere presence exacerbates the unrest and provokes backlash that can be perversely

used to justify their continued deployment. Defendants also assert that there is no final agency

---

[11] Moreover, Defendants are wrong on the law. An act of a subordinate official can be attributed
to the agency and constitute final agency action if the act is "definite and ha[s] a direct,
immediate impact" on "the party challenging the agency." *See PDK Labs, Inc. v. Ashcroft*, 338
F.Supp.2d 1, 11 (D.D.C. 2004).   It is, "as a matter of law, meritless" to suggest otherwise. *Id.*

action based on the "future" actions that federal agents may take against protesters in Portland. Br. at 18. But again, this argument does not confront Plaintiffs' actual claims. The Complaint does not challenge future actions by subordinate federal agents on the ground; it seeks to enjoin Defendants' unlawful Policy. Compl., Prayer for Relief. In sum, the allegations in the Complaint allege the existence of a Policy that is a final agency action in light of the deployment orders and violent acts that have already occurred under its authority.

III.    **Plaintiffs have stated nine claims for which relief may be granted.**

    A.    *The alleged Policy violates the APA because it has no statutory basis and is not justified by 40 U.S.C. § 1315.*

Congress has not authorized and could not authorize DHS to act as a generalized police force, and for that reason the Policy is contrary to law and violates the APA. *See* Compl. ¶¶ 169-87 (Counts I, II). Defendants point to 40 U.S.C. § 1315 as justification for the Policy, but that statute provides DHS authority to take certain actions only "to the extent necessary to protect [federal] property and persons on [federal] property." 40 U.S.C. § 1315(b)(1). The statute's narrow applicability to actions "necessary" to protect federal property is not just statutory but also constitutional. Section 1315 is bounded by the U.S. Constitution's Property Clause, which permits Congress to "make all needful rules and regulations respecting . . . property belonging to the United States." U.S. Const., art. IV, § 3, cl. iv. The Clause does not authorize federal action off federal property except when it is "directed *solely* to [the public lands'] protection." *Camfield v. United States*, 167 U.S. 518, 525-26 (1897) (emphasis added). Thus, federal action on "private land adjoining public land" is permitted by the Property Clause only "when the regulation is for the protection of the federal property." *Kleppe v. New Mexico*, 426 U.S. 529, 538 (1976). These limitations, which give effect to principles of federalism, are crucial to preventing DHS from acting with a "police power, which the Founders denied the National Government and reposed in

the States." *See United States v. Morrison*, 529 U.S. 598, 618 (2000); *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (quoting *Screws* v. *United States,* 325 U.S. 91, 109 (1945) (plurality opinion)) ("Our national government is one of delegated powers alone.").

Defendants concede, as they must, that federal authority under § 1315 extends only "to the extent necessary to protect the property or persons on [it]." Br. at 22 (quoting 40 U.S.C. § 1315). Instead, Defendants' key line of defense is to raise an evidence-based factual dispute that is inappropriate for a Rule 12(b)(6) motion. Specifically, Defendants ask the Court to take judicial notice of a Portland Police Bureau report to contradict Plaintiffs' allegation that federal agents unnecessarily used force against them while peacefully protesting in a crowd more than two blocks away from the Mark O. Hatfield federal courthouse. Br. at 22-24. But judicially noticed facts are still, of course, facts that are outside the pleadings. *See* Fed. R. Evid. 201(b) ("Judicial Notice of Adjudicative Facts"). Weighing this evidence is a task for the jury..[12]

Rather than confront Plaintiffs' allegations directly, Defendants mischaracterize the Complaint as "assum[ing] that federal law enforcement cannot issue or enforce dispersal orders to anyone outside federal property." Br. at 22. That is not Plaintiffs' contention. Plaintiffs instead assert, consistent with Defendants' recitation of the law, that authority under § 1315 "extends only to the extent 'necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property.'" *United States v. Zagorovskaya*, No. CR 13-583 PA, 2014 WL 12665158, at *7 (C.D. Cal. Oct. 8, 2014), *aff'd on other grounds*, 628 F. App'x 503 (9th Cir. 2015); *United States v. Evans*, 581 F.3d 333, 341 (6th Cir. 2009).

---

[12] Moreover, the judicial notice rule would not allow a hearsay police report into evidence for the truth of the matters asserted as to a disputed factual issue. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Hurd v. D.C., Gov't*, 864 F.3d 671, 686-87 (D.C. Cir. 2017).

As the Complaint alleges, the Policy is neither necessary for nor aimed at protecting federal property. *First*, in public official statements, Trump has repeatedly confirmed the Policy is aimed not at protecting federal property but at quelling protest by individuals with whom he disagrees. Compl. ¶ 178 (quoting the President).*Second*, DHS's public and internal documents confirm that the Policy is not focused on defense of *federal* property. Operation Diligent Valor is part of PACT. *Id.* ¶ 75. Defendant Wolf's announcement of PACT admits that the program extends to the protection of *all* "people and property," with no federal qualifier. Press Release, Dep't of Homeland Sec., DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues (July 1, 2020), https://perma.cc/2DYE-FTE4. Similarly, an unclassified internal DHS Office of Intelligence & Analysis memorandum, which describes DHS's "appropriate missions" pursuant to the Policy, authorizes federal personnel to surveil protesters based on threats of damage to any government facility or public monument, federal or non-federal. Compl. ¶¶ 99-101 & n.3.[13]

