**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DON'T SHOOT PORTLAND, *et al.*,

                Plaintiffs,

      v.

CHAD F. WOLF, in his official capacity as
purported Acting Secretary of Homeland
Security, *et al.*,

                Defendants.

Case No. 20-cv-2040 (CRC)

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER**
**AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION ......................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.     The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch ............................................................................................ 3

    II.    Chad Wolf Was Illegally Performing the Role of Acting DHS Secretary When He Adopted the Challenged Policy ........................................................ 6

          A.     Wolf's Predecessor Had No Power to Install Him as Acting Secretary ...... 6

          B.     The Time Limits for Service by an Acting Secretary Expired Before Wolf Took Office ................................................................................ 16

    III.    Because Wolf's Tenure Was Unlawful, the Policy Must Be Set Aside Under the APA ..................................................................................................... 21

    IV.    Under the FVRA, the Policy Is Void and May Not Be Ratified ........................... 23

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*CASA de Maryland, Inc. v. Wolf*,
No. 20-2118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ...................................... *passim*

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*,
139 F.3d 203 (D.C. Cir. 1998) .................................................................. 4

*Edmond v. United States*,
520 U.S. 651 (1997) ................................................................................ 3

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020) ............................................................................ 1, 3

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991) ................................................................................ 3

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
816 F.3d 550 (9th Cir. 2016) ................................................................. 23

*Immigrant Legal Res. Ctr. v. Wolf*,
No. 20-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................................. 8, 9, 12, 16

*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) ............................................................. 15

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001) ................................................................................ 19

*La Clínica de La Raza v. Trump*,
No. 19-4980, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020)................................... 9, 10, 12, 16

*L.M.-M. v. Cuccinelli*,
442 F. Supp. 3d 1 (D.D.C. 2020) .......................................................... 22, 24

*NLRB v. SW Gen., Inc.*,
137 S. Ct. 929 (2017) .............................................................................. *passim*

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*,
132 F.3d 775 (D.C. Cir. 1998) ............................................................... 25

*SW Gen., Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015) ................................................................. 22, 23

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. Giordano*,
   416 U.S. 505 (1974) ................................................................................... 25

*United States v. Eaton*,
   169 U.S. 331 (1898) ................................................................................... 18

*United States v. Smith*,
   962 F.3d 755 (4th Cir. 2020) ..................................................................... 18

*U.S. Telecom Ass'n v. FCC*,
   359 F.3d 554 (D.C. Cir. 2004) ................................................................... 25


<u>CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS</u>

U.S. Const. art. II, § 2, cl. 2 ............................................................................ 3

5 U.S.C. § 706(2) ...................................................................... 2, 21, 22, 23

5 U.S.C. § 3345(a) ...................................................................... *passim*

5 U.S.C. § 3346(a) ...................................................................... *passim*

5 U.S.C. § 3347(a) ...................................................................... *passim*

5 U.S.C. § 3347(b) ...................................................................... 6

5 U.S.C. § 3348(a) ...................................................................... 21, 22, 23

5 U.S.C. § 3348(b) ...................................................................... 6

5 U.S.C. § 3348(d) ...................................................................... *passim*

6 U.S.C. § 112(a) ...................................................................... 24

6 U.S.C. § 112(b) ...................................................................... 14, 24

6 U.S.C. § 113(a) ...................................................................... 7, 20

6 U.S.C. § 113(g) ...................................................................... *passim*

12 U.S.C. § 5491 ...................................................................... 19

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

40 U.S.C. § 1315 ........................................................................................ 2, 25

144 Cong. Rec. (daily ed. Oct. 21, 1998) ....................................................... 15

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415 ......................................................... 4

Act of July 23, 1868, ch. 227, 15 Stat. 168..................................................... 15

S. Rep. No. 105-250 (1998) ...................................................................... 5, 6, 23


OTHER AUTHORITIES

Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*,
    2017 Cato Sup. Ct. Rev. 151 ................................................................... 5

DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and
    Delegations of Authorities for Named Positions* (Apr. 10, 2019) ............ *passim*

DHS Delegation No. 00106 (Revision No. 08.6), *DHS Orders of Succession and
    Delegations of Authorities for Named Positions* (Nov. 14, 2019) ............ 11

Exec. Order No. 13753, 81 Fed. Reg. 90,667 (Dec. 14, 2016).................... 8

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................. 3

Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the
    Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) ......... 11

*Memorandum for the Secretary from John M. Mitnick, General Counsel,
    Department of Homeland Security* (Apr. 9, 2019) .................................... 9, 11, 14

Office of Legal Counsel, *Designating an Acting Dir. of the Bureau of Cons. Fin.
    Protect.*, 2017 WL 6419154 (Nov. 25, 2017) ............................................ 15

Morton Rosenberg, Cong. Research Serv., No. 98-892, *The New Vacancies Act:
    Congress Acts to Protect the Senate's Confirmation Prerogative* (1998) ............... 3

*The Vacancies Act*, 22 Op. O.L.C. 44 (1998) ................................................ 4

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain
    Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788
    (Aug. 3, 2020) .................................................................................. 17, 20, 21

iv

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

U.S. Gov't Accountability Office, B-331650, *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020)........................................   9

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC has a strong interest in preserving the checks and balances set out in our nation's charter, as well as the proper interpretation of laws that help maintain that balance.

## INTRODUCTION

The Secretary of Homeland Security is empowered to make a range of decisions that have enormous consequences for those affected. To help ensure that the Secretary wields this power responsibly, the Constitution requires that he or she be appointed by the President with the advice and consent of the Senate. "By limiting the appointment power in this fashion," the Constitution seeks to make the officers who exercise the authority of the federal government "accountable to political force and the will of the people." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (quotation marks omitted). But despite that, the Department of Homeland Security (DHS) has operated without a Senate-confirmed Secretary for a year and a half. Meanwhile, lower-level officials, who were never vetted by the Senate for the Secretary's role, have run the Department and steered its policies.

