**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

DON'T SHOOT PORTLAND et al.,

　　　　　　　Plaintiffs,

　　v.

CHAD F. WOLF, in his official capacity as
Acting Secretary of Homeland Security,

　　　　　　　Defendant.

---

Case No. 1:20-cv-2040-CRC

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

　　Pursuant to Local Civil Rule 7(d), Defendants hereby submit this reply memorandum in response to Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss (ECF No. 26) ("Opp'n") and in support of Defendants' Motion to Dismiss (ECF No. 24) ("Mot.").

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.   PLAINTIFFS LACK STANDING. ..................................................................................... 2

    A.   Don't Shoot Portland Has Failed to Allege Organizational Standing. ......................... 2

    B.   The Individual Plaintiffs Have not Plausibly Alleged Future Injury. ........................... 4

    C.   Plaintiffs Cannot Claim Standing to Challenge Future Actions Based on a "Policy" That Does Not Exist. ................................................................................................. 6

II.  PLAINTIFFS HAVE NOT ALLEGED ANY FINAL AGENCY ACTION. ............................. 8

III. PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS. ..................................................... 9

    A.   Plaintiffs Have Not Plausibly Alleged that Defendants' Deployment to Portland Violates the Administrative Procedure Act (Counts 1 and 2). ...................................... 9

        1.  DHS's deployment does not violate 40 U.S.C. § 1315(b)(1). ............................. 11

    B.   Plaintiffs Have Not Plausibly Alleged that Defendants Violated Plaintiffs' First Amendment Rights (Count 3). ................................................................................. 14

    C.   Plaintiffs Have Not Stated Plausible Fourth or Fifth Amendment Claims (Counts 4, 5, and 6). ................................................................................................................. 16

    D.   Plaintiffs Have Not Alleged a Plausible Claim Based on Mr. Wolf's Service (Counts 7, 8, and 9). ............................................................................................................. 17

        1.  Mr. Wolf's Service Is Irrelevant to Plaintiffs' Claims. ...................................... 17

        2.  Mr. McAleenan Lawfully Served Under the April 9 Order. ................................. 18

        3.  Mr. Wolf Lawfully Serves Under Mr. McAleenan's Order of Succession. ......... 21

        4.  Mr. Wolf Ratified His Prior Delegable Acts. ..................................................... 28

CONCLUSION ................................................................................................................... 30

## INTRODUCTION

Plaintiffs base their entire case on the allegation that "Defendants have instituted a Policy to quell and punish the lawful speech and assembly of those advocating a particular viewpoint under the banner of federal property protection." Opp'n 1. That supposed "Policy" is the basis for their claims to standing and their entitlement to relief. And indeed, all Plaintiffs ask through this lawsuit is "to enjoin Defendants from continuing to implement the Policy." *Id.*

But Plaintiffs cannot obtain that relief, because they have not pled factual allegations from which the Court could reasonably infer that the policy even exists. Instead, Plaintiffs infer "the Policy" from *other* policies; from various statements on social media; and from precious few examples of actions by federal agents on the ground in Portland. As Defendants have explained at length, Mot. 11-16, those alleged facts are not nearly enough to raise a plausible inference that the federal government has enacted a *policy* of taking over cities, conducting unlawful arrests, and indiscriminately gassing peaceful protesters with whom the government disagrees.

Plaintiffs would like to allege that "[the U.S. Department of Homeland Security ("DHS")] established a policy," Opp'n 16 (quoting Compl. ¶ 80) and leave it at that. But the Court need not accept as true "naked assertions" devoid of "further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Nor must the Court, in a case challenging a government policy, accept a "nebulous assertion of the existence of a 'policy'," where none is actually cited. *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). Raising a plausible inference that "the Policy" exists is a *pleading requirement*, not a "quintessential kind of factual dispute," Opp'n 16, as those cases and others make clear. Plaintiffs' case should be dismissed because their fear of future injury and substantive claims are all based on a "nebulous assertion."

Plaintiffs claim that the "policy" is invalid because Chad Wolf, the Acting Secretary of Homeland Security, had no power to implement it. But even if Plaintiffs had plausibly alleged that the policy exists, and even if the validity of Mr. Wolf's service were relevant to Plaintiffs' claims, those claims would still fail because Mr. Wolf lawfully services as Acting Secretary.

1

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING.

Plaintiffs seeking injunctive relief to prevent future injury must plead plausibly that such injury is "certainly impending" and not merely "possible." Mot. 4-5 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).[1]  Plaintiffs have failed to do so. Instead, they attack a straw man; Defendants have never argued that "because their conduct was lawful, Plaintiffs don't have standing to sue," and Plaintiffs offer no citation to such an argument. Opp'n 9.

### A.   Don't Shoot Portland Has Failed to Allege Organizational Standing.

Plaintiffs agree that Plaintiff Wall of Moms should be dismissed, Opp'n 1 n.1, but maintain that Don't Shoot Portland ("DSP") has standing. Plaintiffs are wrong.

DSP alleges that its "core organizational mission" is to support activists, protesters, and organizers exercising their First Amendment rights "through 'mutual aid.'" Opp'n 14 (citing Compl. ¶¶ 10, 36, 153). The critical shortcoming of Plaintiffs' Complaint, however, is the absence of any allegation that Defendants have impaired DSP's provision of mutual aid. *See* Mot. 7-8. In response, Plaintiffs argue that "Defendants' Policy" of intimidating and deterring protesters impedes DSP's core mission. But even if Defendants had a policy of "excessive force, unlawful arrests, and [unjustified] surveillance," Opp'n 14—which they do not—none of that stops DSP from providing "mutual aid" to protesters. Plaintiffs conflate the deterrence of *actual protesting* with the interruption of *aid*, the latter of which is DSP's actual mission, and the frustration of which is never alleged. *See* Mot. 8 ("There is no allegation that Defendants are interrupting, intercepting, or impounding these supplies.").

---

[1] Plaintiffs argue that the Court need only find one plaintiff with standing to reach the merits of the case. *See* Opp'n 9-10 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). In *Rumsfeld* and other appellate cases, courts have reasoned that they need only find one plaintiff with standing—because that is all that is required to affirm or vacate a judgment below. That reasoning has less force in the Rule 12 context, however, and certainly "does not mean the Court must give all Plaintiffs an automatic 'pass' when one meets the standing requirements." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 29 (D.D.C. 2020) (citing *Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)). This Court should similarly exercise its discretion to analyze each Plaintiff's standing.

Instead of pointing to any such allegation, Plaintiffs argue that Defendants have "destroyed the essential supplies that [DSP] provides protesters." Opp'n 15. But as Defendants have explained, Mot. 7-8, that "mutual aid" was never meant to be returned. Take "food" and "water," for example. Compl. ¶ 154. Plaintiffs' theory is that, if DSP donates food and water to a protester, who then eats the food and drinks the water while attending a protest, that constitutes the *Defendants'* destruction of *DSP's* property. That is a facially untenable theory of standing, both as to injury and traceability to Defendants. It is all the more so, given that—as Plaintiffs reveal for the first time in their opposition—the mutual aid was *donated* to DSP in the first place. Opp'n 15. DSP cannot claim an injury from the "destruction" of supplies that were given to it for free and then donated to protesters with no expectation that the property would ever be returned.[2]

DSP disclaims any "proprietary" theory of injury. Opp'n 15. But in the preceding paragraph, it argues that it "has spent thousands of additional dollars and extensive time to directly purchase personal protective equipment, first aid kits, items to provide relief from tear gas, and food and water." *Id.* Once again, that is not an impingement of, or diversion from, DSP's core mission—providing those items *is* DSP's core mission. At bottom, Plaintiffs allege that DSP's mission is to donate aid to protesters and, because of Defendants' actions, DSP has had to donate aid to protesters. That is insufficient to support standing. Mot. 8 (citing *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 132, (D.D.C. 2014) (organization "cannot convert its ordinary activities and expenditures . . . into an injury-in-fact"); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014) (same)).

Finally, Plaintiffs never respond to Defendants' argument that DSP's "thousands of dollars of funds and extensive time," Compl. ¶ 157, are never broken down in any level of detail. Mot. 9 (collecting cases). Putting aside the facial implausibility of Plaintiffs' theory of standing, therefore,

---

[2] At one point, Plaintiffs suggest that Defendants destroyed DSP's donated supplies "*before* they could be 'consumed' as intended." Opp'n 15 (emphasis added). Plaintiffs cite no such allegation in the Complaint. Rather, the allegation is that food, water, hand sanitizer, etc. were all consumed just as they were intended to be.

they have not provided sufficient detail to support it. That is reason enough to dismiss DSP.

> ### B.    The Individual Plaintiffs Have not Plausibly Alleged Future Injury.

The individual Plaintiffs stake their theory of standing expressly on the "official policy, as well as a pattern and practice, of engaging in unlawful conduct." Opp'n 10. Thus, if the Court agrees that no such policy or practice is plausibly alleged, then Plaintiffs have failed to allege a "certainly impending" future injury by their own terms.