The way in which the Policy has been carried out leaves no doubt its purpose is not to protect federal property, but to punish dissent. Defendants ignore Plaintiffs' numerous allegations regarding federal agents' overly aggressive actions far from the Hatfield courthouse or taken without regard for federal property. Plaintiffs allege federal agents have forcibly moved protesters as five blocks away from the protest. Compl. ¶¶ 96-97. Mark Pettibone was blocks from the courthouse, walking home from a protest, when he was arrested by CBP officers wearing camouflage and thrown in a van. Compl. ¶¶ 102-07. And DHS agents acting under the Policy's directives have repeatedly and indiscriminately assaulted peaceful protesters, including Plaintiffs, with toxic tear gas, flash grenades, and pepper-spray balls, with no rational relation to

---

[13] *See also* Steve Vladeck & Benjamin Wittes, DHS Authorizes Domestic Surveillance to Protect Statues and Monuments, Lawfare (July 20, 2020), https://perma.cc/96CB-RVTV.

property protection. *Id.* ¶¶ 97, 111-12, 116-24. Plaintiffs have personally witnessed federal agents shoot protesters who are not engaged in acts of violence, standing blocks away from the federal courthouse, posing no threat to the building. *See id.* ¶¶ 94-96.

Because the Complaint describes policing actions by federal agents that are unnecessary to protect federal property or federal agents, Plaintiffs have sufficiently alleged that neither § 1315 nor any other federal statute authorizes the Government's Policy. It is therefore arbitrary, capricious, not in accordance of law, contrary to the Constitution, in excess of statutory authority, and violative of the APA. 5 U.S.C. § 706(2)(A)-(C).

### B.    *The Policy violates the First Amendment.*

Defendants' Policy tramples on Plaintiffs' First Amendment rights by restricting lawful protest activity. Compl. ¶ 188-92, 202-10 (Counts III, VI); *see Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603, 2607-08 (2020) ("Public protests, of course, are themselves protected by the First Amendment"). The Policy violates the First Amendment in two distinct ways: (1) it is viewpoint and content discrimination, and (2) it is retaliation for protected speech.

### 1.    DHS's Policy is viewpoint and content discrimination, not a reasonable time, place, and manner restriction.

Where a government policy infringes First Amendment rights, the burden is on the government to show that the policy is a "reasonable time, place, and manner restriction." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions are permissible only if "they are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Id.* The Policy here fails this test because it is not "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). As discussed above, the Policy extends far beyond

any legitimate interest to protect public property, extending to actions that quell protests, including peaceful ones.

Plaintiffs allege, among other things, that Defendants routinely directed the use of force to drive protesters who were up to five blocks away from federal property, far from the point where they could pose any threat to federal property. Compl. ¶¶ 94-97. This amounts to the establishment of a prophylactic "buffer zone" around the public for a as a matter of convenience – a practice prohibited by the First Amendment. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Buffer zones are only appropriate where the government demonstrates that less restrictive measures are inadequate. *Id.* at 496. Even then, legitimate buffer zones usually extend tens of feet around the location at issue, not blocks as alleged in the Complaint. *See id.* at 496-97 (striking down 30-foot buffer zone around abortion clinics as not narrowly tailored); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) (upholding 15-foot buffer zone around health clinics); *see also Burson v. Freeman*, 504 U.S. 191, 209-11 (1992) (upholding 100-foot buffer zone around polling places). Even if Defendants' actions had the appropriate geographic nexus, Defendants' use of excessive force against peaceful protesters, as alleged in the Complaint, is not a "narrowly tailored" restriction.

The Policy is also not a valid time, place, and manner restriction because it is neither content- nor viewpoint-neutral. *See Clark*, 468 U.S. at 293. When the government regulates based on the subject matter of speech, the regulation is content-based and strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). When the government regulates based not just on the content of speech, but also on the viewpoint expressed on a particular subject, the regulation is outright impermissible. *Minn. Voters All. v. Mansky*, 138 S.Ct. 1876,

1885 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited").

Here, the Policy discriminates on the basis of both viewpoint and content. In terms of content, the Policy targets only speech relating to race, monuments, and statues. *See* Compl. ¶¶ 99, 101, 185, 191. Although BLM protesters in Portland were subject to Defendants' brutal crackdown in July, Defendants did not extend their Policy to heavily armed anti-pandemic-restriction protests in Michigan. *See* Compl. ¶ 55. Defendants articulate no compelling government interest for these restrictions. And once again, even if they could, the widespread use of tear gas, pepper spray, and munitions at close range is not a "narrowly tailored" restriction.

Even more egregious, the Policy targets the viewpoint, not just the content, of speech. The Policy is aimed at protests that express support for the BLM movement. *See* Compl. ¶¶ 52-60. This viewpoint discrimination is flatly unconstitutional. No amount of scrutiny can save it. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Contrary to Defendants' contentions, *Edrei v. Maguire* does not support the proposition that their actions were  lawful responses to threats to public safety. Br. at 26-27. *First*, as Defendants concede, *Edrei* condones such speech restrictions only if they are content-neutral. *See Edrei v. Maguire*, 892 F.3d 525, 541 (2d Cir. 2018). As discussed above, the Policy expressly targets BLM protesters. *Second*, authority to address public-safety threats is limited–public safety officials have "an obligation, absent imminent harm, to inform demonstrators that they must disperse, and may not use unreasonable force." *Id.* Plaintiffs allege that Defendants' Policy directed agents to use more force than necessary to disperse largely peaceful protesters far

from the courthouse. Compl. ¶¶ 96, 114. Defendants also have destroyed the supplies that Don't Shoot Portland provides to support those wishing to exercise their First Amendment rights. *Id.* ¶ 156. Defendants may argue at trial that their use of force was appropriate, but that is a fact question unsuitable for resolution on a motion to dismiss under Rule 12(b)(6).