In July 2020, the purported Acting Secretary of DHS, Chad Wolf, instituted a policy designed to use federal law enforcement power to quash the speech and protests supporting Black Lives Matter in Portland, Oregon. Compl. ¶¶ 2-3. As part of that policy, Wolf formed the

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

"Protecting American Communities Task Force" within DHS and ordered that federal officers from multiple DHS component agencies be deployed to Portland under the label "Operation Diligent Valor." *Id.* ¶¶ 73-75. Utilizing a power assigned to the Homeland Security Secretary under 40 U.S.C. § 1315, Wolf designated over one hundred agents from the customs, border, and immigration enforcement arms of DHS to perform duties for the Federal Protective Service. *Id.* ¶¶ 77-79. And under the guise of protecting federal property, these agents, "dressed in military fatigues and toting military gear," have "tear-gassed peaceful protestors," "made unlawful arrests without probable cause," and "otherwise used violence in an effort to stamp out peaceful and constitutionally protected protests." *Id.* ¶ 4.

Chad Wolf, however, had no legal authority to hold the position of Acting DHS Secretary, and he therefore lacked the power to institute this new policy. The Federal Vacancies Reform Act of 1998 (FVRA) and the Homeland Security Act (HSA) place careful limits on service by acting officials in order to preserve the Senate's constitutional power over appointments. And under those laws, Wolf never lawfully became the Acting Secretary. First, the person who purported to install him in that role—his predecessor Kevin McAleenan—was himself serving as Acting Secretary illegally and therefore had no power to name Wolf as his successor. Second, and independently, the limited time period during which the Secretary's office may be filled by an Acting Secretary expired before Wolf's tenure even began.

Because Wolf illegally exercised the powers of a vacant office when he adopted the policy challenged here, that policy "shall have no force or effect" under the FVRA. 5 U.S.C. § 3348(d)(1). And because Wolf acted without legal authority, the Administrative Procedure Act (APA) independently requires that the policy be enjoined as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2). Finally, Wolf's adoption

2

of the policy "may not be ratified," *id.* § 3348(d)(2), even by a properly serving Secretary or Acting

Secretary.  For these reasons, Defendants' motion to dismiss should be denied.

## ARGUMENT

**I.      The FVRA Is a Critical Check on the Manipulation of Appointments by the Executive Branch.**

"Article II of the Constitution requires that the President obtain 'the Advice and Consent

of the Senate' before appointing 'Officers of the United States.'"  *NLRB v. SW Gen., Inc.*, 137 S.

Ct. 929, 934 (2017) (quoting U.S. Const. art. II, § 2, cl. 2).  The Framers imposed that requirement

as a check on the President, recognizing that giving him the "sole disposition of offices" would

result in a Cabinet "governed much more by his private inclinations and interests" than by the

public good.  *The Federalist No. 76*, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Indeed, "the power of appointment to offices was deemed the most insidious and powerful weapon

of eighteenth century despotism," and "[t]he manipulation of official appointments had long been

one of the American revolutionary generation's greatest grievances against executive power."

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (quotation marks omitted).

Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard [ ] of the

constitutional scheme.'"  *SW Gen.*, 137 S. Ct. at 935 (quoting *Edmond v. United States*, 520 U.S.

651, 659 (1997)).  And the Appointments Clause, "like all of the Constitution's structural

provisions, is designed first and foremost not to look after the interests of the respective branches,

but to protect individual liberty."  *Id*. at 949 (Thomas, J., concurring) (quotation marks omitted);

*see Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 140 S. Ct. at 1657 ("the Appointments Clause

helps to preserve democratic accountability").

"Over the years, Congress has established a legislative scheme to protect the Senate's

constitutional role in the confirmation process."  Morton Rosenberg, Cong. Research Serv.,

3

No. 98-892, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative*, at 5 (1998).  Indeed, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant . . . office without first obtaining Senate approval." *SW Gen.*, 137 S. Ct. at 935; *see Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 209-11 (D.C. Cir. 1998).  "[F]rom the beginning," however, Congress has placed limits on such acting service.  *Id.* at 210; *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415, 415 (empowering the President to authorize persons "to perform the duties" of vacant offices, but providing that "no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months").

In the 1860s, "Congress repealed the existing statutes on the subject of vacancies and enacted in their stead a single statute," the Vacancies Act, which has been in force since then, with modifications.  *Doolin*, 139 F.3d at 210.  "The Federal Vacancies Reform Act of 1998 . . . is the latest version of that authorization."  *SW Gen.*, 137 S. Ct. at 934.

Congress enacted the FVRA in response to the executive branch's increasing refusal to comply with the Vacancies Act and the Appointments Clause.  Beginning in the 1970s, the Justice Department took the position that the Vacancies Act was not "the exclusive statutory authority for temporarily assigning the duties and powers of a Senate-confirmed office," *The Vacancies Act*, 22 Op. O.L.C. 44, 44 (1998), and that "statutes vesting an agency's powers in the agency head and allowing delegation to subordinate officials" could be used as an alternative during a vacancy, enabling agencies to avoid complying with the limits of the Vacancies Act.  *Id.*  Because virtually all federal departments are governed by such "vesting-and-delegation" statutes, *id.* at 2, individuals "who were ineligible for appointment as acting officers under the terms of the Vacancies Act were frequently 'delegated' the title and duties of precisely the same office, meaning the act's

restrictions had become largely toothless." Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 155.

Dismayed that "acting service beyond the time limitations in the act was widespread," *id.* at 154, and seeking to vindicate the Act's "fundamental purpose" of "limit[ing] the power of the President to name acting officials," Congress enacted the FVRA "to create a clear and exclusive process to govern the performance of duties of offices in the Executive Branch that are filled through presidential appointment by and with the consent of the Senate," S. Rep. No. 105-250, at 7-8, 1 (1998). Accordingly, the FVRA carefully limits who may serve as an acting officer when a vacancy arises. By default, the "first assistant" to the vacant office must perform the functions and duties of that office. 5 U.S.C. § 3345(a)(1). The President "may override that default rule by directing [a different person] to become the acting officer instead," *SW Gen.*, 137 S. Ct. at 935, but the President's choice of whom to select is limited. *See* 5 U.S.C. § 3345(a)(2), (3).

Further, to prevent acting officers from filling vacancies for "constitutionally unacceptable" periods of time, S. Rep. No. 105-250, at 8, the FVRA also limits the length of their service. Relevant here, unless the President sends a nomination to the Senate to fill a vacancy permanently, acting officials may perform the functions and duties of the vacant office "for no longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1).

The FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" requiring Senate confirmation, *id.* § 3347(a), with two limited exceptions. One exception accommodates recess appointments. *See id.* § 3347(a)(2). The other exception permits agency organic statutes to depart from the FVRA if they expressly designate an official to temporarily perform the functions and duties of a vacant office, *id.* § 3347(a)(1)(B), or if they expressly authorize the head of the department to designate an official

to do so, *id.* § 3347(a)(1)(A).  If an office is not validly being filled pursuant to the FVRA or one of these exceptions, however, "the office shall remain vacant."  *Id.* § 3348(b)(1).

To prevent department heads from evading these restrictions by purporting to "delegate" the powers of a vacant office to others, the FVRA specifies that statutes giving "general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to, or to reassign duties among," other agency personnel—*i.e.*, so-called vesting-and-delegation statutes—do not provide an exception to the FVRA's limits.  *Id.* § 3347(b).

Finally, to encourage compliance with these limits, Congress provided that an agency action "shall have no force or effect" if it was taken by a person performing a function or duty of a vacant office without authorization by the FVRA or one of its exceptions.  *Id.* § 3348(d)(1).  Importantly, these void actions "may not be ratified" by other officials.  *Id.* § 3348(d)(2); *see* S. Rep. No. 105-250, at 8 ("[I]f any subsequent acting official . . . can ratify the actions of a person who [violated] the Vacancies Act, then no consequence will derive from an illegal acting designation.  This result also undermines the constitutional requirement of advice and consent.").

## II.   Chad Wolf Was Illegally Performing the Role of Acting DHS Secretary When He Adopted the Challenged Policy.

### A.   Wolf's Predecessor Had No Power to Install Him as Acting Secretary.

Chad Wolf purportedly became the Acting Secretary of DHS by virtue of an order signed by the previous Acting Secretary, Kevin McAleenan, shortly before McAleenan left government. McAleenan himself, however, was never a valid Acting Secretary.  As a result, he had no power to issue any such order, and his attempt to install Wolf as his successor is void and without effect.

**1.**  In creating the office of DHS Secretary, Congress incorporated and supplemented the FVRA's rules for the filling of vacancies.  Consistent with the FVRA, the HSA establishes a Deputy Secretary who is designated as "the Secretary's first assistant" for purposes of the FVRA.

6 U.S.C. § 113(a)(1)(A).  Under the FVRA, only this "first assistant," the Deputy Secretary, would be able to serve automatically as the Acting Secretary during a vacancy.  *See* 5 U.S.C. § 3345(a)(1). The HSA modifies this rule, providing that, in the absence of a Deputy, the Department's third-in-line officer should serve as the Acting Secretary.  *See* 6 U.S.C. § 113(g)(1).  The HSA also empowers the Secretary to extend this line of succession further to account for situations in which the top three positions are all vacant: notwithstanding the FVRA, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2).  The FVRA permits this type of express departure from its rules in an agency-specific succession statute.  *See* 5 U.S.C. § 3347(a)(1)(A).

In short, the HSA prescribes a specific order of succession that automatically goes into effect when the Secretary's office is vacant, and it empowers the Secretary to expand upon that list by establishing a "further" line of succession beyond those two officials.

Exercising that power, the Secretary has established a further line of succession in the Department's internal regulation governing vacancies, known as Delegation 00106.  *See* DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Apr. 10, 2019); *see also CASA de Maryland, Inc. v. Wolf*, No. 20-2118, 2020 WL 5500165, at *20 (D. Md. Sept. 11, 2020) ("Delegation Order 00106 has been the DHS' repository for changes to the order of succession for the office of the Secretary and twenty-eight other . . . positions within the agency.").  Specifically, Delegation 00106 incorporates the line of succession for the Secretary's office that was first provided in a 2016 executive order: "In case of the Secretary's . . . resignation, . . . the orderly succession of officials is governed by Executive Order 13753."  DHS Delegation No. 00106, *supra*, § II.A.

Executive Order 13753, in turn, lists sixteen DHS officials who are authorized to take over

as Acting Secretary during a vacancy, in the sequence provided.  *See* Exec. Order No. 13753, § 1, 81 Fed. Reg. 90,667 (Dec. 14, 2016).  Under Delegation 00106, therefore, that list of officials, in that order, are to serve as Acting Secretary following a Secretary's resignation.[2]

The last Senate-confirmed DHS Secretary, Kirstjen Nielsen, resigned in April 2019.  At that point, Kevin McAleenan was the Commissioner of U.S. Customs and Border Protection.  Under Executive Order 13753, and therefore under Section II.A of Delegation 00106, the Commissioner is *seventh* in line to become Acting Secretary following a resignation.  *See* Exec. Order No. 13753, *supra*, § 1.  Nevertheless, McAleenan purported to take over as Acting Secretary, even though other officials higher in the line of succession were available to serve.

In doing so, McAleenan unlawfully departed from the "further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(2), that was set forth in DHS's regulation.  *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-5883, 2020 WL 5798269, at *7 (N.D. Cal. Sept. 29, 2020) ("*ILRC*") ("Pursuant to that order of succession, Mr. McAleenan was seventh in line and, thus, was not eligible to assume the role of Acting Secretary."); *CASA*, 2020 WL 5500165, at *21 ("[W]hen Nielsen vacated the office, and McAleenan assumed the position of Acting Secretary, he was not next in line . . . .  McAleenan's leapfrogging over [the proper official] therefore violated the agency's own order of succession.").

---

[2] When Executive Order 13753 was issued in 2016, DHS had not yet been given the statutory power to establish a further line of succession for the Secretary's office.  The President's authority to issue the executive order came from his discretionary power under the FVRA to select specific officials besides the first assistant to fill a vacancy.  *See* 5 U.S.C. § 3345(a)(2), (a)(3).  One week later, the HSA was amended to add 6 U.S.C. § 113(g), which permitted DHS to establish a further line of succession.  In exercising that new power, DHS has adhered to the line of succession set forth in Executive Order 13753, incorporating that executive order by reference as the source governing vacancies caused by resignations.  *See* DHS Delegation No. 00106, *supra*, § II.A.  Indeed, by April 2019 the DHS Secretary had amended Delegation 00106 at least three times, *see id.* at 1-1 (indicating dates of revisions), and each time the Secretary preserved Section II.A and its reliance on Executive Order 13753 to provide the line of succession following resignations.