Plaintiffs rely primarily on *In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012). Opp'n 10. In that case, certain Navy chaplains alleged that they were discriminated against, on the basis of their religion, in the Navy's promotion system. But instead of assailing a secret, undisclosed "policy," the plaintiffs instead "challenge[d] specific policies and procedures . . . that they claim have resulted in denominational discrimination and, if not ended, will continue to do so in the future." *Navy Chaplaincy*, 697 F.3d at 1176. The D.C. Circuit distinguished between cases "where plaintiffs speculated about the very existence of the unwritten discriminatory practices at issue," and that case, where "the Navy acknowledge[d] that the challenged policies and procedures not only exist, but will continue to govern the conduct of future selection boards." *Id.* That distinction is critical, for standing purposes, because "[t]he prospect of future injury becomes significantly less speculative where[] . . . plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury." *Id.* at 1176-77. It also makes for a stark contrast with this case, in which Plaintiffs *are* speculating about the very existence of "the Policy." *See* Compl. ¶ 80 (alleging only "[u]pon information and belief" that "the Policy" exists at all). Thus, *Navy Chaplaincy* does not get Plaintiffs over the hurdle of standing.[3]

In fact, that case counsels *dismissing* Plaintiffs' case. The D.C. Circuit affirmed "that vague predictions of future discriminatory conduct are insufficient to demonstrate the imminent threat of future injury necessary to support standing to seek injunctive relief," *id.* at 1176, and surveyed

---

[3] Plaintiffs also cite *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005), in which the "procedures" being challenged were FEC implementing regulations. *Id.* at 82. These were not secret, undisclosed policies, but rather were published in the Code of Federal Regulations. *Id.* at 98, 103, 107, 110-13.

prior cases in which it had "found standing lacking where plaintiffs claimed future injury based on speculation about alleged discriminatory practices unconnected to concrete policies." *Id.* (citing *Worth v. Jackson*, 451 F.3d 854, 860 (D.C. Cir. 2006) (plaintiff failed to demonstrate likely future injury where he "challenge[d] no statute, regulation, or written policy committing HUD to favoring minorities or women, resting his claim instead on speculation, untethered to any written directive, about how HUD is likely to make future employment decisions")).

Unable to allege a "concrete polic[y]" as required by *Navy Chaplaincy*, 697 F.3d at 1176, and related D.C. Circuit precedent, Plaintiffs are left relying on their own individual experiences. *See* Opp'n 10-14. Defendants have demonstrated at length that those past experiences do not justify prospective relief. *See* Mot. 9-11. Plaintiffs' alleged "future plans," Opp'n 11-12, are insufficient; they must instead convince the Court that, if they attend another protest, injuries would be "certainly impending." *Clapper*, 568 U.S. at 409. In other words, standing depends not only on Plaintiffs' attending another protest, but on Defendants' inflicting harm on them if they do. But "past exposure to illegal conduct," which is all Plaintiffs allege, Opp'n 12-14, "does not in itself show a present case or controversy regarding injunctive relief." *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

Even if past exposure to illegal conduct were sufficient to establish standing, Plaintiffs have failed to identify such illegal conduct.  Plaintiffs try to minimize the flaws in their allegations of supposedly unlawful conduct. *Compare* Mot. 10 ("Ultimately, the most plausible reading of Plaintiffs allegation is that Ms. Barnum was present when crowd-control or crowd-dispersal munitions were employed, and she was incidentally exposed.") *with* Opp'n 13 ("There is no merit to Defendants' assertion that Plaintiffs were injured only incidentally, rather than intentionally, by the use of force carried out under Defendants' direction. The causality prong has no intent requirement . . . ."). But Plaintiffs' failure to show that past exposure to tear gas, flash-bangs, etc. was unlawful is relevant to the standing inquiry in at least in two respects. *Contra* Opp'n 13. First, if Plaintiffs have not plausibly alleged that the past actions on which they rely were unlawful, they also have not plausibly identified a "Policy" of unlawful action—the premise of Plaintiffs'

standing to obtain prospective relief. Second, and more fundamentally, if Plaintiffs have not plausibly alleged unlawful past actions, they any harm they suffered from those actions would not be redressed by the injunction they seek. An injunction against the *unlawful* use of tear gas, for example, would not prevent harms from the *lawful* use of tear gas. Plaintiffs' failure plausibly to allege any unlawful conduct by Defendants is thus fatal to their claims of standing. *See* Mot. 9-11.

Plaintiffs also object particularly to Defendants' arguments about Dr. Kipersztok. Opp'n 13-14. But while they chide Defendants for describing Dr. Kipersztok as someone who "watches the news," that *is* the basis for her supposed standing. Compl. ¶ 166 ("*News coverage* has made clear to her that the federal officers have used tear gas and less-lethal weapons indiscriminately at the crowd . . . .") (emphasis added). On that theory, literally anyone with a television or newspaper subscription—and who "specifically contemplated First Amendment activity," Opp'n 13—could bring this lawsuit. That is not the law. *See* Mot. 11.

### C.    Plaintiffs Cannot Claim Standing to Challenge Future Actions Based on a "Policy" That Does Not Exist.

The heart of this matter is the existence *vel non* of "the Policy." In their motion to dismiss, Defendants catalogued every piece of evidence relied on by Plaintiffs and demonstrated how none of that evidence raises a plausible inference of "the Policy." Mot. 11-15 (addressing and rebutting inferences drawn from Executive Order 13933; formation of the PACT; the alleged DHS intelligence memorandum; and informal statements made by government officials).

In response, Plaintiffs first argue that the existence of "the Policy" is too "factual" to be decided on a motion to dismiss. But invoking the label "factual" does not insulate Plaintiffs from scrutiny of their factual allegations for sufficiency. As the D.C. Circuit has explained, the question of whether a policy is sufficiently alleged should not be reflexively deferred, as Plaintiffs contend, but rather forms the essential inquiry under Rule 12. *See Haase*, 835 F.2d at 908 (explicating the scope of a court's review of a pleading under Rule 12(b)(1), and affirming dismissal of a complaint that insufficiently alleged the existence of a governmental policy).

Turning to Plaintiffs' allegations, they are as weak here as they were in *Haase*. As an initial

matter, Plaintiffs seem to think that alleging "DHS established a policy" is itself enough. Opp'n 16 (quoting Compl. ¶ 80). But that is obviously not how standing is analyzed. *See* Mot. 15-16 (citing *Haase*, 835 F.2d at 910). Plaintiffs try to bolster their "nebulous assertion" with "several subsidiary orders," but those have been debunked. *See* Mot. 13-14 (addressing the formation of PACT and the alleged DHS intelligence memorandum). Plaintiffs describe their allegations as "detailed and specific," Opp'n 17, even though they admitted in their Complaint that it is only "[u]pon information and belief" that they allege the Policy's existence at all. Compl. ¶ 80.

And while deriding as "scant precedent" the cases cited by Defendants, Opp'n 17-18, Plaintiffs bury their three proffered cases—one of them unpublished—in a footnote. *See id.* at 18 n.8. It is not surprising, therefore, that Plaintiffs' cases are so easily distinguishable. In *OCONUS DOD Employee Rotation Action Group v. Cohen*, 144 F. Supp. 2d 1 (D.D.C. 2000), the Department of Defense had released a draft of the policy it intended to issue. *Id.* at 4. That is what the plaintiffs were challenging—not a policy alleged to exist only on information and belief, Comp. ¶ 80, but a written memorialization of the agency's contemplated action. As described above, the plaintiffs in *In re Chaplaincy* challenged Navy procedures that the agency had *admitted* were in effect. And finally, in *Young v. U.S. Department of Labor*, No. 17-cv-2428-JDB, 2020 WL 1557170 (D.D.C. Apr. 1, 2020), the challenged HHS policy was borne out by "several agency documents." *Id.* at *10. The court reproduced two of those documents in its opinion, emphasizing the passages that suggested the alleged HHS policy. *Id.* at *10-11. In this case, by contrast, there are *no* agency documents alleged, nor particularized facts in the pleading, that suggest a policy of excessive force, unlawful arrests, or viewpoint discrimination. *See generally* Mot. 13-15. Plaintiffs have cited no case where a supposed policy is inferred from allegations remotely comparable to those presented "on information and belief" here.

Plaintiffs suggest that, to counter their allegation, Defendants must produce an administrative record ("AR") for the supposed policy. Opp'n 18-19. That is an ironic suggestion, since an AR comprises all records that were "before the agency at the time the decision was made," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), and Plaintiffs fail to allege

plausibly that any agency decided to adopt such a policy.  But in any event, *Haase* and other cases make clear that failure to plead more than a "nebulous assertion" of a government policy—where it is required to infer future harm—warrants dismissal of the complaint, rather than the production of a hypothetical record and judicial review on the merits. The Court need not, and should not, wait until summary judgment.