## 2.     The Policy is unlawful retaliation for speech.

Defendants' Policy of using tear gas, pepper-spray balls, and other munitions, as well as allowing direct assaults on protesters, in order to "quell" protests is quintessential, unlawful retaliation for Plaintiffs' and others' exercise of their First Amendment rights. The First Amendment "'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To establish a First Amendment retaliation claim, Plaintiffs "must show (1) that [they] engaged in protected conduct, (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again, and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (internal quotation marks omitted). "To establish the causal link, the constitutional speech must be the but-for cause of the retaliatory action," *id.*, pursuant to a subjective inquiry, *Doe v. Dist. of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015).

Plaintiffs sufficiently plead a First Amendment retaliation claim.  *First*, Plaintiffs were engaged in the core First Amendment activity of peaceful political protest in a public forum. *See Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011).  *Second,* Defendants' Policy and the federal agents' conduct pursuant to the Policy would certainly deter a person of ordinary firmness from future expression. Federal officers acting pursuant to Defendants' Policy have indiscriminately

targeted protesters, including Plaintiffs, with tear gas, pepper-spray balls, rubber bullets, and other harmful and aggressive tactics, and arrests, causing extreme fear and injury.[14] While some Plaintiffs continued to protest, the federal officers successfully deterred others from rejoining the protests despite their desire to do so. Compl. ¶ 166-67.[15]

The last element of the retaliation claim is satisfied because Plaintiffs' constitutional speech was "the but-for cause of the retaliatory action." *Scahill*, 909 F.3d at 1185. Contrary to Defendants' suggestion, Br. at 26, the Complaint is replete with allegations that Defendants' Policy was a direct response to the viewpoint and content of Plaintiffs' speech. Statements by President Trump and individual Defendants show that the deployment of armed federal agents pursuant to the Policy is targeted at the political protesters exercising their First Amendment rights. President Trump specifically admitted that the deployment of federal agents to Portland was intended to quell the protests, stating his desire to "take over" America's cities, his animosity toward "THUGS dishonoring the memory of George Floyd," and decrying "super-liberal" mayors and "the radical left." *See* Compl. ¶¶ 52-60. No such federal action has been taken against protesters whose views the President embraces. Plaintiffs plausibly allege that the Policy violates their First Amendment rights.

---

[14] *See* Compl. ¶ 48, 50, 51, 57, 97, 111-24, 159-63; *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020) (holding that the Seattle Police Department's "use of less-lethal, crowd control weapons have surely chilled speech"); *Buck v. City of Albuquerque*, No. CV 04-1000 JP/DJS, 2007 WL 9734037, at *40 (D.N.M. Apr. 11, 2007) (holding that "use of tear gas, pepper spray, and physical force to disperse Plaintiffs could have chilled a person of ordinary firmness from continuing to participate in the demonstration"), *aff'd* 291 F. App'x 122 (10th Cir. 2008), *and aff'd in part, appeal dismissed in part* 549 F.3d 1269 (10th Cir. 2008).

[15] Defendants suggest that Plaintiffs allege as retaliation only the warrantless arrests of certain protesters. Br. at 24-25. Not so. Plaintiffs' First Amendment retaliation claim rests on the entirety of the policy, including the use of excessive force to harm Plaintiffs and other protesters.

### C.     *The Policy violates the Fourth and Fifth Amendments.*

Plaintiffs have plausibly alleged that Defendants' Policy of using physical force, including tear gas, rubber bullets, pepper-spray balls, and other crowd-control munitions to disperse largely peaceful protesters violates their Fourth Amendment right to be free from unreasonable seizures. *See* U.S. Const., amend. IV; *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").[16] Furthermore, using force to retaliate against First Amendment activity is excessive force, even when law enforcement faces what the government calls "riotous" crowds. Br. at 1. Individuals have a "clearly established right not to have [violent force] used to 'intimidate or retaliate against' [them]." *Morales v. Fry*, 873 F.3d 817, 826 (9th Cir. 2017) (quoting *Young v. City of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011)).[17]

In seeking to dismiss Plaintiffs' excessive-force claim, Defendants make essentially two arguments: (1) that Plaintiffs lack standing to pursue injunctive relief, and (2) that the use of force was justified by the presence of non-peaceful demonstrators in the crowds. But Plaintiffs

---

[16] *See also United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) ("A Fourth Amendment seizure occurs when physical force is used to restrain movement."); Marbet v. City of Portland, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) (holding that allegations that state officials had used pepper spray and rubber bullets to "physically move[] back [protesters] from their peaceful positions" would, if true, constitute a seizure); *Quraishi v. St. Charles Cnty.*, No. 4:16-CV-1320 NAB, 2019 WL 2423321, at *9 (E.D. Mo. June 10, 2019) (holding that "[f]iring tear gas, pepper spray, or other chemical agents at someone can constitute a seizure under the Fourth Amendment," and that firing tear gas at journalists covering a protest did constitute a seizure in that case).