Because McAleenan "assumed the role of Acting Secretary without lawful authority" under the HSA, *id.*, his tenure violated the FVRA, which is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" unless an alternative succession statute like the one in the HSA is being followed.  *See* 5 U.S.C. § 3347(a).

**2.**   Despite the above, the government insists that McAleenan validly became Acting Secretary upon Nielsen's resignation pursuant to the DHS order of succession adopted under § 113(g)(2).  Every court to address that contention has properly rejected it, as has the Government Accountability Office.  *See ILRC*, 2020 WL 5798269, at *7-9; *CASA*, 2020 WL 5500165, at *20-23; *La Clínica de La Raza v. Trump*, No. 19-4980, 2020 WL 4569462, at *13-14 (N.D. Cal. Aug. 7, 2020); U.S. Gov't Accountability Office, B-331650, *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf.

In support of its position, the government cites an order signed by Secretary Nielsen on April 9, 2019.  This order states that it is revising Annex A to Delegation 00106, the internal DHS regulation providing the line of succession for the Department's various offices.  *See Memorandum for the Secretary from John M. Mitnick, General Counsel, DHS*, at 1 (Apr. 9, 2019) (memorializing Nielsen's "approval of the attached document," identified as "Annex A"); *id.* at 2 (the attached document, which reads: "Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof").

Crucially, however, Annex A governs only who may exercise the Secretary's powers during a disaster or catastrophic emergency that prevents the Secretary from acting, *not* who may exercise the Secretary's powers following a resignation.  *See* DHS Delegation No. 00106, *supra*,

§ II.B ("I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office . . . in the event I am unavailable to act during a disaster or catastrophic emergency."); *CASA*, 2020 WL 5500165, at *21 ("On Nielsen's last day of service, she amended Annex A of Delegation Order 000106, which applied only to succession 'in the event of disaster or emergency.'").

The day after Nielsen signed this order, DHS updated Delegation 00106 accordingly.  Just as Nielsen ordered, Annex A now contained a revised line of succession for cases of "disaster or catastrophic emergency."   DHS Delegation No. 00106, *supra*, § II.B.  Also consistent with Nielsen's order, the updated regulation left intact the line of succession for cases involving "the Secretary's . . . resignation," which were still "governed by Executive Order 13753."  *Id.* § II.A.

The government claims that this was all a mistake that "did not accurately capture Ms. Nielsen's order."  MTD 33 n.16.  But DHS personnel did exactly what Nielsen's order told them to do: they "replaced Annex A and made no other changes to Delegation No. 00106."  *La Clínica*, 2020 WL 4569462, at *13; *see CASA*, 2020 WL 5500165, at *22.  Thus, when Nielsen resigned, "the orderly succession of officials [was] governed by Executive Order 13753 . . . not the amended Annex A, which only applied when the Secretary was unavailable due to disaster or catastrophic emergency."  *La Clínica*, 2020 WL 4569462, at *13 (quotation marks omitted).

In sum, Nielsen's order and DHS's subsequently revised Delegation 00106 are consistent with each other and are perfectly clear: Nielsen altered the line of succession for cases of disaster or catastrophic emergency, but she did not alter the line of succession for resignations, which remained governed by Executive Order 13753.  And under that executive order, Kevin McAleenan was not entitled to become Acting Secretary when Nielsen resigned.

**3.**  The government argues that Nielsen's order actually established a new, consolidated

line of succession for "all vacancies," including those caused by resignations, eliminating any further reliance on the line of succession provided in the executive order.  MTD 31.  That, however, is simply not what Nielsen's order says.  Rather, her order states: "I hereby designate the order of succession for the Secretary of Homeland Security *as follows*."  *Memorandum for the Secretary*, *supra*, at 2 (emphasis added).  The only thing that "follows" is an amendment to the text of Annex A.  And that annex governs only vacancies during a disaster or catastrophic emergency.

The government's position thus requires adding text to Nielsen's order that it does not contain (language specifying that she was creating a single line of succession to govern all vacancies, eschewing further reliance on Executive Order 13753), while ignoring text that the order *does* contain (language specifying that the only change being made was to Annex A).  *See CASA*, 2020 WL 5500165, at *22 (refusing to read Nielsen's order "to also apply in the case of resignation," given "its clear language limiting application to disaster and emergency").

In reality, the government is attempting to conflate what Secretary Nielsen did in April 2019 with what Kevin McAleenan did later that year.  In November, McAleenan signed an order purporting to change the Secretary's line of succession again.  But unlike Nielsen, McAleenan altered the line of succession for vacancies caused by resignations—replacing the list of officials set forth in Executive Order 13753 with the list in Annex A: "Section II.A of DHS Delegation No. 00106 . . . is amended hereby to state as follows: 'In case of the Secretary's . . . resignation, . . . the order of succession of officials *is governed by Annex A*.'"  Kevin K. McAleenan, Acting Secretary of Homeland Security, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) (emphasis added).  The Department's regulation was then changed accordingly.  *See* DHS Delegation No. 00106 (Revision No. 08.6), *DHS Orders of Succession and Delegations of Authorities for Named Positions*, § II.A (Nov. 14, 2019).

11

When DHS personnel amended that regulation to implement McAleenan's order, they were not belatedly correcting a mistake they made seven months earlier, as the government claims. The record plainly shows that "McAleenan amended Delegation No. 00106 . . . to cross-reference Annex A but Nielsen did not." *La Clínica*, 2020 WL 4569462, at *14. The government has never explained "why it was necessary for Mr. McAleenan to amend Section II.A of Delegation 00106, if Secretary Nielsen had already accomplished that change." *ILRC*, 2020 WL 5798269, at *8.

**4.** Instead, the government argues that the plain text of Nielsen's order should be ignored based on "context" supposedly indicating that Nielsen intended something other than what she prescribed. These "context" arguments, unpersuasive on their own terms, do not warrant overriding the clear language of Nielsen's order.