*       *       *

At bottom, Plaintiffs do not plausibly allege that DHS has enacted a policy of intimidating and deterring protesters because of their viewpoint; of using excessive force against peaceful protesters; or of conducting widespread warrantless arrests without probable cause. Comp. ¶ 80. The notion that a federal agency would adopt such a policy should be met with great skepticism and, contrary to Plaintiffs' suggestion, need not be accepted at face value. *Contra* Opp'n 19. Rather, because Plaintiffs have offered no more than a "nebulous assertion" of "the Policy," *Haase*, 835 F.2d at 911 (citing *Lyons*, 461 U.S. 95; *Rizzo v. Goode*, 423 U.S. 362 (1976); *O'Shea*, 414 U.S. 488), their complaint should be dismissed. *See* Mot. 11-16.

## II.    PLAINTIFFS HAVE NOT ALLEGED ANY FINAL AGENCY ACTION.

Even assuming that Plaintiffs had plausibly alleged a "policy" to challenge, such policy would not constitute "final agency action" reviewable under the APA under the governing two-part *Bennett* test. *See* Mot. 17; Opp'n 19-20.

On the first element, Plaintiffs argue that "the Policy" is a final consummation of agency decisionmaking because Plaintiffs used the past tense in their complaint. Opp'n 20 (emphasizing "established") (citing Compl. ¶ 80). But again, the Court need not accept so conclusory an allegation as true. And the Complaint nowhere includes "the scope and details of the Policy," and "multiple memoranda setting forth the Policy" that Plaintiffs mention in their Opposition. *See* Mot. 13-16; Opp'n 20.[4] Nor can Plaintiffs meaningfully deny that the particulars of Defendants'

---

[4] Plaintiffs attempt to cure these deficiencies by suggesting, in a footnote, that "the administrative record will likely contain further written orders and memoranda relating to the Policy." Opp'n 20

response to the situation in Portland—whether and how many additional agents to designate; where to deploy them; how long to deploy them; which tactics to adopt in order to protect federal property; etc.—are fluid and therefore *not* consummate. Mot. 17-18.[5]

Plaintiffs misunderstand the second *Bennett* element, which asks "from the *regulated parties' perspective*," whether "rights or obligations have been determined, and legal consequences flow." Mot. 17 (citing *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1271 (D.C. Cir. 2018) (emphasis added)). Plaintiffs' argument—that "obligations" were determined for the *federal officials* being deployed—is simply nonresponsive. Opp'n 22. And needless to say, firing tear gas or a rubber bullet to disperse a riot does not determine anyone's rights or obligations in the *Bennett* sense—especially since, as Plaintiffs admit, they are not challenging "individual agents' acts." Opp'n 22.

Agency action must satisfy both *Bennett* elements in order to be reviewable. *See* Mot. 17. Because the action alleged here satisfies neither element, Plaintiffs APA claims must be dismissed.

## III.   PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS.

Should the Court find that Plaintiffs have standing, the Complaint nevertheless should be dismissed for failure to state claims upon which relief can be granted.

### A.   Plaintiffs Have Not Plausibly Alleged that Defendants' Deployment to Portland Violates the Administrative Procedure Act (Counts 1 and 2).

Plaintiffs first challenge the deployment of federal officials to Portland as unlawful *ab initio*. These claims, and Plaintiffs' opposition memorandum, overstate the limits on federal law enforcement. Opp'n 23-24. While 40 U.S.C. § 1315 is the authority by which the *Secretary of Homeland Security* may designate additional agents to protect federal property and persons on such property, "federal action" generally is not "bounded by the U.S. Constitution's Property Clause." Opp'n 23. Defendants Washington and the U.S. Marshals Service have statutory authority

---

n.10. This is the very definition of a fishing expedition and forms no basis to permit the case to proceed. Mot. 12 (citing *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 328 (D.D.C. 2018)).

[5] Those particulars are also committed to agency discretion. *See* Mot. 23 n.12.

to arrest anyone, anywhere, if the person commits a federal crime in the deputy's presence or upon reasonable grounds to believe that the person has committed a federal felony elsewhere. 28 U.S.C. § 566(d); 18 U.S.C. § 3053.[6] U.S. Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") has the same arrest authority under 19 U.S.C. § 1589a, and the FBI—which falls under the purview of Defendant Barr—has the same arrest authority under 28 U.S.C. § 3052. ICE Enforcement and Removal Operations's ("ERO") has arrest authority under 8 U.S.C. §§ 1357, 1226(a) and also holds limited, delegated, general-crimes arrest authority under 19 U.S.C. § 1589a. In sum, "federal action" on "private land adjoining public land" is *not* limited to "the protection of the federal property." *Contra* Opp'n 23 (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 538 (1976)).[7] Accordingly, the mere presence of federal agents off federal property— on which Plaintiffs rely so heavily—is not prima facie evidence of any unconstitutional overstep.

In any event, 40 U.S.C. § 1315 expressly authorizes designated DHS agents to perform duties "in areas outside the property to the extent necessary to protect the property and persons on the property," *id.* § 1315(b)(1); to "conduct investigations, on and off the property in question," *id.* § 1315(b)(2)(E); and to "make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States," if the officer or agent "has reasonable grounds to believe that the person to be arrested has committed or is committing a felony," *id.* § 1315(b)(2)(C).

"The statute thus expressly empowers FPS officers to conduct investigations and make arrests outside of federal property when 'necessary to protect the property and persons on the property.'" *United States v. Evans*, 581 F.3d 333, 340-41 (6th Cir. 2009). In *Evans*, two FPS

---

[6] USMS has also been delegated arrest authority from the Attorney General under 28 U.S.C. § 561(b), and has inherent court-security authority under 28 U.S.C. §§ 566(a), 566(e)(1)(A).

[7] *Kleppe* involved a challenge to the Wild Free-Roaming Horses and Burros Act of 1971, and has nothing to do with the law-enforcement issues in this case. But for what it is worth, the Supreme Court in that case affirmed that "the power granted by the Property Clause is broad enough to reach beyond [federal] territorial limits." 426 U.S. at 538 (citing *Camfield v. United States*, 167 U.S. 518 (1897)).

officers followed the defendant's car after she caused a disturbance and made threats in a federal office in Detroit. *Id.* at 336. However, "approximately four to five blocks from [that] office," the defendant "maneuvered her car behind the officers' FPS vehicle and began 'tailgating' their marked police car." *Id.* After the defendant and others in the car made threatening gestures as if they had guns, the FPS officers pulled over the defendant, who was arrested and charged with threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B). *Id.* at 338. The Sixth Circuit affirmed that both the surveillance and arrest were authorized under § 1315. *Id.* at 341, 342-43 ("As the district court and magistrate judge recognized, Evans's conduct, her tailgating of the FPS officers' marked police vehicle, and her visible hand gestures, which simulated the firing of a gun, provided the FPS officers with probable cause to arrest her, *regardless of her presence on non-federal property*.") (emphasis added).

*Evans* and other cases illustrate that federal agents operating under § 1315 may investigate and surveil persons *off* federal property and arrest them on suspicion of federal crimes, even if those crimes were themselves committed *off* federal property. Thus, neither federal presence nor federal arrests outside of federal property suggests any violation of § 1315.

### 1. DHS's deployment does not violate 40 U.S.C. § 1315(b)(1).

Plaintiffs claim that Defendants' designation and deployment of federal agents for deployment to Portland violates 40 U.S.C. § 1315, which empowers the Secretary of Homeland Security to designate additional DHS employees to augment FPS for certain purposes. Compl. ¶¶ 77, 177. Defendants have demonstrated that Plaintiffs do not plausibly allege that Defendants have exceeded § 1315's scope. Mot. 20-23.[8]

---

[8] On November 2, 2020, the DHS Office of Inspector General ("OIG") issued a "Management Alert," which recommended that "the Director of the [FPS] did not properly designate DHS employees recently deployed to protect Federal properties under 40 U.S.C. § 1315(b)(1)," because the FPS Director "did not identify any DHS employees by name." *See* DHS OIG, *FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. § 1315(b)(1)* (Nov. 2, 2020), *available at* https://www.oig.dhs.gov/sites/default/files/assets/Mga/2020/oig-21-05-nov20-mgmtalert.pdf.

Plaintiffs accuse Defendants of raising an "evidence-based factual dispute." Opp'n 24; *see* Mot. 22-23 (quoting from Portland Police Bureau ("PPB") report of which the Court can take judicial notice). But the PPB report of which the Court can take judicial notice, and whose accuracy Plaintiffs never dispute, merely dispels Plaintiffs' reinvented version of the facts—such as their latest suggestion that "minor damage" to the federal courthouse is what prompted Defendant's response. Opp'n 1. The federal courthouse, and the federal agents within, have been subjected to weeks of attacks and violence. *See* Mot. 2 & nn.1-2. And Plaintiffs' *singular* account of extra-courthouse operations is belied by the facts. *Compare* Compl. ¶ 97 *with* Mot. 22-23.