[17] If this Court were to find that the use of tear gas does not constitute a seizure, Defendants' actions would violate Plaintiffs' Fifth Amendment right to due process. The Constitution's guarantee of due process protects "the individual against arbitrary action of government," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotation marks omitted), and therefore prohibits government conduct that "shocks the conscience," including because it is "intended to injure in some way unjustifiable by any government interest," *id.* at 846-49.

do have standing to pursue injunctive relief, as discussed in section I. And whether the use of force was justified is, again, a fact question not suitable for resolution on a motion to dismiss. Defendants acknowledge that officials may use force to disperse a demonstration only if it is "*substantially* infected with violence or obstruction." Br. at 28 (emphasis added) (quoting *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)). Plaintiffs have alleged that they, along with the majority of other protesters, were peaceful, and that violence was isolated. Multiple courts have held that indiscriminate use of tear gas against crowds protesting constitutes excessive force.[18] Defendants' reliance on statements by the Portland Police Bureau to characterize the tenor of the protests again raises factual questions not suitable for resolution on a motion to dismiss. The Court should deny the government's motion to dismiss Plaintiffs' Fourth and Fifth Amendment claims, as well as the APA claim based on the violation of these constitutional rights.

### D.    *The Policy is null and void because Defendant Wolf cannot lawfully act as DHS's secretary.*

Finally, Plaintiffs have stated claims that Defendant Chad Wolf, the purported Acting Secretary of Homeland Security since November 2019, was not serving lawfully at the time he promulgated the Policy, and that it must be set aside. The Appointments Clause requires the Senate's "Advice and Consent" for the appointment of all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The Clause distinguishes between principal officers, who can serve only with the Senate's advice and consent, and "inferior Officers," who are subject to the same requirement *unless* Congress "by law vest[s] the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

---

[18] *See, e.g.*, *Black Lives Matter Seattle-King Cnty.*, 2020 WL 3128299, at *4; *Don't Shoot Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2020 WL 3078329, at *3 (D. Or. June 9, 2020); *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1291-92 (D. Colo. 2020).

For the offices requiring the Senate's advice and consent ("PAS offices"), Congress has recognized that vacancies arise, and has therefore enacted statutes to allow for such vacancies to be filled on a temporary basis. *See L.M.-M. v. Cuccinelli*, 442 F.Supp.3d 1, 6 (D.D.C. 2020).

The two vacancies-related statutes relevant here are (i) the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345, and (ii) DHS's organic statute. The FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" a vacant PAS office *unless* "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," or expressly authorizes another official to make that designation. 5 U.S.C. § 3347(a)(1). The FVRA generally limits the time during which an office may be filled by an acting official to 210 days. *Id.* § 3346. DHS's organic statute is one of the statutes contemplated by the FVRA that expressly governs the order of succession for the position of Acting Secretary of Homeland Security when the office of the Secretary is vacant. *See* 6 U.S.C. § 113(a)(1)(A), (g).

As alleged in the complaint, Wolf's service as Acting Secretary of Homeland Security does not comport with this statutory scheme. *First*, no Senate-confirmed Secretary of Homeland Security has approved an order of succession that would designate Wolf as Acting Secretary. *Second*, Secretary McAleenan was not the proper Acting Secretary under the HSA at the time he did so. *Third*, by the time McAleenan and Wolf took their relevant actions, the FVRA's time limit on acting service had expired. *Fourth*, because Wolf is not the lawful Acting Secretary, his exercise of the functions and duties of the office violates the Appointments Clause. *Fifth*, Wolf's efforts to ratify his prior actions as (purported) Acting Secretary do not save them.

        **1.**      **No Secretary of Homeland Security has approved an order of succession that would designate Wolf as Acting Secretary.**

Wolf's service is not lawful under the Homeland Security Act or the FVRA because no

Senate-confirmed Secretary signed an order of succession that would result in his appointment as Acting Secretary. Defendants identify two orders of succession that purportedly result in Wolf's properly serving as Acting Secretary of the Department at some point in time: an order of succession signed on November 8, 2019, by then-purported Acting Secretary Kevin McAleenan, Ex. 3 to Blackwell Decl., and a second order of succession signed on September 10, 2020, by Federal Emergency Management Agency Administrator Peter T. Gaynor, Ex. 2 to Swartz Decl.[19]

Neither of these two orders provides a valid basis for Wolf's assumption of the Acting Secretary role, because neither McAleenan nor Gaynor were Senate-confirmed, as the HSA requires. Only a Senate-confirmed permanent Secretary of Homeland Security is permitted to change the Department's order of succession. *See Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206, at *17-*24 (D.D.C. Oct. 8, 2020) ("*NWIRP*"). The HSA's allows that "*the Secretary* may designate such other officers of the Department in further order of succession to serve as *Acting Secretary*." 6 U.S.C. § 113(g)(2) (emphasis added). By distinguishing the role of "Secretary" from "Acting Secretary," Congress indicated its intent to limit the order-of-succession authority to Senate-confirmed permanent secretaries.

The HSA's distinction between acting and actual secretaries is consistent with the FVRA, which is by default the "exclusive means" for appointing acting officials, unless another statute "expressly authorizes . . . the President, a court, or the head of an Executive department, to designate an officer." 5 U.S.C. § 3347(a)(1). In the absence of such a statute, under the FVRA, only the President may set an order of succession beyond a vacant office's first assistant. *Id.* §§ 3345(a)(2), 3345(a)(3). The HSA succession provision, 6 U.S.C. § 113(g)(2), thus creates an exception to the FVRA by allowing "the Secretary" to establish an order of succession. If, as

---

[19] As discussed in section III.D.5 below, the question of whether Gaynor properly took office as Acting Secretary is a fact question not suitable for resolution on a Rule 12(b)(6) motion.

Defendants urge, an *Acting* Secretary is permitted to exercise the succession-order authority, this exception would greatly undermine the appointments "role ordinarily reserved to the 'President (and only the President).'" *NWIRP*, 2020 WL 5995206, at *18. Such a result would "undermine the structure and purpose of the FVRA" and raise serious constitutional concerns under the Appointments Clause, by potentially allowing a non-Senate-confirmed inferior officer in the role of Acting Secretary to determine who would run the Department in the future. *Id.* at *19-*21.