The government's primary argument is that Nielsen's use of the term "order of succession" must mean that she actually meant to alter the line of succession for resignations, not just the line of succession for disasters and emergencies. Nielsen's order indicates that it is establishing the "order of succession" for the Secretary's office, and it cites 6 U.S.C. § 113(g)(2) (allowing the Secretary to designate a "further order of succession") as among the authorities empowering her to do so. According to the government, Nielsen could not possibly have designated an "order of succession" under § 113(g)(2) to govern situations involving disaster and emergency, because— the government argues—those situations are covered only by a "delegation of authority" in DHS's regulation. In other words, by invoking § 113(g)(2) and using the term "order of succession," the preamble to Nielsen's order *must* mean that she meant to amend Section II.A of Delegation 00106 (governing resignations) because Section II.B (governing disasters and emergencies) was not an order of succession but rather "a delegation of authority."

This argument is premised on a supposedly black-and-white distinction between "orders

12

of succession" and "delegations of authority," as well as the idea that an "order of succession" applies only to permanent vacancies following an officer's death or resignation.  But that premise is false.  The HSA, Delegation 00106, and Nielsen's order itself all refute the notion that the term "order of succession" is restricted to permanent vacancies following death or resignation.  Those authorities also reveal that there is no distinction in usage between the terms "order of succession" and "delegation of authority" so clear and firmly entrenched as to justify overriding the plain language of Nielsen's order.

In the HSA, § 113(g) states that the "order of succession" it empowers the Secretary to create will govern not only a "vacancy in office," but also situations in which "absence" or "disability" prevents a Secretary from being "available to exercise the duties of the Office." 6 U.S.C. § 113(g)(1).  That language clearly encompasses situations in which a Secretary is "unavailable to act during a disaster or catastrophic emergency."  DHS Delegation No. 00106, *supra*, § II.B.  The government is simply wrong, therefore, to claim there was "no reason that Ms. Nielsen would have invoked her § 113(g)(2) authority to designate the order of succession . . . if she was merely amending the order for delegated authority during an emergency."  MTD 32-33.

Likewise, Delegation 00106 twice uses the term "order of succession" to describe its various annexes, *see id.* ¶¶ II.C, II.G, while it also "delegate[s] authority" to the officials listed in those annexes "to exercise the powers and perform the functions and duties of the named positions in case of," among other things, "death" and "resignation," *id.* ¶ II.D.

Finally, while Nielsen's order is titled "Amending the Order of Succession in the Department of Homeland Security," and while it proclaims its intent to designate an "order of succession" for the Secretary's office, the revised version of Annex A that ensues is titled "Order *for Delegation of Authority* by the Secretary of the Department of Homeland Security."

13

*Memorandum for the Secretary*, *supra*, at 2 (emphasis added).

Neither the HSA nor the Department's own practices, therefore, draw the firm distinction between the terms "order of succession" and "delegation of authority" that the government says they do.  Indeed, the government belies its own claim by asserting that Nielsen's new order of succession "applied to all vacancies regardless of reason," including vacancies arising from disaster or emergency, even while simultaneously insisting that the provision for disasters and emergencies in Section II.B is a "delegation of authority," not an "order of succession."  MTD 32.[3]

Thus, the supposed boundary between these two terms is not nearly solid enough to justify the inference that the government seeks to draw from it—namely, that Nielsen's order should be read to mean something other than what its language plainly says, simply because it invokes § 113(g)(2) to designate an "order of succession."  Instead, her use of that term "at best states the obvious—that Nielsen had the authority to change the succession order as applied to the office of the Secretary," not that she "changed two separate succession lists applicable to each scenario." *CASA*, 2020 WL 5500165, at *22.

In defending its position, the government also relies on a second flawed premise.  It insists that an "order of succession" adopted pursuant to § 113(g)(2) cannot have been meant to address only scenarios involving disaster or emergency, because § 113(g)(2) provides a carve-out from the FVRA, and situations in which disaster or emergency prevent an officer from acting "are not the

---

[3] As the government would have it, a delegation of authority "simply allow[s] an official to exercise certain powers of the office of the Secretary," not to become the Acting Secretary. MTD 37.  That distinction might be valid when a sitting Secretary permits another official to exercise only *some* of the Secretary's powers, as under 6 U.S.C. § 112(b)(1).  But when a Secretary is "unavailable to act" during a disaster or emergency, DHS Delegation No. 00106, *supra*, § II.B, and another official assumes *all* of the Secretary's "authority to exercise the powers and perform the functions and duties of [the] office," *id.,* then this stand-in official is clearly serving as the Acting Secretary, whether or not that label is used.  Under those conditions, a "delegation of authority" is indistinguishable from an "order of succession."

kind of vacancy that would trigger the FVRA." MTD 34; *id.* (asserting that someone exercising the Secretary's powers under § II.B of Delegation 00106 would not be an Acting Secretary). The government cites no authority supporting that proposition, and it is wrong. The FVRA covers more than permanent vacancies that arise when an officer "dies" or "resigns." 5 U.S.C. § 3345(a). It applies to *every* situation in which an officer "is otherwise unable to perform the functions and duties of the office." *Id.* And it expressly covers scenarios in which an incumbent officer is temporarily prevented from performing his or her duties.[4]

The government counters that if this is true, then former DHS Secretary Jeh Johnson lacked the authority to establish Section II.B (and Annex A) in the first place because it was not until a week later that the HSA was amended to add § 113(g), giving the Secretary the power to designate an order of succession that could supplant the FVRA. But that conclusion does not follow. Section II.B includes an important caveat: it purports to delegate all of the Secretary's powers during a disaster or catastrophic emergency "to the extent not otherwise prohibited by law." DHS Delegation No. 00106, *supra*, § II.B. Thus, to the extent that the FVRA conflicts with this provision or limits the permissible scope of the delegation, Section II.B makes clear that it does not, on its face, purport to override that limitation. And even if Johnson *did* lack the authority to

---

[4] *See* 5 U.S.C. § 3346(a) (referencing "a vacancy caused by sickness"); Office of Legal Counsel, *Designating an Acting Dir. of the Bureau of Cons. Fin. Protect.*, 2017 WL 6419154, at *3 (Nov. 25, 2017) ("an officer is 'unable to perform the functions and duties of the office' during both short periods of unavailability, such as a period of sickness, and potentially longer ones"). Indeed, the Vacancies Act, which the FVRA amended, has *always* covered temporary vacancies caused by an incumbent's inability to act. For 130 years, the Act referred to "death, resignation, absence, or sickness," Act of July 23, 1868, ch. 227, § 2, 15 Stat. 168, 168, and Congress broadened that language even further in the FVRA, *see* 5 U.S.C. § 3345(a), in order "[t]o make the law cover all situations when the officer cannot perform his duties," 144 Cong. Rec. S12823 (daily ed. Oct. 21, 1998) (Sen. Thompson); *see also In re Grand Jury Investigation*, 916 F.3d 1047, 1055-56 (D.C. Cir. 2019) (the Attorney General's recusal constituted "absence or disability" under the Justice Department's succession statute and therefore "created a vacancy").

establish Section II.B, the phenomenon of executive branch department heads pushing the limits of the Vacancies Act through their "delegation" authority is hardly new.  *See supra* at 4-6.