But the Court need not take judicial notice of the PPB report to dismiss Plaintiffs' claims as implausible. They rely first on the President's statements at a roundtable event on July 13, 2020. Opp'n 25 (citing Compl. ¶ 178); *see* Compl. ¶ 84 (same). Defendants have already addressed those statements and pointed out that the "it" in the President's statement was "violence directed specifically at law enforcement." *See* Mot. 15 & n.7. At no time did the President suggest a policy of quelling any peaceful protests, let alone from a particular viewpoint, or by particular means. *Id.* Plaintiffs offer no response to these arguments.

Plaintiffs then cite "DHS's public and internal documents," Opp'n 25, the import of which have also been dispelled, *see* Mot. 13-16. In their opposition, Plaintiffs misrepresent the July 1, 2020, DHS press release. *Compare* Opp'n 25 (suggesting that there was no "federal qualifier") *with* U.S. Dep't of Homeland Security, *DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues* (July 1, 2020) (noting that Executive Order 13933 "directs DHS, within its statutory authority, to provide personnel to assist with the protection of *federal* monuments, memorials, statues, or property" and that "[*a*]s *a result*, DHS created the PACT")

---

Plaintiffs make no such claim in their complaint, and have not sought leave to amend their complaint in order to add such a claim. While Defendants have consented to a sur-reply on the topic of the Management Alert, Plaintiffs cannot amend their pleading through briefing in opposition to a motion to dismiss. *Grell v. Trump*, 330 F. Supp. 3d 311, 318 (D.D.C. 2018) (Cooper, J.) (collecting cases). Because there is no such claim in this case, Defendants do not address it here.

(emphasis added).[9] The leaked DHS memorandum gets Plaintiffs no closer, as that memorandum *specifically forbids* the sort of discriminatory surveillance that Plaintiffs infer from it. *Compare* Opp'n 25 *with* Mot. 13-14. Plaintiffs offered no response to these arguments, either.

That leaves Plaintiffs relying on "[t]he way in which the Policy has been carried out" to demonstrate that "its purpose is not to protect federal property." Opp'n 25. But when they allege federal operations "far from the Hatfield courthouse," Plaintiffs mean *five blocks*—exactly the distance in *Evans*. Nothing about that distance suggests a violation of § 1315. Nor does the single incident involving Mr. Pettibone—who was detained, *Mirandized*, and released—suggest any "Policy" of the sort alleged by Plaintiffs. *See* Mot. 25 (citing *Wood v. Moss*, 572 U.S. 744, 763-64 (2014) ("We therefore decline to infer from alleged instances of misconduct on the part of particular agents an unwritten policy of the Secret Service to suppress disfavored expression, and then to attribute that supposed policy to all field-level operatives.")). Plaintiffs never address the Supreme Court's unanimous opinion in *Wood v. Moss*.

And Plaintiffs' cursory allegation that Defendants "have repeatedly and indiscriminately assaulted peaceful protesters, including Plaintiffs," is not entitled to a presumption of truth. Opp'n 25-26 (citing Compl. ¶¶ 94-97, 111-12, 116-24). Those paragraphs contain, at most, four examples of conduct: (1) the alleged July 24, 2020, displacement of protesters two blocks from the federal courthouse; (2) the alleged July 11, 2020, use of force against Donovan LaBella; (3) the alleged July 18, 2020, pepper-spraying of "Naked Athena"; and (4) the alleged July 18, 2020, use of force against Christopher David. Additional DHS agents have been deployed to Portland for *four months*; the fact that Plaintiffs can amass only four examples of purportedly unlawful conduct strongly suggests the absence, rather than the establishment, of a policy of "repeatedly and indiscriminately assault[ing] peaceful protesters." Opp'n 25.[10]

---

[9]   *Available   at*   https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues.

[10]  Defendants will not address the merits of any of these four examples, in part because "the *individual agents' acts* are not the agency actions that Plaintiffs challenge." Opp'n 22.

Finally, because Plaintiffs have not plausibly alleged that DHS's designation or deployment falls outside the scope of 40 U.S.C. § 1315, they have not plausibly alleged that § 1315 was a pretext for DHS's deployment. Mot. 23-24.

### B.     Plaintiffs Have Not Plausibly Alleged that Defendants Violated Plaintiffs' First Amendment Rights (Count 3).

Plaintiffs' First Amendment argument is long on legal standards and constitutional doctrine, but short on the sufficiency of their pleading. *See* Opp'n 26-30. Citing four paragraphs of their complaint, Plaintiffs say that Defendants have "routinely directed the use of force to drive protesters who were up to five blocks away from federal property." Opp'n 27 (citing Compl. ¶¶ 94-97). In reality, as Defendants pointed out in their motion, those allegations consist of a single night's events. Mot. 22-23.[11] That is a far cry from "the establishment of a prophylactic 'buffer zone,'" and the cases relied on by Plaintiffs are inapposite. Opp'n 27.

Plaintiffs also have not plausibly alleged any content- or viewpoint-based regulation of speech. Regarding "content," Plaintiffs' only argument is that Defendants "did not extend their Policy to heavily armed anti-pandemic-restriction protests in Michigan." Opp'n 28 (citing Compl. ¶ 55). Putting aside that there is no "Policy" to "extend," Defendants are unaware of the federal courthouse in Lansing being firebombed and vandalized 17 times in a 31-day period. *Compare id. with* Mot. 2 & nn.1-2. The conduct in the two cities was not remotely comparable, in terms of threats to federal property, which is an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for the apparent difference in federal response. Plaintiffs themselves allege that the protesters in Lansing were at the "state house," not at any federal property. Compl. ¶ 55.

Regarding "viewpoint," Plaintiffs assert that Defendants' "Policy" only targets the Black Lives Matter ("BLM") movement. Opp'n 28 (citing Compl. ¶¶ 52-60). But the cited paragraphs of the Complaint do not even *mention* BLM, let alone aver facts from which the Court could plausibly infer a policy targeting that viewpoint (and Plaintiffs' shifting theories about the policy undermine

---

[11] And again, if the Court takes judicial notice of the Portland police report, even that allegation is belied by the true story.

the credibility of their claims to its existence). As Defendants have argued: "There is no allegation, for example, that Defendants dispersed *some* protesters who were lighting fires on federal property but not *other* protesters who were doing the same." Mot. 26. Nor is there any "allegation that *protesters* who shone lasers in officers' eyes were arrested, while *counter-protesters* who did the same thing were not." *Id.* In their opposition, Plaintiffs point to no such allegations.[12]

Finally, Plaintiffs allege that "the Policy" constitutes unlawful retaliation for speech. But under the legal framework that Plaintiffs lay out, they have failed to state a claim. First, they fail to allege "anything other than the unintended consequence of an otherwise constitutional use of force under the circumstances." *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (rejecting First Amendment retaliation claim where "protesters were warned repeatedly to clear the street or tear gas would be deployed, and there is no dispute that a small group of the crowd became violent"). Indeed, "a violent subset of protestors who disrupt civic order will by their actions impair the scope and manner of how law-abiding protestors are able to present their views." *Menotti v Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005). More importantly, Plaintiffs have not alleged that any speech was a but-for cause of any retaliatory action. The Complaint is not "replete with [such] allegations," as Plaintiffs contend, but rather rests on implausible readings of a smattering of social-media statements. *Compare* Opp'n at 30 *with* Mot. 14-16 (addressing and refuting the alleged import of four, informal statements by the President).

---

[12] Plaintiffs try to distinguish *Edrei v. Maguire*, 892 F.3d 525, 541 (2d Cir. 2018), on the grounds that "the Policy expressly targets BLM protesters." Opp'n 28. But of course, Defendants only cited *Edrei* for the proposition that, "*[a]bsent some viewpoint- or content-based motivation*, it is well understood that 'government officials may stop or disperse a protest when faced with an 'immediate threat to public safety, peace, or order.'" Mot. 26 (quoting *Edrei*, 892 F.3d at 541) (emphasis added). And as Defendants have now twice demonstrated, there *is no* content- or viewpoint-based discrimination at play here. *Edrei* applies, and Defendants actions were lawful.

**C.     Plaintiffs Have Not Stated Plausible Fourth or Fifth Amendment Claims (Counts 4, 5, and 6).**

Plaintiffs allege that "Defendants have adopted a practice of deploying physical force, without provocation or legal grounds to do so, to compel demonstrators to move," in violation of the Fourth and Fifth Amendments. Compl. ¶¶ 194-95, 199-200. Defendants have demonstrated why Plaintiffs have not plausibly alleged such violations. Mot. 27-30.