Moreover, Defendants' reading of § 113(g) "is also at odds with the plain meaning of the word 'expressly'" in the FVRA. *Id.* at *19. The FVRA provides that exceptions to its succession provisions apply only if "a statutory provision *expressly*" allows for an alternative means of filling the vacancy. "The word 'expressly' . . . means 'explicitly,' 'particularly,' or 'specifically." *Id.* Here, the relevant statutory provision, § 113(g)(2), refers only to the "Secretary," and not the Acting Secretary, as having the power to set an order of succession. And in the absence of an express statutory authorization, the FVRA forbids the Acting Secretary from designating the Department's order of succession.

Contrary to Defendants' contention, Br. 38-39, the *NWIRP* decision is not at odds with the D.C. Circuit's recent ruling in *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019). In that case, the court held that the Deputy Attorney General, while acting as Attorney General, was the constitutional "Head of Department" and therefore could appoint inferior officers. *Id.* at 1056. Its ruling relied on specific statutory authority providing the Deputy Attorney General with the power to perform "all the duties of th[e] office" in case of a vacancy, 28 U.S.C. § 508(a). *Id*. Here, by contrast, there is no similar authority for an officer other than the Secretary at DHS. Three times in two pages of their brief, Defendants point to dicta in the court's opinion that an "acting officer is vested with the same authority that could be exercised

by the officer for whom he acts," 916 F.3d at 1055, to argue that an Acting Secretary of DHS *must* have all of the powers assigned to the Secretary of Homeland Security. But the court's reasoning is focused entirely on the specific statutory authorities of the Deputy Attorney General, *NWIRP*, 2020 WL 5995206 at *21-23, and the case does not compel the same result here.

Because both McAleenan and Gaynor signed changes to the orders of succession when they were (purportedly) serving as *Acting* Secretaries of the Department, those orders of succession were outside the scope of their authority and have no effect. Under any version of Defendants' argument, Wolf's service as Acting Secretary relies on one of those two orders. No further analysis is required to hold that Wolf's appointment and service as Acting Secretary is unlawful under the Homeland Security Act, and thus his issuance of the Policy violates the Appointments Clause, the Federal Vacancies Reform Act, and the Administrative Procedure Act.

> **2.    McAleenan was not lawfully serving as Acting Secretary when he promulgated the order of succession that was the basis for Wolf's service as Acting Secretary.**

Even if a lawfully serving Acting Secretary could change the order of succession, at the time McAleenan signed the November 8 order of succession, he *himself* was not lawfully in that position, and therefore could not change the order of succession. Every court to address this question – in addition to GAO – has concluded McAleenan did not validly become Acting Secretary under DHS's rules for vacancies in the Secretary's office.[20] For the reasons set forth below, this Court should conclude the same.

---

[20] *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ("ILRC"); *CASA de Maryland, Inc. v. Wolf*, No. 20-cv-2118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ("CASA"); *La Clínica de La Raza v. Trump*, No. 19-cv-4980, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ("La Clínica"); U.S. Gov't Accountability Office, B-331650, Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security (Aug. 14, 2020), https://perma.cc/NBR5-2S3D [hereinafter "GAO Decision"].

When the last Senate-confirmed DHS Secretary Kirstjen Nielsen took office, the operative order of succession was DHS Delegation No. 00106, Revision No. 8, issued in 2016 by then-Secretary Jeh Johnson. *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016). Two provisions of Johnson's order are relevant here. First, in case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order stated "the orderly succession of officials is governed by Executive Order 13,753, amended on December 9, 2016." *Id.* § II.A. Second, if the Secretary is "unavailable to act during a disaster or catastrophic emergency," the order delegated the Secretary's authority "to the officials occupying the identified positions in the order listed (Annex A)." ECF No. 24-1, at 7, Ex. 1 to Blackwell Decl., DHS Delegation No. 00106, Revision No. 08, § II.B.

Before resigning on April 10, 2019, Nielsen purported to amend the operative DHS succession orders. However, Nielsen's April 9, 2019 order stated that it was merely revising Annex A to Delegation 00106. ECF No. 24-1 ("Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof"). Annex A only determines who may exercise the Secretary's powers in the event the Secretary is incapacitated due to "a disaster or catastrophic emergency." *See* DHS Delegation No. 00106, *supra*, § II.B. The portion of the succession order that applied to "the Secretary's death, *resignation*, or inability to perform the functions of the Office," remained unchanged, *id.* § II.A (emphasis added), and should have governed when Secretary Nielsen resigned. Under that provision, Executive Order 13753 provides the pertinent hierarchy for DHS succession, placing the U.S. Customs and Border Protection ("CPB") Commissioner seventh in line to become

Acting Secretary following a resignation. 81 Fed. Reg. 90,667 (Dec. 9, 2016).

Nevertheless, upon Nielsen's resignation, Kevin McAleenan, who was serving as CBP Commissioner, purported to assume the position of Acting Secretary, despite the fact that two other Senate-confirmed individuals were ahead of him to succeed to that Office: Christopher Krebs, the Senate-confirmed then-Under Secretary for National Protection and Programs, and David Glawe, the Senate-confirmed then-Under Secretary for Intelligence and Analysis.