In short, nothing the government cites offers any reason to disregard the unambiguous text of Nielsen's order.  Neither her use of the term "order of succession" nor her invocation of § 113(g)(2) is in tension with the straightforward reading of that plain text.  They certainly do not offer such clear indications of a contrary meaning as to override the order's plain language, which "changed Annex A, and Annex A only."  *CASA*, 2020 WL 5500165, at *22.  Thus, when the Secretary's office became vacant in April 2019, the line of succession provided in Executive Order 13753 still prescribed who would serve as Acting Secretary following a resignation, and no legal authority permitted Kevin McAleenan to assume that role.[5]

Chad Wolf's claim to be Acting Secretary, in turn, rests entirely on the November 2019 order in which McAleenan ostensibly designated a new line of succession under § 113(g)(2).  *See* MTD 31.  Because McAleenan's tenure was unlawful, however, he had no right to exercise the Secretary's powers under § 113(g)(2).  His order therefore had "no force or effect" under the FVRA, 5 U.S.C. § 3348(d)(1), and Wolf could not become Acting Secretary based on that order.

**B.      The Time Limits for Service by an Acting Secretary Expired Before Wolf Took Office.**

Even if Kevin McAleenan validly became the Acting Secretary of Homeland Security in April 2019 (a proposition no court has accepted), his authority to serve as Acting Secretary expired

---

[5] One of the courts that held that McAleenan did not validly become Acting Secretary under the HSA concluded that he was nonetheless eligible to be named to that role by the President under the FVRA, pursuant to 5 U.S.C. § 3345(a)(2) or (a)(3).  *See La Clínica*, 2020 WL 4569462, at *14. That court did not address whether the President actually *did* designate McAleenan as Acting Secretary under the FVRA, and it has "granted leave to file a motion to reconsider that decision," because since that decision the government has consistently "taken the position . . . that Mr. McAleenan was not appointed pursuant to the FVRA."  *ILRC*, 2020 WL 5798269, at *7 n.9.

in early November—before he signed his order attempting to make Wolf his successor.

The FVRA limits the amount of time during which a vacant office may be filled by an acting official.  Except in the case of vacancies caused by sickness, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  This time limit is extended if the President nominates someone to fill the office permanently, *id.* § 3346(a)(2), but in the absence of such a nomination, the outer limit on acting service is 210 days from the beginning of the vacancy.  The office of DHS Secretary became vacant on April 10, 2019, and because President Trump did not nominate anyone to fill the office, the FVRA's time limits for the office expired on November 6, 2019.

To overcome this problem, the government has argued that the FVRA's time limits do not apply to the Secretary's office when a person is serving as Acting Secretary under a "further order of succession" established pursuant to 6 U.S.C. § 113(g)(2).  *See U.S. Citizenship and Immigration Services Fee Schedule*, 85 Fed. Reg. 46,788, 46,804 (Aug. 3, 2020) (asserting that Secretary Nielsen's designation of a further order of succession under § 113(g)(2) "superseded the FVRA" and that McAleenan thus "served as Acting Secretary without time limitation").

The implication of this argument is that DHS may operate indefinitely without ever having a Senate-confirmed Secretary.  If no time limits on acting service apply, and if the order of succession under § 113(g)(2) can be modified at will, a series of Acting Secretaries can run the Department in perpetuity.  Not only that, but these Acting Secretaries can choose their own successors, as long as the top three positions in the Department remain vacant (thus enabling the "further" line of succession under § 113(g)(2) to take effect).  Before leaving office, all a departing Acting Secretary has to do is revise the order of succession, as Kevin McAleenan did, to put his chosen replacement at the top of the list.  Moreover, the individuals who make up this chain of

Acting Secretaries need not have been confirmed by the Senate to *any* position in DHS.  That is because § 113(g)(2) permits any "officers of the Department" to be included in the Secretary's line of succession, not merely those whose offices require Senate confirmation.  In short, a self-perpetuating sequence of Acting Secretaries, some of whom may have been selected for their underlying positions in the Department without presidential nomination or Senate confirmation, may run the Department indefinitely.

Even if such a system were constitutional,[6] it is plainly impermissible under the relevant statutes, which preserve the FVRA's time limits on acting service for the Secretary's office.

First, the HSA does not displace the FVRA's time limits.  A provision like § 113(g)(2) may deviate from the FVRA's rules, but only if it "expressly" authorizes a department head "to designate an officer or employee to perform the functions and duties of [the] office temporarily." 5 U.S.C. § 3347(a)(1)(A).  Where such express authorization is lacking, the FVRA's procedures, including its time limits, remain "the exclusive means" for permitting acting service, *id.* § 3347(a).

Nothing in § 113(g)(2) "expressly" authorizes the designation of Acting Secretaries who may serve beyond the FVRA's 210-day time limit.  Although § 113(g)(2) states that it applies "[n]otwithstanding chapter 33 of Title 5" (which includes the FVRA and other provisions), the presence of this "notwithstanding" clause does not displace the FVRA's time limits—much less "expressly" purport to do so.  A "notwithstanding" clause "just shows which of two or more provisions prevails *in the event of a conflict*."  *SW Gen.*, 137 S. Ct. at 940 (emphasis added); *id.* at 939 (the word "shows which provision prevails in the event of a clash" (quotation marks omitted)). When two provisions do not conflict, there is nothing for a "notwithstanding" clause to resolve.