To save these claims, Plaintiffs begin with a red herring: that the protests are "largely peaceful." Opp'n 31. But as Defendants have noted, law enforcement may implement crowd-control measures if that crowd is "substantially infected with violence or obstruction." Mot. 28 (citing *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). Plaintiffs dismiss *Washington Mobilization Committee* based on the word "substantially," which they read to mean "mostly." *Cf.* Opp'n 32 ("Plaintiffs have alleged that they, along with the majority of other protesters, were peaceful."). But the D.C. Circuit equated "substantial measure" with a much lower standard: "numerous instances of disruptive and destructive behaviour by persons participating in these activities." *Wash. Mobilization Comm.*, 566 F.2d at 120. In the "Three Sisters Bridge" protest at issue, for example, there were "300-400 persons" marching and only "a few instances" of objects thrown at police. *Id.* at 112. In the "Watergate Apartments" protest, there were only "uncoordinated and spasmodic" throwing of "small stones and other objects" at police. *Id.* Yet these were deemed "substantially infected with violence or obstruction." *Id.* at 120. And the court expressly rejected the argument "that the restrictions imposed by the police were greater than necessary because they resulted in the arrest of demonstrators who were not guilty of violence or obstruction, or of bystanders who were not participants in the demonstrations," which is the sum of Plaintiffs' arguments here. *Id.* at 120. In such cases, "the police cannot be expected to single out individuals," as Plaintiffs would require; instead, the police "may deal with the crowd as a unit." *Id.*[13]

---

[13] *See also id.* at 120 ("[T]he police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after

Plaintiffs then conflate their First Amendment and Fourth Amendment claims. Opp'n 31 ("Furthermore, using force to retaliate against First Amendment activity is excessive force, even when law enforcement faces what the government calls 'riotous' crowds."). As noted above, Plaintiffs have not plausibly alleged that *any* force has been employed in retaliation against anyone's speech.

Finally, Plaintiffs argue that "whether the use of force was justified is, again, a fact question not suitable for resolution on a motion to dismiss." Opp'n 32. On that theory, no use-of-force claim (whether retrospective, or, as here, prospective) could ever be dismissed—which is not the law. *See, e.g.*, *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (affirming, in an appeal from dismissal of an excessive-force claim for damages, that a district court should dismiss such a claim if it "does not contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quoting *Iqbal*, 556 U.S. 678; *Twombly*, 550 U.S. at 570) (quotation marks omitted). But more to the point, Plaintiffs make clear that they are not challenging individual agents' actions, so their re-invocation of a "fact question" is a red herring. Opp'n 22, 32. The question is not whether any particular incident involved unlawful force, but whether Defendants have a *policy* of excessive force. As explained at length, no such policy is plausibly alleged.

Plaintiffs do not address Defendants' arguments that Plaintiffs have failed to state Fourth Amendment claims based on arrests or surveillance. Mot. 29. Should the Court agree that Plaintiffs have not stated a plausible claim based on excessive force, those alternative theories would not save the day. Counts 4, 5, and 6 should be dismissed.

### D.   Plaintiffs Have Not Alleged a Plausible Claim Based on Mr. Wolf's Service (Counts 7, 8, and 9).

#### 1.   Mr. Wolf's Service Is Irrelevant to Plaintiffs' Claims.

As explained, Plaintiffs have not plausibly alleged that any "policy" exists. Other than this purported policy, Plaintiffs analyze just a single discrete action allegedly taken by Mr. Wolf: "[t]he

---

fair notice and opportunity to comply, his arrest does not violate the Constitution even though he has not previously been violent or obstructive.").

designation of DHS employees to serve as Federal Protective Service agents." Opp'n 45. But the FPS Director—not Mr. Wolf—cross-designated the DHS employees under 40 U.S.C. § 1315. On October 25, 2019, Acting Secretary McAleenan delegated his authority to designate officers under 40 U.S.C. § 1315(b) to the Under Secretary for Management.[14] Later, Mr. Alles, the Senior Official Performing the Duties of the Under Secretary for Management, delegated this authority to the FPS Director.[15] In June 2020, Mr. Wolf directed DHS components to coordinate with FPS to support the protection of federal property; he also ordered "[c]omponents with law enforcement personnel" to "[c]omplete cross-designation consent and the appropriate training with FPS to legally allow Components to support the protection of Federal facilities and property."[16] Throughout June and July 2020, the FPS Director designated officers in four DHS components.[17] As these events show, Mr. Wolf did not designate the officers, and his service is immaterial to Plaintiffs' claims.

### 2.     Mr. McAleenan Lawfully Served Under the April 9 Order.

If the Court concludes that Mr. McAleenan's service is relevant to Plaintiffs' claims, it should find that he served lawfully under Ms. Nielsen's order. On April 9, 2019, then-Secretary

---

[14] Decl. of Juliana Blackwell ¶ 2, Ex. 1, Update to the Delegation 00002, Delegation to the Under Secretary for Management (approved Oct. 25, 2019).

[15] *Id.* ¶ 6, Ex. 5, *Delegation to the Director, Federal Protective Service*, DHS Delegation No. 02500, Revision No. 00, § II.D (Dec. 18, 2019).

[16] *Id.* ¶ 5, Ex. 4, DHS Support to Protect Federal Facilities and Property (June 30, 2020).

[17] Decl. of L. Eric Patterson ¶ 3, Ex. 1, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Customs and Border Protection Personnel (June 4, 2020); *id.* ¶ 3, Ex. 2, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Customs and Border Protection Personnel (issued June 29, 2020); *id.* ¶ 3, Ex. 3, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Customs and Border Protection Personnel (July 31, 2020); *id.* ¶ 4, Ex. 4, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Immigration and Customs Enforcement Personnel (June 4, 2020); *id.* ¶ 4, Ex. 5, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Immigration and Customs Enforcement Personnel (issued June 29, 2020); *id.* ¶ 4, Ex. 6, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Immigration and Customs Enforcement Personnel (July 31, 2020); *id.* ¶ 5, Ex. 7, Designation of 40 U.S.C. § 1315 Law Enforcement for Transportation Security Administration Personnel (issued June 29, 2020); *id.* ¶ 5, Ex. 8, Designation of 40 U.S.C. § 1315 Law Enforcement for Transportation Security Administration Personnel (July 31, 2020); *id.* ¶ 6, Ex. 9, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Secret Service Personnel (issued June 6, 2020); *id.* ¶ 6, Ex. 10, Designation of 40 U.S.C. § 1315 Law Enforcement for United States Secret Service Personnel (July 31, 2020).

Nielsen exercised her authority under 6 U.S.C. § 113(g)(2) and designated an "order of succession" for the office of the Secretary that applied "[n]otwithstanding" the Federal Vacancies Reform Act ("FVRA"). Mot. 31-33. Ms. Nielsen's order changed the list of officials in Annex A, which, before April 9, set the list of officials who could exercise the Secretary's delegated authority during an emergency. *Id.* at 33-35. But the order did more than that. By explaining several times that she was designating an "order of succession," and by invoking her power under § 113(g)(2), Ms. Nielsen designated the first-ever order of succession for the office of the Secretary. *Id.* at 32-33. As a matter of law, that order superseded the FVRA order set out in Executive Order ("EO") 13753. *Id.* at 35. Plaintiffs' arguments conflate orders of succession with delegations of authority and ignore the context of Ms. Nielsen's order.

      **i.** Arguing that orders of succession can extend to "non-permanent vacancies," Plaintiffs try to explain the order's references to "order of succession" by suggesting that Ms. Nielsen transformed § II.B of DHS Delegation 00106 into an order of succession. *See* Opp'n 39. This argument selectively picks and chooses which parts of § II.B the April 9 order retained and which parts it replaced. Plaintiffs point to § II.B's reference to a catastrophic emergency to support their claim that the April 9 order did not apply when a Secretary resigned because it only amended Annex A, which applied only during an emergency. *See id.* at 37. But they then ignore § II.B's plain text, which says "I hereby *delegate* to the officials . . . listed [in Annex A] my authority" (emphasis added). *See* Opp'n 39. Plaintiffs cannot point to any text in the April 9 order where Ms. Nielsen said that she was changing § II.B from a delegation of authority to an order of succession. And because § II.B was clearly a delegation of authority, Plaintiffs offer no explanation for why Ms. Nielsen would have said she was designating an "order of succession" under her authority in § 113(g)(2) if she was simply amending the delegation of authority.[18]

      The more natural reading is that, even after the April 9 order, § II.B is still a delegation of

---

[18] Plaintiffs suggest that the purpose of an order of succession under § 113(g)(2) is to avoid the FVRA's limit on who may serve as an acting official during a vacancy. Opp'n 39 n.21. But because § II.B has always been a delegation of authority, it was not subject to the FVRA's limits. There was thus no reason for Ms. Nielsen to transform § II.B into an order of succession to "avoid" them.

authority. Far from "an unsubstantiated distinction," *see* Opp'n 38, the HSA recognizes that delegations of authority, which allow subordinate officials to exercise certain powers of the office of the Secretary, differ from orders of succession, which identify officials who may become Acting Secretary in the event of a vacancy.[19] *Compare* 6 U.S.C. § 112(b)(1), *with id.* § 113(g)(2); *see also Stand Up for California! v. DOI*, 298 F. Supp. 3d 136, 141 (D.D.C. 2018) (explaining that "non-exclusive responsibilities [may] be delegated to other appropriate officers and employees in the agency"). Earlier revisions to DHS Delegation 00106—indeed, the § II.A and § II.B structure that Plaintiffs rely on—recognize the difference. The references to "order of succession" and citations to § 113(g)(2) are best read as designating an unqualified order of succession.