Thus, McAleenan could not lawfully exercise the authority of the Office of the Secretary when, on November 8, 2019, he issued a directive attempting to amend the order of succession to elevate the Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency. *See* Ex. 3 to Blackwell Decl. When McAleenan resigned on November 13, 2019, Wolf – who had been confirmed to the relevant Under Secretary position on that same day – purported to become Acting Secretary of Homeland Security. But Wolf's purported authority to serve in that position rests on McAleenan's invalid change to the succession order. This is the unanimous conclusion of the GAO and every court that has considered the matter. *See supra*, at 36 n.20. No court has accepted Defendants' counterarguments, and this Court should not be the first to do so.

Defendants' argument begins with an unsubstantiated distinction between "orders of succession" and "delegations of authority." Br. at 35. Assuming this distinction, Defendants argue Nielsen's invocation of 6 U.S.C. § 113(g)(2) indicates her intention was to modify both sections II.A and II.B of DHS Delegation No. 00106. *Id.* at 32, 35. They posit that section II.A was "merely descriptive" rather than a manifestation of the Secretary's authority, and therefore an express statement of amendment was unnecessary. *Id.* at 34-35. Lastly, they say further support for their position is provided by DHS's notice to the Senate on April 10, 2019, which stated the Office of the Secretary position had become vacant and listed McAleenan as the

38

Acting Officer. *Id.* at 37. According to Defendants, this notice reflects DHS's official contemporaneous understanding of Nielsen's April 9 order and is entitled to deference. *Id.*

Each of Defendants' points fails upon closer examination. *First*, the term "order of succession" is not used only to refer to vacancies that arise when an officer resigns or otherwise permanently leaves office. In fact, the DHS succession statute explicitly states that an "order of succession" extends to non-permanent vacancies, such as when the Secretary or Deputy Secretary are not "available to exercise the duties of the Office of the Secretary" due to "absence" or "disability." 6 U.S.C. § 113(g).[21]

*Second*, Nielsen's invocation of § 113(g)(2) could not override the plain language of her April 19 order. As explained above, *supra*, the April 9 order explicitly states that it revises Annex A. At no point does it provide that Annex A will now apply in the case of the Secretary's death, resignation, or inability to perform the functions of the Office *and* in the event the Secretary is unavailable to act during a disaster or catastrophic emergency. Nor can Defendants point to any language that explicitly amends Section II.A of Delegation 00106.[22] Nowhere does the order assert that it supersedes the line of succession established by Executive Order 13753.[23]

---

[21] Furthermore, the purpose of an "order of succession" adopted under the § 113(g)(2) is to avoid the FVRA's limits on who may serve by default during a vacancy. *See* 5 U.S.C. § 3347(a)(1). Without a doubt, the FVRA applies to vacancies that arise when an official is temporarily "unable to perform the functions and duties of the office." *Id.* § 3345(a).

[22] Defendants suggest that there was "no need" for Nielsen to expressly amend Section II.A because it merely described the succession order in EO 13753, rather than setting out a separate order of the secretary. But that is beside the point: Section II.B and Annex A explicitly apply only in the event the Secretary is incapacitated due to "a disaster or catastrophic emergency"; as long as the Nielsen order did not change that language, which it did not, her changes to Annex A apply only in those limited circumstances.

[23] Indeed McAleenan's later change to the order of succession *does* purport to make Annex A the order of succession for all vacancies, superseding the executive order's line of succession. ECF No. 24-1, at 41. This would have been unnecessary had Nielsen already made that change.

*Third*, while Defendants cite to the DHS General Counsel's April 10 notice to Congress to support their claim that their argument reflects DHS's official contemporaneous understanding of the April 9 order, the next day DHS took an action that supports Plaintiffs' position, rather than Defendants'.  On April 10, DHS updated its internal regulations to reflect the changes to the order of succession. Consistent with Nielsen's order, Annex A of the updated regulation now contained a revised line of succession for cases of "disaster or catastrophic emergency," ECF No. 24-1, at 7, which matched the revised line of succession approved by Nielsen, *see id.,* but the updated regulation left intact the line of succession for cases involving "the Secretary's . . . resignation," which were still "governed by Executive Order 13753." *Id.* § II.A.

The record is unambiguous: when Nielsen resigned, Executive Order 13753 still governed who would serve as Acting Secretary. As such, McAleenan had no authority to ascend to the role of Acting Secretary or designate Chad Wolf as Acting Secretary.

### 3.  Wolf's service as Acting Secretary also violates the time limits under the FVRA

Both McAleenan's efforts to change the DHS order of succession, and Wolf's entire purported service as Acting Secretary, fail for an additional reason: they were undertaken after the FVRA's time limit for acting service had expired. As noted above, the HSA creates a limited exception to the FVRA only with respect to *who* can serve as Acting Secretary of the Department. It does not otherwise displace the FVRA's requirements for acting service. Specifically, it leaves in place the limitation that acting officers can serve in a vacant position only "for no longer than 210 days beginning on the date the vacancy occurs," unless the president has nominated someone to fill the position permanently. 5 U.S.C. § 3346(a).

Defendants may argue that the HSA displaces the FVRA's time limits on acting service. But this is contrary to the text of the HSA, and would raise serious constitutional concerns. The

HSA indicates it is intended to operate alongside the FVRA. For example, the HSA specifies that, in the case of a vacancy, the Deputy Secretary is the "first assistant" to the Secretary *for purposes of the FVRA*. 6 U.S.C. § 113(a)(1)(A). Thus, the FVRA's time limits would certainly apply to the Deputy Secretary acting as first assistant. *See* 5 U.S.C. § 5546(a). It would be an "absurd" result to impose those limits on a Senate-confirmed Deputy Secretary but not to a lower-level (potentially non-Senate-confirmed) official chosen by the agency head. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S.Ct. 2449, 2462 (2019). This interpretation would also raise serious constitutional concerns by potentially allowing for acting officers to serve indefinitely. It is "the temporary nature" of acting service that saves it from violating the Appointments Clause. *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020).