_____

[6] Courts have held that "the temporary nature" of acting service is what prevents it from violating the Appointments Clause. *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020); *see United States v. Eaton*, 169 U.S. 331, 343 (1898) (citing "special and temporary conditions").

And here, there is no conflict between § 113(g)(2) and the FVRA's time limits: nothing in § 113(g)(2) addresses how long Acting Secretaries may serve or refers to time limits at all. Congress knows how to address such matters when it wants to. *See, e.g.*, 12 U.S.C. § 5491(c)(2) (permitting officer to serve "until a successor has been appointed and qualified").

Thus, the "notwithstanding" clause in § 113(g)(2) does not erase every rule of the FVRA, including those rules (like its time limits) that are compatible with § 113(g)(2). Rather, it resolves a specific conflict between § 113(g)(2) and the FVRA: As explained, § 113(g)(2) permits DHS officers to serve as Acting Secretary automatically even though they are not the "first assistant" to the Secretary's office. Because the FVRA forbids that arrangement, *see* 5 U.S.C. § 3345, the "notwithstanding" clause is needed to clarify "which provision prevails." *SW Gen.*, 137 S. Ct. at 940. By contrast, allowing such officers to serve automatically as Acting Secretary does not conflict with the FVRA's imposition of a time limit on how long they may serve. *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quotation marks omitted)). Because there is no conflict between § 113(g)(2) and the time limits of 5 U.S.C. § 3346, the "notwithstanding" clause does not override those limits even implicitly, much less "expressly," 5 U.S.C. § 3347(a)(1).

The government's position, moreover, creates the untenable result that while a Deputy Secretary of DHS may serve as Acting Secretary for no longer than 210 days, lower-level officials chosen unilaterally by the Department are exempt from that time limit. The Deputy is unquestionably bound by the FVRA's time limits because the provision of § 113 that permits him to serve as Acting Secretary does not contain a "notwithstanding" clause or supersede any part of the FVRA. To the contrary, it authorizes the Deputy to serve as Acting Secretary by designating

the Deputy as the Secretary's "first assistant" for FVRA purposes.  6 U.S.C. § 113(a)(1)(A).

Despite the fact that this Senate-confirmed Deputy Secretary is bound by the FVRA's time limits,

the government insists that subordinate, non-Senate-confirmed officers who have been listed in an

order of succession that the Department can revise at will are permitted to serve as Acting Secretary

"without time limitation."  85 Fed. Reg. at 46,804.  That cannot be what Congress intended.[7]

The HSA therefore leaves the FVRA's time limits intact, and nothing in FVRA itself makes

those limits inapplicable here.  The time limits apply to any official who is "serving as an acting

officer as described under section 3345."  5 U.S.C. § 3346(a).  And a person who is the Acting

Secretary by virtue of § 113(g)(2) is indeed "serving as an acting officer as described under section

3345" of the FVRA.  That is because § 113(g)(2) does not stand in isolation—it connects directly

to other portions of § 113, which in turn link directly to § 3345.

Specifically, § 113(a)(1)(A) incorporates the FVRA's "first assistant" rule (found in

§ 3345) as the means of authorizing service by an Acting Secretary.  It does so by making the

Deputy Secretary the "first assistant" to the Secretary for FVRA purposes.  Subsection (g)(1) then

modifies this rule to account for the possible absence of a first assistant: if no Deputy Secretary is

available to serve under § 113(a)(1)(A), the Under Secretary for Management automatically steps

in.  And if no Under Secretary is available either, the "further order of succession" established

under (g)(2) fills out the scheme.  In other words, this "further" order of succession extends the

limited order of succession provided in (g)(1), and (g)(1), in turn, extends the rule of (a)(1)(A).

---

[7] The government has admitted that a Deputy Secretary who serves as the Acting Secretary under 6 U.S.C. § 113(a)(1)(A) must cease performing that role when the 210-day limit expires. But then what happens?  One possibility is that the office must remain vacant from then on.  But this would mean that whether the office can be filled indefinitely depends on the fortuity of whether a Deputy Secretary was in place at the start of the vacancy.  The other, equally untenable possibility is that the Deputy would have to turn over the reins to whoever is next in line under § 113(g), and that this person would then serve indefinitely—while outranking the Deputy Secretary.

These provisions thus work with each other, and with the FVRA, to form a single interlocking sequence. Through their connections, a person who is the Acting Secretary under an order of succession adopted pursuant to § 113(g)(2) is ultimately "serving as an acting officer as described under section 3345," making applicable the FVRA's time limits. 5 U.S.C. § 3346(a). And as explained earlier, Congress cannot plausibly have intended any other result.

Finally, nothing in the FVRA suggests that its time limits vanish whenever another statute like the HSA provides a supplementary means of designating an acting officer. To the contrary, the FVRA says that provisions like § 113(g)(2) may be used only to designate someone "to perform the functions and duties of a specified office *temporarily*." 5 U.S.C. § 3347(a)(1)(A) (emphasis added). Thus, DHS may not utilize § 113(g)(2) to designate someone to perform those functions and duties "without time limitation." 85 Fed. Reg. at 46,804.

## III.    Because Wolf's Tenure Was Unlawful, the Policy Must Be Set Aside Under the APA.

The illegality of Wolf's service as Acting Secretary means that his approval of the policy challenged here cannot stand. That result is required both by the APA (discussed in this section) and by the FVRA (discussed in the next section).

Because agency actions that are taken in violation of the FVRA are "not in accordance with law" and are "in excess of statutory jurisdiction, authority, or limitations," they must be set aside as "unlawful" under the APA. 5 U.S.C. § 706(2). Congress also imposed additional penalties on certain FVRA violations, which go beyond the normal APA remedies for unlawful agency action. *See id.* § 3348(d) (providing that certain actions are void *ab initio* and may not be ratified). Those additional FVRA penalties apply when an illegally serving official performs a "function or duty" of a vacant office, as that term is defined in § 3348, which requires that the function or duty in question be one that "only that officer" could take. *Id.* § 3348(a)(2)(A).

21

However, even when the FVRA's unique penalties do not apply because this definition of "function or duty" is not met, agency actions taken by a person whose acting service violates other portions of the FVRA are still "unlawful" and must be set aside under the APA.  5 U.S.C. § 706(2). In other words, actions taken by an illegally serving official must be set aside under the APA even if the function in question is not assigned exclusively to the vacant office.  *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 34 (D.D.C. 2020).