**ii.** Plaintiffs then ask the Court to ignore the parts of the April 9 order that do not support their reading: they claim that "Nielsen's invocation of § 113(g)(2) could not override the plain language of her April []9 order." Opp'n 39. This "plain language" argument focuses on a single sentence in the two-page order where Ms. Nielsen explained that she was replacing Annex A. *Id.*; *id.* at 37. Defendants agree that Ms. Nielsen changed Annex A and that the new Annex A would control the list of officials who could exercise the Secretary's delegated authority. Mot. 36. But the unqualified references to "order of succession" and citations to § 113(g)(2)—which Plaintiffs try to ignore—show that Ms. Nielsen *also* designated an order of succession. That order applied "[n]otwithstanding" the FVRA, *see* 6 U.S.C. § 113(g)(2), so it superseded EO 13753, which is the President's pre-designation under the FVRA. And because it did so as a matter of law, Ms. Nielsen did not need to expressly say that her order would supersede EO 13753 or that it would amend § II.A of DHS Delegation 00106. Mr. McAleenan's later amendment to the order of succession

---

[19] Although other courts have disagreed with Defendants' reading of the April 9 order, *see Casa de Md., Inc. v. Wolf*, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *20-23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-JSW, 2020 WL 5798269, at *7-8 (N.D. Cal. Sept. 29, 2020) ("*ILRC*"), they confused orders of succession and delegations of authority and overlooked the context of DHS Delegation 00106, *see* Mot. 37-38. Another court recently found that Ms. Nielsen's order did not designate an order of succession that controlled when a Secretary resigned, *see Batalla Vidal v. Wolf*, Nos. 16-CV-4756 (NGG) (VMS), 17-CV-5228 (NGG) (RER), 2020 WL 6695076, at *6-8 (E.D.N.Y. Nov. 14, 2020), but it relied on *Casa* and *ILRC* and made the same errors.

amended Part II.A and clarified that Annex A governs the order of succession when a Secretary resigns. Mot. 36. But Part II.A was still merely descriptive, and it was McAleenan's order itself that changed the order of succession. Although Plaintiffs claim Mr. McAleenan's clarification "would have been unnecessary had Nielsen already made that change," Opp'n 39 n.23, the clarifying language about Annex A cannot change the legal effect of the April 9 order (and Plaintiffs cite no authority to the contrary).

**iii.** Plaintiffs point to Revision 8.5 of DHS Delegation 00106 as evidence that Ms. Nielsen did not designate an order of succession that controlled when a Secretary resigned. *See* Opp'n 40. Ms. Nielsen's signed order—not the unsigned Revision 8.5—is the controlling document. The revisions made to DHS Delegation 00106 were done merely as an administrative matter, Mot. 33, and do not constitute an "internal regulation," as Plaintiffs claim, *see* Opp'n 40. The fact that Delegation 00106 was not correctly updated as an administrative matter to reflect the legal effect of Ms. Nielsen's order does not change the official action Ms. Nielsen took when she signed the April 9 order. Swartz Decl. ¶ 4, ECF No. 24-2 at 2-3. Indeed, Ms. Nielsen's order was effective when she signed it, not when a subordinate inserted it into DHS Delegation 00106. *Id.* Ms. Nielsen understood that her order would govern and install Mr. McAleenan as Acting Secretary when she resigned.[20] As shown by the notice of vacancy the agency sent to the Senate, DHS had the same understanding. Mot. 36-37.

### 3. Mr. Wolf Lawfully Serves Under Mr. McAleenan's Order of Succession.

If the Court concludes that Mr. Wolf's service is relevant to Plaintiffs' claims, it should conclude that he lawfully serves under the order of succession that Mr. McAleenan designated.

#### a) An Acting Secretary May Designate an Order of Succession.

As the Acting Secretary, Mr. McAleenan had the authority to designate an order of

---

[20] *CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters*, Border Observer, https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/ (last visited Nov. 1, 2020) (Ms. Nielsen swore Mr. McAleenan in as Acting Secretary).

succession under § 113(g)(2) because an acting official is vested with all of the authority of the officer for whom he acts. Mot. 38. The Supreme Court explained this principle more than a century ago, *Ryan v. United States*, 136 U.S. 68, 81 (1890), and the D.C. Circuit recently reaffirmed it, *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019). Congress itself has embraced this principle by allowing acting officials to exercise authority that may be exercised only by the officers for whom they act, *cf.* 5 U.S.C. § 3348(b); *id.* § 3348(a)(2), and by regularly designating acting officials by statute, *see, e.g.*, 6 U.S.C. § 113(g)(1); 15 U.S.C. § 633(b)(1); 38 U.S.C. § 304; 40 U.S.C. § 302(b); 42 U.S.C. § 902(b)(4).

Relying on a single district court decision, Plaintiffs argue that only a Senate-confirmed Secretary may designate an order of succession. Opp'n 33-36. This Court is bound by D.C. Circuit precedent and should conclude that Mr. McAleenan possessed *all* of the Secretary's authority.

**i.** Plaintiffs argue that Congress intended to limit the order-of-succession power to only Senate-confirmed Secretaries because § 113(g)(2) distinguishes between "Secretary" and "Acting Secretary." Opp'n 34. But there is no reason to think this was Congress's intent. After all, Congress understands that acting officials can exercise all the authority of a vacant office, and it expressly allows them to do so. Plaintiffs' reading would lead to bizarre results that would undermine the point of acting service. Under Plaintiffs' reading, each reference to "Secretary" in the HSA would refer to the Senate-confirmed Secretary. *See Azar v. Alina Health Serv.*, 139 S. Ct. 1804, 1811 (2019) ("This Court does not lightly assume . . . Congress silently attaches different meanings to the same term in the same or related statutes."). An Acting Secretary thus could not exercise any authority vested in the "Secretary." The Court should reject a reading that leads to such absurd results. Had Congress wanted to limit the order-of-succession power to a Senate-confirmed Secretary, it easily could have done so. It did not.

**ii.** Plaintiffs also claim the FVRA requires Congress to "expressly" authorize the Acting Secretary to designate an order of succession, *see* Opp'n 35, but this misreads the FVRA. The FVRA is the "exclusive means" for acting service unless, as relevant here, "a statutory provision expressly" "authorizes . . . the head of an Executive department" to designate an acting official. 5

U.S.C. § 3347(a)(1). Section 113(g)(2) expressly authorizes the head of DHS to designate an acting official. This is all the FVRA requires; thus, it is not the exclusive means for an official to serve as Acting Secretary. There is no further requirement in the FVRA that a statute must "expressly" authorize an acting official to perform specific actions.

Moving beyond the FVRA's text, Plaintiffs argue that allowing an Acting Secretary to designate an order of succession would "greatly undermine" the President's role in designating acting officials under the FVRA. *See* Opp'n 35; 5 U.S.C. § 3345(a)(2)-(3) (allowing President to designate acting officials). But Plaintiffs fail to explain how. Mr. Wolf holds his underlying position as the Under Secretary for Strategy, Policy, and Plans at the pleasure of the President. The President thus controls Acting Secretary Wolf the same as he does a Senate-confirmed Secretary.

As shown here, the HSA can give the President *more* control over the Executive Branch, even when an Acting Secretary designates an order of succession. Because Mr. Wolf serves under the HSA, he can serve as Acting Secretary while his nomination is pending. But if he were serving under the FVRA, he could *not* do so while his nomination is pending. 5 U.S.C. § 3345(b). Thus, the HSA allows the person the President has chosen to run the agency to serve in an acting capacity while that person's nomination is pending.

**iii.** Plaintiffs argue that allowing an Acting Secretary to designate an order of succession would "raise serious constitutional concerns under the Appointments Clause[] by potentially allowing a non-Senate-confirmed inferior officer . . . to determine who would run the Department in the future." Opp'n 34. This concern is misplaced.

The Court need not even consider the merits of this argument because a "designation" under § 113(g)(2) is best understood as conferring temporary duties on an already-appointed officer, not as an "appointment" to a new office under the Appointments Clause. Thus, an officer may serve as Acting Secretary without first being "appointed" as such in the constitutional sense. *See Weiss v. United States*, 510 U.S. 163, 176 (1994) (holding that Senate-confirmed commissioned officers could serve as military judges without second confirmation because they acquired duties in their official capacity that were germane to those of their underlying office);

23

*Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 122 n.3 (2003) (noting that the question whether an acting officer is an officer or employee "does not arise for anyone who is already an 'Officer of the United States' . . . , as any duties arising [from the acting service] can be regarded as part and parcel of the office to which he was appointed" (citing *Weiss*, 510 U.S. at 174)). Congress did not require a separate appointment for Acting Secretary. *See generally* 6 U.S.C. § 113; *see also Weiss*, 510 U.S. at 172 (explaining Congress knows how to require a separate appointment when it wants to). Rather than requiring a separate appointment, Congress has instead provided that certain officials will automatically begin serving in an acting capacity under both the HSA and the FVRA. *See* 6 U.S.C. § 113(g)(1); 5 U.S.C. § 3345(a)(1). Thus, a designation under § 113(g)(1) does not implicate the Appointments Clause.