Here, it is clear the FVRA's time limits were exceeded well before Wolf took office.  The vacancy at DHS occurred when Secretary Nielsen resigned on April 10, 2019. Thus, on November 6, 2019, the office of Secretary had been vacant for 210 days. After that date, at the latest, the FVRA required the office to "remain vacant" until the President submitted a new nominee for Senate confirmation. *Id.* § 3348(b)(1). When McAleenan sought to amend the DHS succession order on November 8, the 210-day time limit had expired, so his succession order has no lawful effect. And Wolf has never lawfully served as Acting Secretary under the FVRA because the 210-day limit expired before he purported to assume the Office on November 13, 2019. Thus, his service violates the FVRA, and he could not authorize the Policy.

> **4.      Because Wolf is not the lawful Acting Secretary under any applicable statute, his service in that position violates the Appointments Clause**

Wolf's service as Acting Secretary also violates the Appointments Clause, because he is serving as an officer of the United States without Senate confirmation. While Congress may be able to permit someone to serve as Acting Secretary of Homeland Security under "special and

temporary conditions," *United States v. Eaton*, 169 U.S. 331, 343 (1898), Wolf does not satisfy the applicable statutory conditions.[24] The Supreme Court has blessed acting service by non-Senate-confirmed officers only in temporary and exigent circumstances, *see Eaton*, 169 U.S. at 343-44. But Wolf did not hold the position of Acting Secretary temporarily or in an exigent circumstance. The vacancy was created in April 2019; Wolf was appointed to fill it approximately seven months later. The administration moved to nominate Wolf to the position permanently only after the GAO found him to be serving unlawfully. *See supra*, at 36 n.20.

Nor does Mr. Wolf's confirmation as Under Secretary satisfy the requirement for Senate confirmation for principal officers. Defendants contend that the position of Secretary of Homeland Security is "germane" to Mr. Wolf's position as Under Secretary, and therefore he may serve as Acting Secretary without raising Appointments Clause concerns. Br. at 41. But the Supreme Court has never held that a Senate-confirmed inferior officer can serve as a principal officer by virtue of the prior confirmation. *See Weiss v. United States*, 510 U.S. 163, 191 (1994) (Souter, J., concurring) (allowing an inferior officer to serve as a principal officer "would raise a serious Appointments Clause problem").

---

[24] There is also very real question as to whether the Appointments Clause would be violated *even if* Wolf satisfied the DHS succession statute or the FVRA. *See NLRB v. S.W. Gen., Inc.*, 137 S. Ct. 929, 945-49 (2017) (Thomas, J. concurring). In short, there is no doubt that the Secretary of Homeland Security is a principal officer. Under the Appointments Clause, principal officers can *only* be appointed with the advice and consent of the Senate—the Clause provides no alternative mechanism as it does for inferior officers. *See id.* at 946. Thus, "[a]ppointing principal officers under the FVRA" or, by the same logic, an agency succession statute, "raises grave constitutional concerns because the Appointments Clause forbids the President to appoint principal officers without the advice and consent of the Senate." *Id.* One might get around this constitutional problem if the fact that Wolf is *Acting* Secretary—and thus purportedly will be exercising those powers on a temporary basis—somehow renders him an inferior officer, rather than a principal officer. But that would be inconsistent with the Supreme Court's holdings in *Morrison v. Olson*, 487 U.S. 654, 671-72 (1988), and *Edmond v. United States*, 520 U.S. 651, 663 (1997), where the Court has described tenure in office as only one factor—and perhaps not even an important one—in determining whether an officer is principal or inferior.

### 5.     Wolf's subsequent effort to ratify the policy cannot save it.

Defendants' final attempt to save the Policy is to claim a *third* order of succession, signed after this lawsuit was filed, designates Wolf as the proper Acting Secretary and allows him to ratify past actions. This argument fails as well. *See ILRC*, 2020 WL 5798269, at \*9.

*First*, the question of whether FEMA Administrator Gaynor ever properly became Acting Secretary of the Department is a fact question not suitable for resolution on a motion to dismiss. Defendants append one document, an order of succession signed by Gaynor, as evidence that Gaynor took office as Acting Secretary and changed the order of succession. They offer no evidence that the agency complied with other requirements for acting service pursuant to the FVRA, such as a notification to Congress that a vacancy had been created for Gaynor to fill. 5 U.S.C. § 5549. Nor is it apparent from the record whether this order was signed before or after President Trump sent Wolf's nomination to the Senate on the same day. This raises serious questions as to whether Gaynor ever ascended to the office of Acting Secretary at all, and whether he did so before or after signing this order of succession.

*Second*, Gaynor was not eligible to become Acting Secretary because there was no "vacancy" to fill. According to Defendants' brief, Gaynor ascended to the position of Acting Secretary when Wolf was nominated to be the permanent Secretary on September 10, 2020. But as discussed in section III.D.3, *supra*, the FVRA's 210-day time limit for acting service expired on November 6, 2019. Defendants argue that Gaynor could serve notwithstanding the time limit because of 5 U.S.C. § 3346(a)(2), which allows an acting official to continue to serve while a nomination is pending. But, crucially, § 3346(a)(2) doesn't create a new vacancy, it only *extends* the service of a lawfully-serving acting official. Defendants' own legislative history citation makes this clear: "When the acting person's 150 days expires, the position again becomes