The FVRA's text makes this clear.  While its enforcement provision sets forth a definition of "function or duty" for purposes of that section and its unique penalties, 5 U.S.C. § 3348(a)(2), the "functions and duties" that the rest of the FVRA governs include a broader array of agency actions.  Section 3348 explicitly states that its narrower definition of "function or duty" applies only "[i]n this section."  *Id*. § 3348(a).  And the FVRA uses phrases like "in this section" with precision and intent, as the Supreme Court has explained:

> Now add "under this section."  The language clarifies that subsection (b)(1) applies to all persons serving under § 3345.  Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line.  Congress used that structure in the FVRA and relied on it to make precise cross-references.

*SW Gen.*, 137 S. Ct. at 938-39 (citations omitted).  By specifying that § 3348's definition of "function or duty" applies only "in this section," Congress "ma[d]e [a] precise cross-reference[]," *SW Gen.*, 137 S. Ct. at 939, to clarify that this definition does not apply elsewhere in the FVRA. That definition, therefore, governs only whether the penalties of § 3348 apply, not the meaning of "functions and duties" elsewhere in the Act.

The upshot is that demonstrating a violation of 5 U.S.C. § 3345, § 3346, or § 3347 does not require showing that the challenged action was a function that "only that officer" could take. 5 U.S.C. § 3348(a)(2).  Even if the unique penalties of § 3348 do not apply, therefore, the standard remedies for unlawful agency action under the APA remain available.  *See SW Gen., Inc. v. NLRB*,

796 F.3d 67, 79, 80-81 (D.C. Cir. 2015); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016).

Wolf's approval of the policy at issue here violated § 3345, § 3346, and § 3347 because he was not eligible to be Acting Secretary under those provisions when he approved that policy. Under the APA, Wolf's "unlawful" action must be set aside.  5 U.S.C. § 706(2).

**IV.     Under the FVRA, the Policy Is Void and May Not Be Ratified.**

In enacting the FVRA, Congress was concerned that the standard remedies for unlawful agency action might not be sufficient to deter violations of the Act.  The FVRA therefore imposes additional penalties on certain violations of its rules.  If "any person" performs "any function or duty" of a vacant office, without validly serving as an acting officer under the FVRA or an agency's succession statute, then that person's action "shall have no force or effect."  5 U.S.C. § 3348(d)(1); *see SW Gen.*, 137 S. Ct. at 938 n.2 ("the general rule" is that "actions taken in violation of the FVRA are void *ab initio*").  By making such actions "void" and not merely "*voidable*," this penalty forecloses defenses such as harmless error and the *de facto* officer doctrine, *SW Gen.*, 796 F.3d at 79.  The FVRA further provides that actions deemed void under this provision "may not be ratified."  5 U.S.C. § 3348(d)(2); *see* S. Rep. No. 105-250, at 19 ("A lawfully serving acting officer cannot ratify the actions of a temporary officer whose service does not comply with the Vacancies Reform Act.").

These additional penalties are triggered when an illegally serving official performs a "function or duty" of a vacant office.  That term includes "any function or duty of the applicable office" that is "required by statute to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2)(A).  Wolf's approval of the policy at issue here satisfies this standard. Indeed, it cannot seriously be argued that the statutes permit anyone but the Secretary to adopt a

policy like this.  That policy was therefore void *ab initio* and is ineligible for ratification.

"The Secretary is the head of the Department and shall have direction, authority, and control over it."  6 U.S.C. § 112(a)(2).  Establishing Wolf's new policy required ordering the leadership and personnel from multiple DHS agencies to comply with his directives.  The government has cited no statute that allows anyone but the Secretary to issue such a directive.  Not only that, but Wolf also relied on additional statutory authority that specifically empowers "[t]he Secretary," and no one else, to designate DHS employees "as officers and agents for duty in connection with the protection" of federal property.  40 U.S.C. § 1315(b)(1).

The government has elsewhere argued that the term "function or duty" in § 3348 "includes only 'non-delegable duties'—that is, only those duties . . . that may not be reassigned."  *L.M.-M.*, 442 F. Supp. 3d at 31 (quoting brief).  Working from that premise, the government has suggested that no action performed by the Secretary can ever be void under § 3348(d) because the Secretary's vesting-and-delegation provision allows the Secretary to delegate power to others.  *See* 6 U.S.C. § 112(b)(1).  Such delegation, however, is permitted only "except as otherwise provided by this chapter."  *Id.*  And Congress clearly did not intend DHS Secretaries to be able to delegate their status as "the head of the Department" or their "direction, authority, and control over it," *id.* § 112(a)(2), to "any . . . employee . . . of the Department," *id.* § 112(b)(1).  Indeed, every department secretary has delegation authority comparable to that of § 112(b)(1), *see L.M.-M.*, 442 F. Supp. 3d at 31 & n.11, so under the government's view the most important statutory functions assigned to the highest-level executive branch officers would never be subject to the FVRA's penalties.  That cannot be what Congress intended, particularly because "[i]t was the pervasive use of those vesting-and-delegation statutes" to avoid vacancies legislation "that convinced Congress of the need to enact the FVRA" in the first place.  *Id.* at 34.

24

For similar reasons, the Secretary's authority under 40 U.S.C. § 1315 to transfer personnel from any DHS agency to serve temporarily under the Federal Protective Service is a power that only the Secretary may exercise.  The government argues that "no statute or regulation prevents the Secretary from delegating this authority," MTD 44, but restrictions on delegation need not be explicitly stated—as here, they can be inferred from statutory structure and context.  *See United States v. Giordano*, 416 U.S. 505, 514 (1974) (the question is whether the statute, "fairly read, was intended to limit the power" to the specified officer); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) (requiring only "affirmative evidence of a contrary congressional intent"); *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998) (finding delegation foreclosed based on "implied limitation").

In sum, Chad Wolf performed a "function or duty" that is exclusively assigned to the Secretary when he established the policy at issue here.  Because he did so without legal authority under the FVRA or the HSA, that policy is void and "may not be ratified."  5 U.S.C. § 3348(d)(2).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted,

Dated:  November 5, 2020

*Brianne J. Gorod*
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*