Even if a designation under § 113(g)(2) is viewed as an appointment, binding precedent defeats Plaintiffs' argument. In *In re Grand Jury*, the D.C. Circuit held that "an Acting Attorney General *becomes the head of the Department* when acting in that capacity *because an acting officer is vested with the same authority* that could be exercised by the officer for whom he acts." 916 F.3d at 1055 (emphases added); *see also id.* at 1056. The same logic controls here. Like the Attorney General, the Secretary is the head of the Department. *Compare* 28 U.S.C. § 503, *with* 6 U.S.C. § 112(a)(2). And like an Acting Attorney General, an Acting Secretary "becomes the head of the Department" in accordance with *In re Grand Jury* by virtue of becoming the Acting Secretary. An Acting Secretary thus has the constitutional authority to make that appointment.

In an attempt to distinguish *In re Grand Jury*, Plaintiffs cite *Northwest Immigrant Rights Project v. USCIS*, No. CV 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ("*NWIRP*"), which posited that *In re Grand Jury* relied on separate statutory authority allowing the Deputy Attorney General to "exercise all the duties" of the office of Attorney General when it is vacant. *See* Opp'n 34-35; 28 U.S.C. § 508(a). The Court should reject this argument for several reasons. To begin, it ignores the opinion's language, which says that "the Deputy Attorney General became the head of the Department *by virtue of becoming the Acting Attorney General*," not by virtue of the position's statutory authority. *See* 916 F.3d at 1056. The argument also disregards the authority

on which *In re Grand Jury* was based: two Supreme Court decisions standing for the basic proposition that an acting officer can exercise all of the authority of the office for which she acts. *Id.* at 1055 (citing *Ryan v. United States*, 136 U.S. 68, 81 (1890); *Keyser v. Hitz*, 133 U.S. 138, 145–46 (1890)). Neither Supreme Court decision focused on the specific statutory language of 28 U.S.C. § 508(a). This shows that the D.C. Circuit's holding did not turn on § 508(a).

Finally, this argument misunderstands § 508(a)'s legal effect. While § 508(a) allows the Deputy Attorney General to exercise "all the duties" of the Attorney General, that simply allows the Deputy to serve as Acting Attorney General when the office is vacant. *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 662–63 (D.D.C. 2018) ("It is well-settled . . . that statutory language authorizing one to exercise the duties of an office suffices to make that person an acting officer."). And contrary to the reasoning of *NWIRP*, 2020 WL 5995206, at *21, it carries no special Appointments Clause significance. The Attorney General—not the Deputy—is the head of the Department of Justice. 28 U.S.C. § 503. The Deputy became the head of the Department "by virtue of becoming the Acting Attorney General." *In re Grand Jury*, 916 F.3d at 1056. Far from having unique constitutional significance, § 508(a) is functionally identical to § 113(g)(2). The court in *In re Grand Jury* analyzed the statutory authority under § 508(a) to respond to the appellant's argument that the Attorney General's recusal did not make the Deputy the Acting Attorney General, not to support its conclusion that an Acting Attorney General becomes the head of the Department. *See* 916 F.3d at 1055.

### b)      The FVRA's Time Limit Does Not Apply.[21]

Because neither Mr. McAleenan nor Mr. Wolf ever served under the FVRA, the FVRA's initial 210-day time limit does not apply. Each court to decide the issue has concluded the FVRA's initial 210-day time limit is not incorporated in the HSA. *Casa*, 2020 WL 5500165, at *19; *ILRC*, 2020 WL 5798269, at *11; *Batalla Vidal*, 2020 WL 6695076, at *6-8.

---

[21] Because Plaintiffs did not raise this claim in their complaint, the Court should not consider it. *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 57 n.1 (D.D.C. 2019) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").

The FVRA's initial 210-day limit applies only to a "person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a)(1) (emphasis added); *see also* S. Rep. No. 105-250, at 17 (1998). An official who serves under an office-specific vacancy statute—such as the HSA—does not serve under 5 U.S.C. § 3345. *See* 5 U.S.C. § 3347(a)(1) (explaining the FVRA is not the exclusive means for acting service when a vacancy arises in an office with an office-specific vacancy statute). The HSA itself contains no express time limit and provides that the Secretary's authority to designate an officer under § 113(g)(2) applies "[n]otwithstanding" the FVRA. Because there is a conflict between the FVRA, which initially limits acting service to 210 days, and the HSA, which does not, the FVRA's initial 210-day limit must give way under § 113(g)(2)'s "[n]otwithstanding" clause. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" (citation omitted)). Plaintiffs wrongly argue that the HSA is an exception to the FVRA only with respect to *who* can serve as Acting Secretary. *See* Opp'n 40. And although Plaintiffs may disagree with the results that the HSA's plain text compel, *see id.* at 41 (claiming it is "absurd" that the Deputy Secretary, who serves under the FVRA, is subject to the FVRA's time limit while subordinate officers designated under the HSA would not be), that disagreement cannot overcome the plain text, *Casa*, 2020 WL 5500165, at *19 (explaining why the result Congress chose is "logical[]"); *ILRC*, 2020 WL 5798269, at *11.[22]

c)   **Mr. Wolf's Service Does Not Violate the Appointments Clause.**

Mr. Wolf's service as Acting Secretary is consistent with the Appointments Clause because an individual acting in a principal office does not need Senate confirmation. *See* Mot. 40-41. Even

---

[22] Plaintiffs argue that the HSA must incorporate the FVRA's initial 210-day limit; otherwise, the HSA would raise constitutional concerns by permitting indefinite service. Opp'n 40-41. This is incorrect. *Casa*, 2020 WL 5500165, at *19; *ILRC*, 2020 WL 5798269, at *11. The Supreme Court has recognized that an acting designation must be "temporary." *United States v. Eaton*, 169 U.S. 331, 343 (1898). But neither the Appointments Clause nor any other constitutional provision sets an express limit on acting service. Nor is there any reason to believe the 210-day period has any constitutional significance. Congress has repeatedly varied the time limits on acting service. *See, e.g.*, Act of Feb. 13, 1795, 1 Stat. 415 (six months); 5 U.S.C. § 3348(a) (1994) (120 days). And not even the FVRA limits all acting service to 210 days; acting officers can serve for much longer under 5 U.S.C. §§ 3346(b)(1)-(2) and 3349a(b).

if this were not the case, Mr. Wolf's confirmation as Under Secretary would satisfy any requirement. *Id.* at 41. Plaintiffs' arguments run counter to Supreme Court precedent and centuries of legislative practice. *See id.*

**i.** Plaintiffs concede that the Supreme Court has long permitted acting officers to serve without Senate confirmation, but they claim that Mr. Wolf's service does not satisfy the requirement that the service be "temporar[y] or in an exigent circumstance." Opp'n 42. But Plaintiffs have cited no clear constitutional standard that is violated by Wolf's length of service. In addition, Mr. Wolf's service is safely on the temporary side of any line. He began serving as Acting Secretary in November 2019, and even the FVRA allows acting officials to serve for years.[23] The Court in *Eaton* did refer to acting service under "special and temporary conditions," 169 U.S. at 343, but no particular exigency is required. The "special and temporary conditions" referred to in *Eaton* were not any particular exigency but the limits of the then-regulatory scheme, which permitted service during "the absence or the temporary inability of the consul," 169 U.S. at 342, whatever the cause, *see Guedes v. ATF*, 356 F. Supp. 3d 109, 153 (D.D.C. 2019) (concluding that "a vacancy triggered by the resignation" was "the special circumstance"). Unsurprisingly, Plaintiffs cite no case finding acting service unlawful as not temporary.

**ii.** Plaintiffs then argue that Mr. Wolf's prior confirmation does not satisfy the requirement for principal officers. Opp'n 42. This argument fails because, as every court to consider the issue has held, Senate confirmation is not required for acting service. *See, e.g.*, *Eaton*, 169 U.S. at 343-44; *United States v. Smith*, 962 F.3d 755, 764 (4th Cir. 2020); *Guedes*, 356 F. Supp. 3d at 146, 153. And if confirmation were required, Mr. Wolf's prior confirmation *would* be sufficient because a person performing the duties of a vacant principal office is not a principal officer, *see Eaton*, 169 U.S. at 343; *Guedes*, 356 F. Supp. 3d at 146; *Smith*, 962 F.3d at 764, and because the duties of the

---

[23] For example, the FVRA allows 210 days of service (or 300 if after a Presidential transition, *see* 5 U.S.C. § 3349a(b)) after the vacancy, *see id.* § 3346(a)(1); non-time limited service during the pendency of a first nomination, *id.* § 3346(a)(2); another 210 days of service if the first nomination is rejected, withdrawn, or returned, *id.* § 3346(b)(1); another period of non-time limited service during the pendency of a second nomination, *id.* § 3346(a)(2); and then another 210 days of service if the second nomination is rejected, withdrawn, or returned, *id.* § 3346(b)(2)(B).