vacant, but there is no 'vacancy' that permits another person to serve as acting for another 150 days." S. Rep. No. 105-250, at 14 (1998) (referencing a 150-day limit that was later extended to 210 days). The only exception to this rule is if an acting officer "die[s] or resign[s]," in which case the vacancy can be re-filled, but the deadline is not extended. *Id.* Section 3346(a)(2) is a narrow exception to this rule that allows the same acting officer to continue (or resume) service in the vacant role when a nomination is submitted to the Senate. *Id.* ("The acting officer may serve even if the nomination is submitted after the 150 days has passed although, as discussed below, the acting officer may not serve between the 151st day and the day the nomination is submitted."); *see also NLRB v. SW Gen., Inc.*, 137 S.Ct. 929, 936 (2017) (the 210-day clock is "tolled" for a person already serving when a nomination is made, but only "reject[ion], withdraw[al], or return[]" will "start[] a new clock"). When the DHS vacancy was created by Nielsen's resignation, Executive Order 13753 specified that Christopher Krebs, then Under Secretary for National Protection and Programs, should have become Acting Secretary. Krebs has not died or resigned, but rather continues to serve as the Director of the Cybersecurity and Infrastructure Security Agency meaning that the vacancy has never re-opened. There was therefore no basis for Gaynor to assume the office of Acting Secretary at all.

*Third*, as discussed in section III.D.1, *supra*, even if Gaynor were the lawful Acting Secretary, that did not give him the authority to change the Department's order of succession.

*Fourth*, Wolf's purported ratification of his past actions as Acting Secretary is not effective under the Appointments Clause, the FVRA, or the APA. Defendants identify no support for their contention that a subsequent ratification can cure action taken by an unlawfully-serving agency head. Indeed, the FVRA specifically provides that actions taken by officials serving in violation of 5 U.S.C. §§ 3345-47 "in the performance of any function or duty of a vacant office .

. . shall have no force or effect" and "may not be ratified." 5 U.S.C. § 5548(d). The designation of DHS employees to serve as Federal Protective Service agents, which is at the heart of the Policy that Plaintiffs challenge, is a function assigned by statute to the Secretary of Homeland Security. 40 U.S.C. § 1315(b)(1). Defendants suggest that this duty *could* be delegated to another official in the agency and therefore is not a "function or duty" belonging to the Secretary. Br. at 44. This argument is contrary to both the text and the statutory purpose of the FVRA, and should be rejected. *Cuccinelli*, 442 F.Supp.3d at 31-34. And even if ratification were permitted under the FVRA, Wolf's promulgation of the Policy as an unlawfully-serving Acting Secretary means that the Policy "[was] not issued 'in accordance with law,' and must, accordingly be set aside under the APA." *Id.* at 34. [25]

* * *

Wolf was not lawfully serving as DHS's Acting Secretary when he promulgated the Policy, and his effort to ratify the Policy is unlawful, therefore Plaintiffs' claims under the Appointments Clause, FVRA and APA should not be dismissed.

## CONCLUSION

In conclusion, Defendants' motion to dismiss should be denied.

---

[25] Defendants do not invoke, and could not satisfy, either the APA's prejudicial-error rule or the *de facto* officer doctrine as potential bases for Wolf's ratification. With respect to prejudicial error, the court "cannot be confident that" the Policy "would have issued" under an Acting Secretary "other than" Wolf. *SW General, Inc. v. NLRB*, 796 F.3d 67, 80 (D.C. Cir. 2015). The *de facto* officer doctrine does not apply when a plaintiff's action is brought "at or around the time that the challenged government action is taken," and when the agency "has had reasonable notice under all of the circumstances of the claimed defect in the official's title to office." *Id.* at 81-82. Plaintiffs brought suit within a month of the Policy's promulgation, Compl. ¶¶ 71-75, and DHS had notice of the defect in Wolf's service by at least November 15, 2019, when members of Congress sought the GAO's opinion on lawfulness of his service, *see* GAO Decision at 2.

Dated: October 29, 2020

By: */s/ David  A. O'Neil*

Deana K. El-Mallawany (MA Bar No. 674825)*
Justin G. Florence (D.C. Bar No. 988953)
Benjamin L. Berwick (D.D.C. Bar No. MA0004)
The Protect Democracy Project, Inc.
15 Main Street, Suite 312
Watertown, MA 02472
T: (202) 579-4582 | F: (929) 777-8428
deana.elmallawany@protectdemocracy.org
justin.florence@protectdemocracy.org
ben.berwick@protectdemocracy.org


Jessica A. Marsden (NC Bar No. 50855)*
The Protect Democracy Project, Inc.
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
T: (202) 579-4582 | F: (929) 777-8428
jess.marsden@protectdemocracy.org


Christine Kwon (CA Bar No. 319384)*
The Protect Democracy Project, Inc.
555 W. 5th St.
Los Angeles, CA 90013
T: (202) 579-4582 | F: (929) 777-8428
christine.kwon@protectdemocracy.org


Rachel F. Homer (D.C. Bar No. 1045077)
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW, #163
Washington, DC 20006
T: (202) 579-4582 | F: (929) 777-8428
rachel.homer@protectdemocracy.org


*Admitted *pro hac vice*

David A. O'Neil  (D.C. Bar No. 1030615)
Debevoise & Plimpton, LLP
801 Pennsylvania Ave., N.W.
Washington, D.C.  20004
T: (202) 383-8000
daoneil@debevoise.com


Matthew D. Forbes (NY Bar No. 5664354)*
Debevoise & Plimpton, LLP
919 Third Avenue
New York, NY  10022
T: (212) 909-6000
mforbes@debevoise.com

*Counsel for Plaintiffs*