Secretary are germane to the duties of the Under Secretary, *see Weiss*, 510 U.S. at 176.[24]

### 4.    Mr. Wolf Ratified His Prior Delegable Acts.

As explained, Plaintiffs analyze just a single discrete action allegedly taken by Mr. Wolf: the designation of DHS employees under 40 U.S.C. § 1315. Opp'n 45. But Mr. Wolf did not issue any such designations. Even if the Court concludes that Plaintiffs' claims somehow implicate actions taken by Mr. Wolf under § 1315, and even if the Court agrees with Plaintiffs' reading of Ms. Nielsen's order of succession, Ms. Nielsen's authority eventually passed under the FVRA to the head of the Federal Emergency Management Authority ("FEMA"), Peter T. Gaynor, who issued an order of succession under § 113(g)(2) that likewise placed Wolf in the position of Acting Secretary. Mot. 42-44.[25] Acting under that authority, Mr. Wolf ratified his prior delegable actions, which would cover any actions (including the designation of officers) that he took under § 1315.[26]

---

[24] Plaintiffs suggest that perhaps acting principal officers have to be confirmed. Opp'n 42 n.24. It is unsurprising that they do not actually ask the Court to adopt this suggestion. It is inconsistent with *Eaton*, 169 U.S. at 343-44, and with two hundred years of precedent from all three branches of government, *see Guedes*, 356 F. Supp. 3d at 149; *Smith*, 962 F.3d at 764-65. This suggestion "would ultimately mean . . . that Congress has gotten the Appointments Clause quite wrong for centuries. That is ordinarily a pretty bad sign." *Smith*, 962 F.3d at 765.

[25] Plaintiffs claim it is a fact question whether Mr. Gaynor properly became Acting Secretary. Opp'n 43. It is not. If EO 13753 governed the succession, Mr. Gaynor immediately became Acting Secretary after the President submitted Mr. Wolf's nomination. Plaintiffs also argue that there is no evidence that DHS notified Congress of a vacancy that Mr. Gaynor could fill, as directed by 5 U.S.C. § 3349(a)(1). But the relevant vacancy under § 3349(a)(1) is the one created by Ms. Nielsen's resignation, and DHS notified Congress of that vacancy. *See* ECF No. 24-2 at 6-7. And regardless, the FVRA does not condition acting service upon such a notification. *See* 5 U.S.C. § 3349(a)(1). Finally, Plaintiffs argue that the FVRA permits only "the same acting officer to continue (or resume) service" during a pending nomination. Opp'n 44. Neither § 3346(a)(2)'s text nor its legislative history supports this. Indeed, the legislative history Plaintiffs rely on simply explains that § 3346(a)(1)'s 210-day time limit runs from the date of the vacancy and does not restart with each new acting officer. *See* S. Rep. No. 105-250, at 14 ("Otherwise, a string of acting officials could [each] serve for [210] days.").

[26] Although the court in *Batilla Vidal* found the ratification ineffective on the notion that Mr. Gaynor's order never made Mr. Wolf the lawful Acting Secretary, it relied on the flawed premise that "two different people . . . exercise[d] the Secretary's power." *See* 2020 WL 6695076, at *9. The agency has made clear that Mr. Gaynor designated an order of succession "out of an abundance of caution," and, as Defendants explained, that order comes into play only if the Court finds that Ms. Nielsen did not designate an order of succession. Mot. 42-44. That is exactly what the Court in *Batilla Vidal* found, *id.* at *9, so under its own reasoning, Mr. Wolf never lawfully exercised the Secretary's authority. Thus, Mr. Gaynor's succession order and Mr. Wolf's ratification were valid. *Cf. NWIRP*, 2020 WL 5995206, at *17 (concluding the ratification was

*Id.* at 44. The ratification would cure any service-related defects in the actions. *See Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019) (D.C. Circuit has "repeatedly held" a "properly appointed official's ratification of an allegedly improper official's prior action . . . resolves the claim on the merits by 'remedying the defect' . . . from the initial appointment" (alterations adopted and citation omitted)). There is thus no basis for setting aside any of Mr. Wolf's actions under the APA.

On this topic, and per their earlier notice, ECF No. 31, Defendants acknowledge the apparent inadvertent factual inaccuracy relating to Mr. Wolf's ratification of prior delegable acts contained in Defendants' Motion to Dismiss. Review of FEMA and Senate records indicates that Mr. Gaynor likely signed the September 10, 2020 succession order approximately one hour before the Senate received the formal submission of Mr. Wolf's nomination to serve as Secretary of Homeland Security. At a minimum, Defendants cannot confirm that the September 10 succession order was signed *after* the submission of Mr. Wolf's nomination.

But the precise sequence is irrelevant to the merits of Defendants' ratification arguments because, on November 14, 2020, Mr. Gaynor once more exercised any authority he may have as Acting Secretary by designating an order of succession under § 113(g)(2). Blackwell Decl. ¶ 7, Ex. 6, Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020). Under this succession order, Mr. Wolf, as the Under Secretary for Strategy, Policy, and Plans and the senior-most official in the line of succession, would have become Acting Secretary. Thus, even if the FVRA and EO 13753 governed the order of succession for the office of the Secretary after Ms. Nielsen's April 9 order, and even if Mr. Gaynor's September 10 succession order was invalid, Mr. Wolf would still be the Acting Secretary under Mr. Gaynor's November 14 succession order. And Mr. Wolf has since ratified any actions he took under § 1315 once more. Blackwell Decl. ¶ 8, Ex. 7, Ratification of Actions Taken by the Acting Secretary of Homeland

---

valid, so long as an Acting Secretary can designate an order of succession); *id.* at *24 (finding that an Acting Secretary cannot designate an order of succession).

Security (Nov. 16, 2020).[27]

As for the merits, Plaintiffs argue that Mr. Wolf could not ratify his earlier designation of DHS officers because the designation power is a "function or duty" under the FVRA. Again, Mr. Wolf did not designate any DHS officers. But regardless, the power to do so is not a "function or duty" of the office of the Secretary. Under 5 U.S.C. § 3348(a)(2), a "function or duty" is one that a statute or regulation requires "to be performed by the applicable officer (and only that officer)." Because § 1315's designation authority is not only delegable, *see* 6 U.S.C. § 112(b)(1), but has in fact been delegated by the Secretary since 2003,[28] and was again delegated in 2013,[29] such authority is not a "function or duty" of the Secretary, *see NWIRP*, 2020 WL 5995206, at *16.[30]

## CONCLUSION

For the foregoing reasons, and those stated in Defendants' Motion to Dismiss, the Complaint should be dismissed.

---

[27] Mr. Gaynor's September 10, 2020 succession order was validly issued, regardless of the precise timing, because it was still signed on the same day as the submission of Mr. Wolf's nomination. The FVRA provides that an acting official may serve "once a first or second nomination for the office is submitted to the Senate, *from the date* of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2). That is, once Mr. Wolf's nomination was submitted on September 10, 2020, Mr. Gaynor would have served as Acting Secretary "from th[at] date"—from September 10, 2020—while Mr. Wolf's nomination is pending. Consistent with the long-established rule that, unless required by "substantial justice," a governmental action is deemed effective from the first moment of the day in which it was enacted regardless of the precise time, Mr. Gaynor had the authority under § 3346(a)(2) to issue the succession order from the first moment of September 10, 2020. *See, e.g.*, *Taylor v. Brown*, 147 U.S. 640, 645 (1893); *see also United States v. Norton*, 97 U.S. 164, 170 (1877); *Lapeyre v. United States*, 84 U.S. 191, 198 (1872). Thus, Plaintiffs' argument about the timing of Mr. Gaynor's order, *see* Opp'n 43, fails as a matter of fact (because of the November 14 order and later ratification) and as a matter of law (because of the deemed-effective rule).

[28] Blackwell Decl. ¶ 4, Ex. 3, *Delegation to Deputy Secretary*, DHS Delegation No. 00100.2, ¶ II.H (June 23, 2003) (delegating "any other duties the Secretary . . . may designate").

[29] *Id.* ¶ 3, Ex. 2, *Delegation to the Under Secretary for National Protection and Programs*, DHS Delegation No. 17001, Revision No. 01, ¶ II.W (Oct. 25, 2013) (delegating authority to "[i]mplement 40 U.S.C. § 1315").

[30] Because all of the Secretary's authority under § 1315 has been delegated, the same analysis would apply to any action that Mr. Wolf has taken in connection with protecting federal property.

Dated: November 19, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jason C. Lynch*
JASON C. LYNCH (D.C. Bar No. 1016319)
MICHAEL P. CLENDENEN
JEFFREY A. HALL
JORDAN L. VON BOKERN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Attorneys for Defendants*