**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DON'T SHOOT PORTLAND et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>PETER T. GAYNOR, in his official capacity<br>as Acting Secretary of Homeland Security,[1]<br><br>                    Defendant. | Case No. 1:20-cv-2040-CRC |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

    Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants hereby move to dismiss Plaintiffs' Amended Complaint (ECF No. 35-1) and submit the enclosed memorandum in support of that motion.

---

[1] On January 11, 2021, Peter T. Gaynor was designated as Acting Secretary of Homeland Security. Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Gaynor is automatically substituted for Chad Wolf, the former Acting Secretary of Homeland Security.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

LEGAL STANDARD ........................................................................................ 4

ARGUMENT ...................................................................................................... 4

I. PLAINTIFFS LACK STANDING ................................................................ 6

    A.    Don't Shoot Portland Has Failed to Allege Organizational Standing. ............... 7

        1.    Don't Shoot Portland. ....................................................... 7

    B.    The Individual Plaintiffs Have not Plausibly Alleged Standing to Redress Future Injury. ................................................................................ 9

    C.    Plaintiffs Cannot Claim Standing to Challenge Future Actions Based on a "Policy" That Does Not Exist ............................................................. 11

        1.    Plaintiffs have not plausibly alleged that "the Policy" exists. ............... 12

        2.    Absent such a policy, Plaintiffs cannot obtain declaratory or injunctive relief. ... 15

II. PLAINTIFFS HAVE NOT ALLEGED ANY FINAL AGENCY ACTION. ................... 16

III. PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS. ................................... 19

    A.    Plaintiffs Have Not Plausibly Alleged that Defendants' Deployment to Portland Violates the Administrative Procedure Act (Counts 1, 2). ................... 20

        1.    Relevant legal authority. ................................................... 20

        2.    DHS's deployment did not violate 40 U.S.C. § 1315(b)(1) ............... 21

        3.    DHS's § 1315 designation was not procedurally improper. ............... 23

        4.    DHS's deployment is not pretextual. ...................................... 24

    B.    Plaintiffs Have Not Plausibly Alleged that Defendants Violated Plaintiffs' First Amendment Rights (Count 3). .......................................... 25

    C.    Plaintiffs Have Not Stated Plausible Fourth or Fifth Amendment Claims (Counts 4, 5, 6). ..................................................................... 28

    D.    Mr. Wolf Lawfully Served as Acting Secretary Under the HSA and Relevant Agency Orders of Succession. .......................................... 31

        1.    Former Secretary Nielsen's April 9 Order Designated an Order of Succession That Applied When She Resigned. ............................. 33

        2.    Acting Secretary McAleenan Lawfully Amended the Order of Succession. ....... 39

        3.    Mr. Wolf Lawfully Served as Acting Secretary ........................... 41

    E.    Mr. Wolf's Ratification of His Prior Orders Cures the Alleged Service-Related Defects in the Actions at Issue Here. ........................................ 43

CONCLUSION .............................................................................................. 45

# INTRODUCTION

Plaintiffs are an organization and individuals who allegedly desire to participate in racial-justice protests in Portland, Oregon, but fear that they will be subjected to riot-control actions taken by federal law enforcement officers. Plaintiffs' claims are predominantly based on events that took place in July 2020, when otherwise peaceful protests outside the U.S. District Court in Portland regularly turned riotous and violent in the middle of the night, necessitating crowd-control and dispersal actions by federal agents tasked with defending the courthouse. Yet Plaintiffs do not seek redress for any of those past actions; their prayer for relief is entirely prospective.

Plaintiffs' claims of future injury are speculative and should be dismissed, both because Plaintiffs lack standing and because they have failed to allege plausible claims on their merits. Plaintiffs' past experiences hardly suggest that future harm is "certainly impending," as Supreme Court precedent requires. Plaintiffs attempt to buttress their fear of future injury by alleging that Defendants have a "Policy" of intimidating and deterring protesters in Portland. Indeed, "the Policy," though never cited or identified, is expressly relied on throughout Plaintiffs' Amended Complaint, both to undergird their theories of standing and as the premise of their claims. But because "the Policy" does not exist, Plaintiffs cannot claim standing to challenge it.

Not only do they lack standing, but Plaintiffs have failed to allege "final agency action" as required for judicial review under the Administrative Procedure Act ("APA"). The designation and deployment of additional federal agents is not final agency action as defined by the APA and applicable precedent, nor are future actions to be taken in real time, on the ground, by individual agents facing violent rioters. Plaintiffs' APA claims must therefore be dismissed.

Plaintiffs also fail to state claims that are plausible on their face. Counts 1 and 2 challenge the deployment of federal agents to protect federal property in Portland, but that deployment was plainly authorized by the applicable statute, 40 U.S.C. § 1315. Counts 3-6 are constitutional claims, but Plaintiffs have identified no pattern or practice of unlawful use of force of the sort that would stifle future speech, nor any policy of unlawful arrests that would violate the Fourth or Fifth Amendment. Plaintiffs claim in Counts 7-9 that Mr. Wolf was invalidly appointed and that his

1

actions are therefore unlawful, but he indeed lawfully served as Acting Secretary under the Homeland Security Act and related agency orders of succession. In any event, any doubt about Mr. Wolf's authority to take the actions that Plaintiffs challenge has been removed: under an alternative basis, and out of an abundance of caution, former Acting Secretary Wolf ratified his prior delegable actions, including those at issue here, removing any question about their legality.

The Court should not indulge Plaintiffs' fanciful request for prospective relief against hypothetical future law enforcement activity at protests Plaintiffs suggest they wish to attend. The Amended Complaint should be dismissed in its entirety.

## BACKGROUND

The City of Portland, Oregon saw near-nightly protests for more than four months. *Cf.* Am. Compl. ¶ 33. Those protests followed in the wake of George Floyd's killing at the hands of police in Minneapolis, Minnesota. *Id.* Almost all Plaintiffs in this case claim to have participated in at least one of these protests, albeit in different roles and to varying extents. *Id.* ¶¶ 10-15.

Earlier this summer, protesters in Portland directed their efforts at federal property within the city—namely, the Mark O. Hatfield U.S. Courthouse. *See generally* Portland Police Bureau ("PPB"), *Protest Information and Updates*.[2] As noted on PPB's timeline, there were fires set, projectiles thrown, vandalism, fireworks/mortars used, or riots declared, on 17 of 31 days in July. *See* PPB, *Protests in Portland: A Timeline*.[3] However, since July, the protests have largely turned away from federal property. *Id.*

Protests across the country have included various efforts to vandalize, damage, or destroy public monuments, memorials, and statues. On June 26, 2020, President Trump signed Executive Order 13933, *Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence*, 85 Fed. Reg. 40,081 (July 2, 2020). The Order sets a federal policy of prosecuting, to the greatest extent permitted under federal law, the criminal damaging or

---

[2] *Available at* https://www.portlandoregon.gov/police/81118. For reasons explained below, the Court can take judicial notice of this and similar documents when resolving this motion to dismiss.

[3] *Available at* https://www.portlandoregon.gov/police/article/765145.

destroying of monuments, memorials, or statues in the United States. *Id.* at 40,082-83. The federal policy is, furthermore, to withhold federal support from State and local law-enforcement agencies that fail to protect such monuments, memorials, or statues. *Id.* at 40,083. Pursuant to that Order, on July 1, 2020, DHS announced a new task force to protect American monuments, memorials, statues, and federal facilities—known as the Protecting American Communities Task Force ("PACT"). Pursuant to PACT's formation, DHS deployed additional law-enforcement officers to protect federal property in Portland, Oregon.

Plaintiffs are one organization and five individuals who have protested, who have donated supplies to protests, or desire to protest in Portland. They advance various claims against Defendants. First and foremost, Plaintiffs allege that Defendants' very deployment to Portland violates the Administrative Procedure Act, insofar as it exceeds Defendant's statutory authority and lacked the required review process, Am. Compl. ¶¶ 173-89 (Count 1), thus rendering the stated purpose pretextual, *id.* ¶¶ 190-96 (Count 2). Plaintiffs also allege various constitutional violations. They claim that Defendants have, through violence and threats of violence, "depriv[ed] Plaintiffs of the opportunity to express their views, retaliat[ed] against them for their expressive activities, and discriminat[ed] against them on the basis of their viewpoints," in violation of the First Amendment. *Id.* ¶¶ 197-201 (Count 3). Plaintiffs allege further that Defendants' "practice of deploying physical force, without provocation or legal grounds," violates the Fourth Amendment, *id.* ¶¶ 202-05 (Count 4), or, alternatively, the Fifth Amendment, *id.* ¶¶ 206-10 (Count 5), and therefore the APA, *id.* ¶¶ 211-19 (Count 6). Finally, Plaintiffs allege that Acting Secretary Wolf's "purported change to DHS policy," which Plaintiffs do not define, is illegal, because he was invalidly appointed to his position. *See id.* ¶¶ 220-23 (Count 7) (claiming violation of the Appointments Clause); *id.* ¶¶ 224-29 (Count 8) (claiming violation of the Homeland Security Act or the Federal Vacancies Reform Act); *id.* ¶¶ 230-31 (Count 9) (claiming violation of the APA).

Importantly, for the purposes of this motion, Plaintiffs ask the Court *only* for declaratory and injunctive relief. *See* Am. Compl. 49-50 (Prayer for Relief).

## LEGAL STANDARD

Defendants bring this motion under Rule 12(b)(1), arguing that Plaintiffs lack standing, and under 12(b)(6), arguing that Plaintiffs have failed to state a claim.

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Indian River Cty. v. Rogoff*, 201 F. Supp. 3d 1, 7 (D.D.C. 2016) (Cooper, J.) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992)). In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("The defect of standing is a defect in subject matter jurisdiction."). A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction. *See Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)), *aff'd*, No. 00-7176, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although well-pleaded factual allegations must be accepted as true, legal assertions devoid of factual support are not entitled to this assumption. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). In addition to well-pleaded factual allegations, "a court may consider on a motion to dismiss . . . public records subject to judicial notice." *Citizens for Responsibility & Ethics in Wash. v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018)).

## ARGUMENT

Plaintiffs' statutory and constitutional claims fail for the following reasons.

*First*, Plaintiffs lack standing. To obtain declaratory or injunctive relief—which is the only relief sought here—the "threatened injury must be *certainly impending*," and "[a]llegations

of *possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added)).  In this case, Plaintiffs fear future harm because of their past experiences and, "on information and belief," a supposed government policy of inflicting those harms. But Plaintiffs' allegations, even taken as true, show only that they have been *exposed* to crowd-control munitions—for example, tear gas— which is entirely consistent with lawful use of force against other, violent rioters nearby. And "the Policy" alluded to at length in the Amended Complaint simply does not exist; Plaintiffs' "information and belief" is not enough to raise a plausible inference that it does. For these reasons alone, the case should be dismissed.

*Second*, Plaintiffs cannot challenge under the Administrative Procedure Act anything other than "final agency action for which there is no adequate remedy in a court." 5 U.S.C. § 704. Future potential actions by law-enforcement agents on the ground, made in real time while their safety is threatened, do not and should not qualify. Nor would "the Policy" supposed by Plaintiffs, even if it existed, be reviewable under the APA.

*Third*, Plaintiffs fail to state plausible claims. The statute on which Defendants relied to deploy agents to Portland, 40 U.S.C. § 1315, requires the Secretary of Homeland Security to protect federal property, and expressly permits him to designate employees for "duty in areas outside the property to the extent necessary to protect the property and persons on the property," as well as to "conduct investigations, on and off the property in question, of offenses that may have been committed" against federal property. *Id.* §§ 1315(a), (b)(1), (b)(2)(E). The statute does *not* require "specifically identifying employees for deployment" in the designation instrument itself. Am. Compl. ¶ 180. Therefore, Plaintiffs have not alleged a violation of any law and cannot state a plausible claim for relief. Plaintiffs' constitutional claims likewise fail: the Amended Complaint raises no plausible inference that Defendants are stifling speech or discriminating on the basis of viewpoint. Nor have Plaintiffs plausibly pled a pattern of unlawful searches or seizures. To the contrary, uses of force are justified under the circumstances to control crowds of demonstrators, which crowds may include violent and nonviolent members alike.

*Fourth*, as demonstrated below, Mr. Wolf lawfully served as Acting Secretary under the Homeland Security Act. And even if the Court agrees with Plaintiffs' theory of the order of succession, Mr. Wolf, acting under an alternate basis that would have permitted Mr. Wolf to serve as Acting Secretary, ratified any of his prior actions that would be relevant here. That ratification removed any service-related doubt about Mr. Wolf's prior actions.

## I.    PLAINTIFFS LACK STANDING.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper*, 568 U.S. at 408 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). One element of this constitutional limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.*

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of alleging facts that establish the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In this case, Plaintiffs draw upon their past experiences to suggest that they will face future injuries. But those past experiences are entirely consistent with lawful use of force. They portend no "certainly impending" future harm. Moreover, Plaintiffs' standing is expressly tied to "the Policy." *See* Am. Compl. ¶ 159 (Don't Shoot Portland) ("*As a result of the Policy*, participating in lawful protests has become more difficult and dangerous.") (emphasis added); *id.* ¶ 162 ("*The*

6

*Policy* has also injured the individual plaintiffs.") (emphasis added). Because no such policy exists, and has not been plausibly pled, Plaintiffs fail to satisfy their own prerequisite to standing.

### A.      Don't Shoot Portland Has Failed to Allege Organizational Standing.

An organizational plaintiff "can assert standing in one of two ways." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100 (D.C. Cir. 2019) ("*EPIC I*"). An organization "can assert standing [1] on its own behalf, as an organization, or [2] on behalf of its members, as associational standing." *Id.* To establish organizational standing, the plaintiff must "show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Id.* at 100-01. There are "two important limitations" on organizational standing, however. "First, the plaintiff must show that the defendant's 'action or omission to act injured the organization's interest.'" *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) ("*EPIC II*") (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal quotation and brackets omitted)). "Second, the plaintiff must show that it 'used its resources to counteract that harm.'" *Id.* (quoting *PETA*, 797 F.3d at 1094).

### 1.      Don't Shoot Portland.

Don't Shoot Portland ("DSP") describes its mission as advocating and providing "support for individuals wishing to exercise their First Amendment rights to organize, protest, and create art for social change." Am. Compl. ¶ 157. DSP claims a "particular focus" on supplying Black Lives Matter with "materials to protect protesters during the COVID-19 pandemic," including "facemasks and hand sanitizer; first aid kits; baking soda and other items to provide relief from tear gas; as well as food, water, temporary shelter, and transportation." *Id.* ¶ 158.

Plaintiffs claim that Defendants' deployment to Portland has stymied this mission. But Plaintiffs never explain how Defendants' protecting the federal courthouse in Portland makes it "substantially more difficult," *id.* ¶ 159, to donate protective equipment to protesters. There is no

well-pled allegation that Defendants are interrupting, intercepting, or impounding these supplies.[4] DSP is just as free to donate supplies to Black Lives Matter as it was before the federal deployment to Portland; this theory of standing therefore fails.

Plaintiffs also claim that Defendants are damaging and destroying DSP's property. Am. Compl. ¶ 160. That theory of harm is far from self-evident, since the materials described by Plaintiffs are, by their nature, consumable. Surely, for example, DSP did not anticipate that the hand sanitizer it donated would be returned, or that it would get its food or water back. These items are meant to be consumed by the user; thus, once donated by DSP, they are no longer its property in any real sense. And in the case of "baking soda and other items to provide relief from tear gas," those items are meant to be consumed when exposed to crowd-control munitions. *Id.* ¶ 158. The fact that the protesters *were* exposed to such munitions, and then used the materials, can hardly be deemed a "destruction of Don't Shoot Portland's property." *Id.* ¶ 160. That is even clearer, given that—as Plaintiffs reveal in their Amended Complaint, ¶ 10—the mutual aid was *donated* to DSP. Notably, Plaintiffs never allege that DSP's property was destroyed while in its possession.

Finally, DSP alleges cursorily that it has had to "divert and expend thousands of dollars of funds and extensive time as a result of the Policy." *Id.* ¶ 161. Putting aside that there is no "Policy," Plaintiffs never say *toward what* they are diverting this money and time. If they mean toward provision of the supplies described above, that is not a "diversion" but rather the organization's stated purpose, which cannot support standing. *See Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 132, (D.D.C. 2014) ("Any resources that [organization] expended . . . were in the normal course of [the organization's] operations, and it cannot convert its ordinary activities and expenditures . . . into an injury-in-fact."); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014) ("[Plaintiff] cannot convert an ordinary program cost—

---

[4] Presumably in response to this argument, Plaintiffs have added to their Amended Complaint the bare allegation that supplies were destroyed "before the mutual aid was given to the intended recipients." Am. Compl. ¶ 38. Plaintiffs offer no examples or details of any such destruction. This transparent attempt to salvage DSP's standing should be rejected.

advocating for and educating about its interests—into an injury in fact.").

In any event, however, Plaintiffs have not provided adequate detail—even in the Amended Complaint, filed almost five months after the original complaint—to support this diversion-of-funds theory of standing. *See Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 10 (D.D.C. 2018) ("The Court needs to know how resources are being drained and from and to where they are being diverted. . . . [T]he Court, without more specifics, is unable to discern whether those outlays would be 'normally expended' to carry out the organization's advocacy mission and the ways in which resources would otherwise be spent."); *N. Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) ("Organizational plaintiffs must allege *specific facts* indicating how a defendant's actions undermine the organization's ability to perform its fundamental programmatic services.") (quoting *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-cv-1915, 2016 WL 4435175, at *6 (D.D.C. Aug. 19, 2016) (emphasis added) (alterations omitted)).

### B.     The Individual Plaintiffs Have not Plausibly Alleged Standing to Redress Future Injury.

Ms. Barnum alleges that she "has regularly attended Black Lives Matter demonstrations in Portland" from July 18-27, 2020. Am. Compl. ¶ 11. Plaintiffs later characterize as "attacks on Ms. Barnum" the fact that she has been exposed to flash-bangs, tear gas, and non-lethal munitions. *Id.* ¶¶ 163-64. But Plaintiffs nowhere allege that Ms. Barnum or her organization was targeted in any way—nor do they provide any level of detail on any of these alleged "attacks." *Id.* ¶ 164. Ultimately, the most plausible reading of Plaintiffs' allegation is that Ms. Barnum was present when crowd-control or crowd-dispersal munitions were employed, and she was incidentally exposed. That alone is not sufficient to support standing for alleged future harms. Nor is Ms. Barnum's having experienced vomiting, burning in her eyes, or sleep deprivation—all of which, again, is consistent with incidental exposure to a *lawful* use of non-lethal force. *Id.*

Plaintiff Danialle James is a Portland resident who attended protests "almost every night" from May 27, 2020, to July 27, 2020. Compl. ¶ 14. She, too, claims to have been "assaulted by

federal agents *implementing the Policy*." *Id.* ¶ 165 (emphasis added). Because "the Policy" does not exist, and because Ms. James avers no other facts sufficient to infer that this "assault" was in any way unlawful, Ms. James cannot allege any "certainly impending" future law enforcement action that will harm her.

Ms. James also claims "emotional distress," insofar as "she fears she will be kidnapped by federal agents." Compl. ¶ 165. But there is no well-pled allegation that *any* Portlander has been kidnapped by federal agents, let alone a sufficient number to engender fear of kidnapping in a reasonable person. At most, Plaintiffs have alleged *one* arrest without probable cause, of Mr. Pettibone on July 15, 2020, *id.* ¶¶ 109-16. But Mr. Pettibone was not kidnapped; he was detained, taken to a holding cell, Mirandized, *id.* ¶ 111, and was released soon thereafter. This solitary incident—even if unlawful, as Plaintiffs allege—cannot lay a foundation for reasonable Portlanders to fear hypothetical, purported *kidnapping* by the federal government.

Ms. Cerquera likewise "fears she will be kidnapped by federal agents." Compl. ¶ 167. Her unfounded fear should likewise should be rejected as a basis for standing. She also claims "similar injuries from being tear-gassed and sprayed with pepper-spray balls," *id.*, but does not plausibly allege that she was exposed because of any *policy* of *excessive* force. Rather, as with other individual Plaintiffs, the most plausible explanation is that Ms. Cerquera was among a crowd of persons being *lawfully* dispersed pursuant to a dispersal order. That bare allegation alone does not suffice as a foundation to fear future harm from defendants, or to think that an injunction against *unlawful* force would prevent such a harm.

Ms. Hester's allegations, Compl. ¶ 166, are not materially different from the various allegations listed above, and should be rejected for the same reasons.

Dr. Kipersztok's claim to standing is perhaps weakest of all. She claims that "*[n]ews coverage* has made clear to her that the federal officers have used tear gas and less-lethal weapons indiscriminately." Compl. ¶ 170 (emphasis added). If that theory of standing were sound, then anyone who watches the news could sue to enjoin federal law-enforcement activities in Portland. "A party claiming 'only harm to his interest in the proper application of the laws, and seeking

relief that no more directly and tangibly benefits him than it does the public at large,' has no concrete and particularized injury." *Kan. Corp. Comm'n v. Fed. Energy Regulatory Comm'n*, 881 F.3d 924, 929-30 (D.C. Cir. 2018) (alterations omitted) (quoting *Lujan*, 504 U.S. at 573-74). Additionally, Dr. Kipersztok's unfounded fear of being "arrested without probable cause and taken away in an unmarked van," Am. Compl. ¶ 171, fails for the reasons above.

Finally, individual Plaintiffs allege that they "have all been deprived of or chilled in the exercise of their constitutional and civil rights." *Id.* ¶ 169. But a supposed chilling effect will not provide standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Clapper*, 568 U.S. 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). As described above, Plaintiffs' fear of future injury is purely speculative.

Ultimately, each individual Plaintiff relies on a speculative chain of events to support her theory of standing. Plaintiffs' theory depends on future protests happening, on the Plaintiffs' attending one of those protests, and—most importantly—on federal agents subjecting them to unreasonable force or the threat of unreasonable force. The facts amassed by Plaintiffs—even in the Amended Complaint, filed five months after the original complaint—simply do not raise a plausible inference that this chain of events will unfold.

### C.    Plaintiffs Cannot Claim Standing to Challenge Future Actions Based on a "Policy" That Does Not Exist.

When a plaintiff "seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy or practice of a government agency," as Plaintiffs do here, they must demonstrate that it is "realistically threatened by a repetition of [its] experience." *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 91 (D.D.C. 2013) (quoting *Haase*, 835 F.2d at 910-11; *Los Angeles v. Lyons*, 461 U.S. 105, 109 (1983)). That requires "more than a nebulous assertion of the existence of a 'policy'," but rather plausible allegations that Plaintiffs are "likely to be subjected to the policy again." *Id.* (quoting *Haase*, 835 F.2d at 911). Absent a plausible allegation, Plaintiffs

should not be allowed to go fishing for "the Policy." *Cf. Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants were motivated, not by their stated reason . . . but by a discriminatory policy that plaintiff believes exists."). Rather, their claims should be dismissed.

### 1.     Plaintiffs have not plausibly alleged that "the Policy" exists.

Plaintiffs allege that "DHS established a policy to intimidate and deter protesters because of their views and beliefs through a number of means: surveillance; the use of militarized and unidentified force; the excessive deployment of crowd-control measures such as tear gas, pepperspray balls, and less-lethal munitions; and warrantless arrests or custodial detentions without probable cause ('the Policy')." Am. Compl. ¶ 86. They expressly rely on "the Policy" throughout their Amended Complaint, both as a basis for their substantive claims, *e.g.*, *id.* ¶ 108 ("Upon information and belief, *the Policy* authorizes agents to arrest or detain protesters without probable cause, in retaliation for their participation in protests against police brutality." (emphasis added)), and to establish their standing, *e.g.*, *id.* ¶ 159-60 ("As a result of *the Policy*, participating in lawful protests has become more difficult and dangerous. *Defendants' unlawful policy* has also caused the damage and destruction of Don't Shoot Portland's property." (emphasis added)). At no point do Plaintiffs identify, cite, or reproduce any *actual* policy—indeed, they admit candidly that it is "on information and belief" that they allege such a policy exists. *Id.* ¶¶ 86, 87, 108, 185. Because that information is lacking, Plaintiffs have offered no "more than a nebulous assertion of the existence of a 'policy,'" *Haase*, 835 F.2d at 911, and their case should be dismissed.

Instead of citing an actual policy of the sort Plaintiffs suppose, they infer such a policy from *other* policies. Plaintiffs cite Executive Order 13933, 85 Fed. Reg. 40,081 (June 26, 2020); *see* Am. Compl. ¶ 70. The "purpose" section of that Order states: "Individuals and organizations have the right to peacefully advocate for either the removal or the construction of any monument. But no individual or group has the right to damage, deface, or remove any monument by use of force." *Id.* at 40,081. More importantly, the actual "policy" promulgated is "to prosecute to the

fullest extent *permitted under Federal law, and as appropriate*," persons who destroy or vandalize monuments, memorials, statues, or religious property. *Id.* at 40,082 (emphasis added). And the federal policy is further to "withhold Federal support" to State and local governments if they fail to protect such properties, which only illustrates that federalism constrains what the federal government can do in this area. Nothing in this Order suggests a policy of widespread illegal use of force, protester intimidation, or unlawful arrests.

Plaintiffs also infer their supposed "Policy" from the formation of the Protecting American Communities Task Force ("PACT"), *see* Am. Compl. ¶ 71, and the institution of Operation Diligent Valor. But "conducting ongoing assessments of potential civil unrest or destruction," and "allocating resources to protect people and property," *id.* (alterations omitted), are a far cry from a conscious policy of unlawful and unconstitutional action.

Plaintiffs also infer "the Policy" from a DHS memorandum leaked to, and posted by, the media. *See* Compl. ¶ 105-06 & n.17 (citing Vladeck & Wittes, *DHS Authorizes Domestic Surveillance to Protect Statues and Monuments* (July 20, 2020).[5] According to Messrs. Vladeck and Wittes, the memorandum allegedly authorized three "appropriate missions" for monitoring protest activity: "(1) Threats to damage or destroy any public monument, memorial, or statue (MMS); (2) Threats of violence to law enforcement personnel, facilities, or resources; and (3) Threats to damage, destroy, or impede the functioning of other government facilities."[6] Even assuming this is an accurate reading of the alleged memorandum, the "missions" do not substantiate Plaintiffs' allegations of "the Policy." As to the first mission, the authors note that the alleged memorandum prohibits surveillance "for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other Constitutional or legal rights, or for the purpose of suppressing or burdening criticism or dissent." *Id.* Thus, far from suggesting the

---

[5]    *Available at* https://www.lawfareblog.com/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments.

[6] Because the alleged memorandum is not attached to the Lawfare article, Defendants cannot attest to its authenticity or accuracy.

sort of "Policy" that Plaintiffs posit, this alleged memorandum *specifically prohibits* such a policy.

Plaintiffs cite a smattering of informal statements made by government officials, including the President. Plaintiffs begin with a post-inauguration statement by President Trump, saying he might "send in the feds" to Chicago to deal with rising homicide rates. Am. Compl. ¶ 51. Then, earlier this year, the President suggested that he might "assume control" in Minneapolis, later suggesting that "[i]f a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them." *Id.* ¶¶ 52, 54. In June, the President suggested he would "[take] care of it" if local law enforcement would not, and in July, he said that he would not let "this happen" in New York, Chicago, Philadelphia, Detroit, Baltimore, or Oakland. *Id.* ¶¶ 57, 58.

None of these various, informal statements supports a plausible inference that "the Policy" alleged by Plaintiffs exists. The President and Defendants know that they cannot "assume control" of a city, and said as much in statements that Plaintiffs themselves cite. *See* Am. Compl. ¶ 93 ("At times, federal officials have suggested that they need permission from local and state governments to send agents to the cities.") (quoting President Trump as saying "the federal government is supposed to wait for the cities to call"); *cf. id.* ¶ 91 (citing Defendant Cuccinelli as saying that President Trump would "*help* restore peace to these beleaguered cities" (emphasis added)); *id.* ¶ 94 (citing Mr. Wolf as "reiterat[ing] that DHS needed 'to be invited and have those state and local authorities ask for the federal government's help."). As to deploying "the United States military," that simply has not happened and is not relevant here. And it is far from clear what President Trump was referring to by "it" in June or "this" in July; Plaintiffs can hardly infer so specific a policy from such vague statements.

Plaintiffs allege that President Trump admitted "the Policy" at a roundtable event on July 13, 2020. *Id.* ¶¶ 89-90. The President said, "We've done a great job in Portland," which was "totally out of control" until "they went in and, I guess, we have many people right now in jail." *Id.* ¶ 90. The President added, "we very much quelled it. And if it starts again, we'll quell it very easily." *Id.* But Plaintiffs leave out what the "it" was—namely, violence directed specifically at

law enforcement.[7] At no point did President Trump suggest a policy of quelling any peaceful protests, let alone protests of a particular viewpoint. Plaintiffs also omit that the President delineated federal and local roles in law enforcement: "If it's anything else, we tell them we work with the states to help them. But if you do anything where it's a federal monument . . . 10 years in jail, monument or statue." *Id.* At bottom, these remarks at a roundtable event do not indicate any "Policy" of particular law enforcement tactics, as Plaintiffs allege.

2.    **Absent such a policy, Plaintiffs cannot obtain declaratory or injunctive relief.**

Because a "nebulous assertion" is all Plaintiffs have offered, their claims must be dismissed.[8] In *Haase*, for example, the plaintiff alleged "one incident, ambiguous and partial statements from some of the participants, and three undocumented allegations of similar searches elsewhere." 835 F.2d at 910. Yet the D.C. Circuit in *Haase* found "nothing in the record that

---

[7] *See* C-SPAN, *President Trump Holds Law Enforcement Roundtable* (July 13, 2020), *available at* https://www.c-span.org/video/?473831-1/president-trump-holds-law-enforcement-roundtable. Because Plaintiffs' claims rely on these remarks, for which the authenticity of them being spoken is not in question, the Court may consider them, even on a motion to dismiss. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 & n.5 (D.C. Cir. 2015) (citing *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (incorporating advertising copy alleged to have been misleading); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (incorporating annual report where plaintiffs' claim rested on report's failure to disclose facts); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (incorporating documents alleged to contain misrepresentations forming basis of plaintiff's claim)).

[8] Plaintiffs' failure to allege plausibly that "the Policy" exists is also grounds for dismissal under Rule 12(b)(6), because an essential element of any case challenging a governmental policy is identifying the policy. *Cf. Tenacre Found. v. I.N.S.*, 78 F.3d 693, 696 (D.C. Cir. 1996) (affirming denial of preliminary injunction where the "gravamen" the plaintiff's complaint was "that INS has adopted an unlawful 'policy' of denying R–1 visas to those engaged in 'training' while working in a religious occupation," which "allegedly burdens [the plaintiff's] free exercise of its religious rights," because the court could "find no 'policy' of the sort described."); *see id.* at 697 ("The main point here is that the Kihu case in no way demonstrates that INS is enforcing an unlawful policy."); *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) (affirming summary judgment for the government against plaintiffs claim that "a pattern of arrests without cause pervades U.S. Park Police practices," but where the plaintiffs tendered nothing but their "personal encounters" and "conclusory allegations") (citing *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (affirming directed verdict because the "catalog of disquieting events [was] not sufficient to demonstrate a pervasive pattern of police officer indulgence in the use of excessive force")).

plausibly supports the existence of the challenged policy, even accepting as true all material allegations in the complaint." *Id.* (alterations and quotation marks omitted). The Court of Appeals agreed with the district court that the allegation of a "policy" was "altogether too phantasmal to warrant discovery of the magnitude which would be necessary to bring such a covert 'policy' to light," *id.* (quoting opinion below), and thus the plaintiff lacked standing. This case, "must be dismissed" for the same reason. *Id.*

*      *      *

Plaintiffs lack standing to seek declaratory or injunctive relief against merely speculative future injury. Plaintiffs' individual experiences, even as described in the Amended Complaint, form no basis to fear such future injury, and their invocation of a non-existent "Policy" cannot save the day. For this reason alone, the entire case should be dismissed.

## II.    PLAINTIFFS HAVE NOT ALLEGED ANY FINAL AGENCY ACTION.

As demonstrated above, Plaintiffs lack standing to challenge Defendants' future actions. But Plaintiffs' failure to allege "certainly impending" harm is also fatal to their APA claims, because they have failed to allege any "final agency action" within the meaning of the APA. *See* 5 U.S.C. § 701(b)(2) (citing *id.* § 551(13) ("agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.")); *id.* § 704 ("Agency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court are subject to judicial review.") (emphasis added). The APA provides for review of discrete agency action; it is not a means to pose "generalized complaints about agency behavior." *Gerber Prod. Co. v. Perdue*, 254 F. Supp. 3d 74, 83 (D.D.C. 2017) (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)). Because Plaintiffs have not alleged final agency action, Counts 1, 2, 6, and 9 should be dismissed.

Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined,

or from which legal consequences will flow." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted); *see also Scenic Am. v. U.S. Dep't of Transp.*, 836 F.3d 42, 55-56 (D.C. Cir. 2016). "An order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).[9] Thus, "*Bennett* directs courts to look at finality from the agency's perspective (whether the action represents the culmination of the agency's decisionmaking) and from the regulated parties' perspective (whether rights or obligations have been determined, and legal consequences flow)." *Soundboard Ass'n*, 888 F.3d at 1271.

Under the *Bennett* test, designating DHS employees under 40 U.S.C. § 1315 and deploying them to Portland is not "final agency action." From the agencies' perspective, neither action consummated a decisionmaking process; rather, both were incremental steps toward managing an unfolding law-enforcement crisis. Agency actions are consummate when they are "not subject to further Agency review," *Sackett v. EPA*, 566 U.S. 120, 127 (2012), and Defendants' ongoing deployment can be augmented, curtailed, or rescinded at any time. From the public's perspective, neither Defendants' designation nor their deployment determined anyone's legal rights or carried any legal consequence; no Plaintiff enjoys fewer legal rights, or has incurred any additional legal obligation, by virtue of either action. For these simple reasons, Counts 1 and 2 must be dismissed.

Nor does the *future* dispersal of any particular crowd on a given night, by federal agents on the ground, satisfy the *Bennett* test. *Cf. Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 65 (D.D.C. 2017) ("The fact that an agency *will* apply a regulation if certain events take place in the future does not satisfy the final agency action requirement for purposes of an as-applied challenge.") (quoting *Nat'l Wildlife Fed'n v. EPA*, 945 F. Supp. 2d 39, 45 (D.D.C. 2013));

---

[9] In *Soundboard Association*, the D.C. Circuit made clear that courts should not "bootstrap[] *Bennett*'s second prong into its first." 888 F.3d at 1272. Thus, the "impact" on regulated parties under the second prong does not affect whether the agency's decision is "final" under the first prong. *Id.* ("The point where an agency's decisionmaking process is complete cannot be pulled to and fro by the gravity of any particular decision for an industry.").

*Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 37 (D.D.C. 2016) ("[P]laintiffs' prediction that the agency will issue import permits to hunters in the future is not enough to establish an application of the challenged 'policy' that causes or threatens harm to a particular claimant. Accordingly, plaintiffs' challenge involves neither an 'agency action' under section 702, nor a 'final agency action' under section 704, and any allegations about the future implementation of the Service's alleged 'policy' are not yet ripe.") (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 891) (citation omitted); *Davis v. United States*, 973 F. Supp. 2d 23, 30 (D.D.C. 2014) ("Here plaintiff does not challenge final agency action. Rather, she merely seeks injunctive relief to compel two specific federal employees to act in a certain way. Therefore, any APA claim that Davis might have must also be dismissed.")).

Moreover, actions taken by individual agents do not qualify as final *agency* action. "In evaluating the first *Bennett* prong," a court must consider, among other things, "whether the action is . . . only the ruling of a subordinate official." *Soundboard Ass'n*, 888 F.3d at 1267 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)). *Cf. Gerber Prod. Co. v. Perdue*, 254 F. Supp. 3d 74, 84 (D.D.C. 2017) ("Guidance supplied by a lower-level official generally does not qualify as a 'final' agency action, even if it proves influential." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 669-70 (D.C. Cir. 2016)); *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 295 (D.D.C. 2005) ("[T]he APA contains no remedy whatsoever for constitutional violations committed by individual federal employees unrelated to final agency action.") (quoting *Robbins v. Wilkie*, 300 F.3d 1208, 1212 (10th Cir. 2002)).

Finally, law-enforcement investigations and operations generally are not final agency actions.[10] Another court in this district recognized as much in *Afifi v. Lynch*, 101 F. Supp. 3d 90

---

[10] These steps are akin to agency investigations, without more, which are not final agency actions. *See Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F.3d 1192, 1198-99 (10th Cir. 1999) (holding that initiation of an audit was not "final agency action") (citing *Veldhoen*, 35 F.3d at 225 (stating that, in a case involving a marine casualty reporting and investigation , "[a]n agency's initiation of an investigation does not constitute final agency action"); *CEC Energy Co.*

(D.D.C. 2015). In *Afifi*, the plaintiff challenged the warrantless installation of a GPS device on his car. *Id.* at 95. Not only did the Plaintiff lack standing to pursue prospective relief, but he failed to state an APA claim because he failed to challenge "final agency action." *Id.* at 110 n.14. The court observed that agency *investigation* is not typically, without more, final agency action. *Id.* (citing *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (holding that an agency's investigation, prior to filing any administrative complaint, was not "final agency action" because the agency "ha[d] not yet made any determination or issued any order imposing any obligation on [Plaintiff], denying any right of [Plaintiff], or fixing any legal relationship."); *ACLU v. NSA*, 493 F.3d 644, 678 (6th Cir. 2007) (rejecting challenge to "NSA's warrantless interception of overseas communications, the NSA's failure to comply with FISA's warrant requirements, and the NSA's presumed failure to comply with FISA's minimization procedures." for failure to allege "final agency action")); *see also Parsons v. U.S. Dep't of Justice*, 878 F.3d 162, 169 (6th Cir. 2017) (gang designation was not "final agency action" because it "does not result in legal consequences because it does not impose liability, determine legal rights or obligations, or mandate, bind, or limit other government actors").

Because Plaintiffs have not alleged final agency action, they have no cause of action under the APA. Counts 1, 2, 6, and 9 should be dismissed.

## III.    PLAINTIFFS FAIL TO STATE PLAUSIBLE CLAIMS.

Even if Plaintiffs had standing and a cause of action, the Amended Complaint would have to be dismissed for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 875 (D.C. Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads

---

*v. Public Serv. Comm'n*, 891 F.2d 1107, 1110 (3d Cir. 1989) (concluding that agency's determination that it had jurisdiction to investigate a public utility contract was not definitive but was merely a determination to commence an investigation); *Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941 (D.C. Cir. 1986) ("It is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding.")).

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

> **A.    Plaintiffs Have Not Plausibly Alleged that Defendants' Deployment to Portland Violates the Administrative Procedure Act (Counts 1, 2).**

Plaintiffs claim that Defendants' designation of ICE and CBP employees to serve as FPS officers, and Defendants' deployment of those officers to Portland, violate the APA in two ways. First, Plaintiffs claim in Count 1 that the deployment is not "in connection with the protection of property owned or occupied by the Federal Government and persons on the property." Am. Compl. ¶¶ 75, 177, 186 (quoting 40 U.S.C. § 1315(b)(1)). Second, Plaintiffs claim in Count 2 that § 1315 "is a pretext." *Id.* ¶ 195.

> **1.    Relevant legal authority.[11]**

Congress has authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). This security mission is primarily carried out by the FPS. While engaged in their duties, FPS officers and agents are authorized to conduct a wide range of law enforcement functions, including carrying firearms, issuing warrants and subpoenas, conducting investigations on and off the federal property in question, making arrests, and enforcing federal laws for the protection of persons and property. *Id.* § 1315(b)(2). The Secretary of DHS may also designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1). And one of the expressed "Powers" under the statute is to "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property." *Id.* § 1315(b)(2)(E).

Further, Congress also delegated authority to DHS to issue regulations "necessary for the

---

[11] To be clear, 40 U.S.C. § 1315 governs Defendant *DHS's* authority to cross-designate employees to protect federal property. Other Defendants, such as the U.S. Marshals, have separate authority.

protection and administration of property owned or occupied by the Federal Government and persons on the property," which regulations may include "reasonable penalties," including fines and imprisonment for not more than 30 days. *Id.* § 1315(c), (c)(2). Current regulations cover many activities, including disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. § 102-74.380(d)). The regulations also empower—and indeed require—federal agencies to control access to federal property as necessary "to provide for the orderly conduct of Government business." *Id.* § 102-74.375.

### 2.    DHS's deployment did not violate 40 U.S.C. § 1315(b)(1).

Plaintiffs' primary theory of liability is that, because § 1315 only allows federal agents to deploy "to the extent necessary to protect the property and persons on the property," it violates that statute to adopt a policy of intimidating and deterring protesters through surveillance, unlawful force, and illegal arrests because of the protestors' beliefs. Am. Compl. ¶ 185-86. As detailed at length above, Plaintiffs do not plausibly allege that any such "Policy" exists. For that reason alone, Count 1 should be dismissed.

Plaintiffs' secondary arguments fare no better. They allege that federal agents "have extended their operations far from the immediate vicinity of the courthouse." *Id.* ¶ 102 (alleging that federal agents have driven protesters as far as "five blocks away from the [federal] courthouse"). Plaintiffs assume that federal law enforcement cannot issue or enforce dispersal orders to anyone outside federal property, which is incorrect. DHS officers have authority to "protect[]" federal property "in areas outside the property to the extent necessary to protect the property and persons on the property," 40 U.S.C. § 1315(b)(1), and to "enforce Federal laws and regulations for the protection of persons and property" on and off federal property, *id.* § 1315(b)(2)(A). Similarly, the Marshals Service has "final authority regarding security requirements for the judicial branch," including "the security of buildings housing the judiciary." 28 U.S.C. § 566(i).  These statutes allow federal officers who have issued dispersal orders on

federal property to effectuate those orders off federal property to the extent necessary. *See United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009).

Plaintiffs' only specific account of extra-courthouse operations is on July 24, 2020, when federal agents "drove the crowd more than two blocks away from the courthouse, declaring 'This is an unlawful assembly.'" Am. Compl. ¶ 103. That is contradicted by the judicially noticeable account of that evening's protest by the Portland Police Bureau:

> At 11 p.m., group members began setting fires inside the fence that protects the Federal Courthouse. Several other people were seen shaking the fence, launching projectiles over the fence, and using different tools to try and dissemble the fence. Several people breeched the fence and Federal Police Officers came out to disperse the crowd. As Federal Police Officers dispersed the group they were hit with large projectiles, various incendiaries, and flashed with lasers.
>
> By 1 a.m., a couple hundred people returned to the fence protecting the Federal Courthouse. These people continued to set fires, cut and breech [sic] the fence, and launch commercial grade fireworks towards the Federal Courthouse. The Federal Police Officers once again exited the Federal Court house and dispersed the crowd.
>
> Although the Federal Police dispersed the crowd, several people remained in the streets around the area of the Federal Courthouse and engaged in violent and criminal behavior. *Because of this, at 1:58 a.m., Portland Police issued public address announcements declaring an unlawful assembly*. The announcements instructed the group to leave the area, moving to the north and the west. Many people stayed in the area and continued to light fires, and destruct federal courthouse property.

Portland Police Bureau, *Fires and Criminal Activity Outside the Federal Courthouse* (July 24, 2020), available at *https://www.portlandoregon.gov/police/news/read.cfm?id=251024* (emphasis added).[12] Not only does this account contradict Plaintiffs', but it contradicts the notion that federal

---

[12] Again, Plaintiffs have put these facts in issue, citing no sources, and the Court is allowed—even on a motion to dismiss—to take judicial notice of the actual story. *CREW*, 924 F.3d at 607 (citing *Kaspersky Lab*, 909 F.3d at 464). "[A] police report is a public record subject to judicial notice. *In re SAIC Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 20 (D.D.C. 2014) (citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)); *accord Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 550-51 (D.S.C. 2008).

agents are out to quell "peaceful protests."

Even assuming that federal agents have operated a few blocks away from federal property, that hardly evidences a policy of "taking over" Portland or "quelling" protests writ large. There were nightly protests all over Portland, and there is no allegation that federal law enforcement has taken action against any protest that did not immediately threaten federal property or federal agents. That is precisely Congress' mandate in § 1315, and Count 1 should be dismissed.[13]

### 3.    DHS's § 1315 designation was not procedurally improper.

In the Amended Complaint, Plaintiffs add the alternative theory that DHS's designation of additional employees under § 1315 was procedurally improper. Plaintiffs claim that the designation was improper because, at the time the designation memoranda were distributed, there were no specific "lists [of employees] attached." Am. Compl. ¶ 180. Plaintiffs are incorrect. The statute does not establish any particular procedure by which the Secretary must designate officers, nor does it define "designate." Indeed, the only mandate from Congress is that "the powers granted to officers and agent designated under [§ 1315] shall be exercised in accordance with guidelines approved by the Secretary and the Attorney General." 40 U.S.C. § 1315(f).

The DHS Office of Inspector General ("OIG") report memorializes, and Plaintiffs do not dispute, that individual officers *were* designated by name. OIG Rep. 17, 21, 22.[14] A dynamic list of designated employees was maintained, given to the OIG, and even appended to DHS's response

---

[13] To the extent Plaintiffs challenge the particulars of Defendants' deployment to Portland, such determinations are committed to agency discretion by law and thus unreviewable under the APA, 5 U.S.C. § 701(a)(2).On its face, the statute provides the Secretary of Homeland Security with discretion to designate and deploy officers. 40 U.S.C. § 1315(b)(1) ("The Secretary *may designate* employees . . . .") (emphasis added); *id.* § 1315(d)(1) ("On the request of the head of a Federal agency having charge or control of property owned or occupied by the Federal Government, the Secretary *may* detail officers and agents designated under this section for the protection of the property and persons on the property.") (emphasis added). The enumerated "powers" given to designated employees are similarly discretionary. *Id.* § 1315(b)(2) ("While engaged in the performance of official duties, an officer or agent designated under this subsection *may* . . . .") (emphasis added).

[14] *Available at* https://www.oig.dhs.gov/sites/default/files/assets/Mga/2020/oig-21-05-nov20-mgmtalert.pdf. This report is specifically incorporated in the Amended Complaint, ¶ 77 n.12.

to the report. *Id.* at 21, 22, 24-26. Plaintiffs' only bone of contention is that this list was not distributed *contemporaneous with* the designation memoranda distributed to DHS components. But again, nothing in the statute requires that formality. It is undisputed that DHS components had identified designable personnel *before* the FPS Director issued the memoranda, *id.* at 16, and that designated personnel were tracked *after* the designation, *id.* at 17. Thus, it was never in doubt whether specific individuals were designated, or who they were. That a static version of the roster was not attached to various memoranda raises no plausible inference of a § 1315 violation.

Finally, Plaintiffs insinuate that because no rosters were attached, DHS employees must have been deployed without proper training. *Cf.* Am. Compl. ¶¶ 83, 85. But as DHS's response to the OIG Report explained—and the OIG did not refute—all cross-designated employees *did* receive the required training before exercising any § 1315 authority. OIG Rep. 22.[15] At most, "due to travel and logistical constraints, the components may have deployed personnel who completed the § 1315 legal orientation training onsite rather than pre-deployment." *Id.* But again, that does not violate any provision in § 1315. Plaintiffs' "designation" theory should be dismissed.

### 4.    DHS's deployment is not pretextual.

Plaintiffs also claim that Defendants' invocation of § 1315 is pretextual, and therefore that DHS's deployment to Portland was arbitrary and capricious. Am. Compl. ¶¶ 190-96 (Count 2). That claim fails principally because the deployment was permitted by § 1315, as explained above.

Plaintiffs also allege that DHS's true motive is to implement "the Policy" of "quell[ing] protests against police brutality and systemic racism." Am. Compl. ¶ 194. As detailed at length above, "the Policy" does not exist. Moreover, the actions alleged by Plaintiffs are inconsistent with such a policy. If Defendants' goal were to quell all peaceful protests, then Defendants would not wait until protests turned violent before dispersing the crowds—as illustrated by the representative police report above. Plaintiffs also ignore the compelling reasons to send additional agents to

---

[15] Even the OIG limits its finding to the *possibility* that deployed personnel "may not have received training on 40 U.S.C. § 1315 before they were deployed." OIG Rep. 7.

Portland, amply demonstrated in that police report: rioters shaking the fence around the federal courthouse; cutting and attempting to breach that fence; and launching projectiles toward the federal courthouse.

Given these facts, Plaintiffs have not plausibly alleged a "disconnect between the decision made and the explanation given." *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019). This Court's review is "deferential," *id.*, and Plaintiffs have alleged no facts to show that something *other* than the threat to federal property, and the legal imperative under § 1315 to protect such property, prompted Defendants' deployment to Portland.

### B.    Plaintiffs Have Not Plausibly Alleged that Defendants Violated Plaintiffs' First Amendment Rights (Count 3).

Plaintiffs claim in Count 3 that Defendants have violated Plaintiffs' First Amendment rights. Am. Compl. ¶¶ 197-201. Once again, Plaintiffs rely on an un-cited "practice" that simply does not exist and has not been plausibly pled, which is enough to dismiss this claim for declaratory and injunctive relief. Nevertheless, Plaintiffs' specific theories fail for the following reasons.

First, Plaintiffs allege that Defendants have "threatened violence against protesters engaged in public demonstrations," which constitutes unlawful retaliation in violation of the First Amendment. *Id.* ¶ 199 (citing *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). Setting aside that there is no well-pled allegation of threatened violence against *peaceful* demonstrations, and that dispersing rioters has been the exception, not the rule, Plaintiffs fail to allege the second element in *Aref*: that Defendants have retaliated sufficiently to deter a person of ordinary firmness from speaking again. While suggesting "other things" broadly, Plaintiffs only specifically allege "a policy of arresting protesters without probable cause in retaliation for their First Amendment-protected activity." *Id.* (citing *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018)).[16]

---

[16] The critical difference between these two cases is that in *Nieves*, the plaintiff challenged an ad hoc arrest, whereas in *Lozman* the plaintiff challenged an alleged "official municipal policy" of

Upon examination, however, Plaintiffs' allegations of widespread "unlawful warrantless arrests" fall short. *See generally* Am. Compl. ¶¶ 108-116.[17] While suggesting "[m]any of these arrests have been made," Plaintiffs only identify one incident: the July 15, 2020, arrest of Mark Pettibone. *See id.* Defendants are unable, in this procedural posture, to contest the facts alleged in these paragraphs. But suffice it to say, even if Mr. Pettibone's detention was unjustified, that does not suggest a federal policy susceptible to declaratory or injunctive relief. *Cf. Wood v. Moss*, 572 U.S. 744, 763-64 (2014) (Ginsburg, J., for a unanimous Court) ("We therefore decline to infer from alleged instances of misconduct on the part of particular agents an unwritten policy of the Secret Service to suppress disfavored expression, and then to attribute that supposed policy to all field-level operatives."); *Martin*, 830 F.2d at 255 ("One instance, however egregious, does not a pattern or practice make.").[18]

Second, Plaintiffs allege that "Defendants' violent actions, and threats of future violent actions, are based on the viewpoint being expressed by the demonstrators." Am. Compl. ¶ 200 (citing *Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015) (en banc)). The exemplar case cited by Plaintiffs involved a "scenario" known as "the heckler's veto," in which "police silence a speaker to appease the crowd and stave off a potentially violent altercation." *Bible Believers*, 805 F.3d at 234. In that case, for example, police had silenced a small group of Christian evangelicals

---

retaliation. *Nieves*, 139 S. Ct. at 1722. In the latter situation, the Court was clear that evidence of such a policy is *required*. *Lozman*, 138 S. Ct. at 1954.

[17] There is a typographical error in the sequence of Plaintiffs' paragraphs: "115 . . . 1 . . . 116." *See* Am. Compl. at 26.

[18] This is equally clear in the analogous area of State or local liability under § 1983 and *Monell*. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Jackson v. City of Hearne*, 959 F.3d 194, 204 (5th Cir. 2020) ("But a single incident doesn't establish a custom or policy."); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (a *Monell* "claim requires more evidence than a single incident to establish liability"); *Losch v. Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984) ("A policy cannot ordinarily be inferred from a single instance of illegality such as a first arrest without probable cause.") (citing *Walters v. City of Ocean Springs*, 626 F.2d 1317, 1323 (5th Cir. 1980); *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir. 1980)).

to avoid a conflict with the Muslim crowds they were heckling. *Id.* It was undisputed that the police had silenced one group's speech because of the other group's "negative reaction" to that speech. *Id.* at 247. There is no allegation here, by contrast, that the government is acceding to one group's plea to silence another; the "heckler's veto" jurisprudence is simply irrelevant.

Even under the *Bible Believers* framework, Plaintiffs' allegations fail. That case affirms that "time, place, and manner restrictions that are content-neutral" are valid restrictions on speech. *Id.* In this case, there are no allegations that Defendants' actions were content-based. There is no allegation, for example, that Defendants dispersed *some* protesters who were lighting fires on federal property but not *other* protesters who were doing the same. There is no allegation that *protesters* who beamed lasers in officers' eyes were arrested, while *counter-protesters* who did the same thing were not.

Absent some viewpoint- or content-based motivation, it is well understood that "government officials may stop or disperse a protest when faced with an 'immediate threat to public safety, peace, or order.'" *Edrei v. Maguire*, 892 F.3d 525, 541 (2d Cir. 2018) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)); *accord Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). This presents an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for the past and future harms that Plaintiffs allege: they were, and could later be, incidentally exposed to *lawful* crowd-control munitions. Consistent with the First Amendment, the government may impose restrictions to "contain or disperse demonstrations that have become violent or obstructive." *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 119 (D.C. Cir. 1977) (stating that it is "axiomatic" that "the police may, in conformance with the First Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful and not obstructive"); *see Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) ("When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious."); *Carr v. Dist. of Columbia*, 587 F.3d 401, 410 n.6 (D.C. Cir. 2009) (noting that "where demonstrations turn violent, they lose their protected quality as expression under

27

the First Amendment") (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 116 (1972)).

Because Plaintiffs have not alleged plausibly that Defendants are either conducting widespread, unlawful arrests, or discriminating against any particular viewpoint, Plaintiffs' First Amendment claims should be dismissed.

### C.   Plaintiffs Have Not Stated Plausible Fourth or Fifth Amendment Claims (Counts 4, 5, 6).

Plaintiffs claim in Count 4 that "Defendants have adopted a practice of deploying physical force, without provocation or legal grounds to do so, to compel demonstrators to move," in violation of the Fourth Amendment's prohibition on unreasonable searches and seizures. Am. Compl. ¶¶ 203-05. Alternatively, Plaintiffs claim in Count 5 that the same "practice" violates the Fifth Amendment's prohibition on "arbitrary government action." *Id.* ¶¶ 207-09. And in Count 6, Plaintiffs allege that Defendants' "Policy" violates the APA, insofar as it was "contrary to constitutional right, power, privilege, or immunity." *Id.* ¶¶ 213-18 (quoting 5 U.S.C. § 706(2)(B)).

As noted above, Plaintiffs have sought only injunctive and declaratory relief, including through their Fourth and Fifth Amendment claims.[19] But as explained above, Plaintiffs lack standing to obtain such relief. The "threatened injury" of future Fourth Amendment violations must be "*certainly impending*" and not merely "*possible*." *Clapper,* 568 U.S. at 409 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)). But Plaintiffs primarily allege *past* conduct by federal officers: tear gas, pepper spray, flash-bang grenades, rubber bullets, and projectile munitions such as paintballs. *See* Am. Compl. ¶¶ 43, 46-48, 103, 116, 119, 163--67. These past incidents do not confer standing to seek prospective injunctive relief. Nor does Plaintiffs' "fear"

---

[19] Plaintiffs do not seek money damages, nor could they, since the individual defendants are all named in their official capacities. Official-capacity claims are in essence claims against the United States itself. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). "Federal constitutional claims for damages are cognizable only under *Bivens*, which runs against individual government officials personally." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016) (citing *FDIC v. Meyer*, 510 U.S. 471, 482 (1994)). Otherwise, "sovereign immunity shields the Federal Government and its agencies from suit." *DeBrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015) (quoting *Meyer*, 510 U.S. at 475).

that they will be harmed by similar actions in the future, *see id.* ¶¶ 156, 164, 169, 170; *see also id.* ¶ 119 (alleging that "[f]ederal agents in Portland use tear gas in a predictable pattern"), which is mere "conjectur[e]." *Lyons*, 461 U.S. at 102; *see id.* at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."). Plaintiffs have not asserted that there is a certainly impending threat that federal officers will continue this conduct in the future—even assuming that it was unconstitutional. As such, plaintiffs lack standing to pursue injunctive relief. The claim for a declaratory judgment should be dismissed for the same reasons. *See Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994) (*Lyons* applies to requests for declaratory relief).

Even assuming *arguendo* that Plaintiffs have standing to pursue a Fourth Amendment claim, their claim is not plausible on its face. To demonstrate excessive force, Plaintiffs must show that the officers' use of force was objectively unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). That showing requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Gardner*, 471 U.S. 1, 8 (1985)). Law enforcement agents may control a demonstration collectively "if it is substantially infected with violence or obstruction." *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977); *see also Grayned v. Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

The Amended Complaint states throughout that Plaintiffs and others were peacefully exercising their right to protest, and that some of these protesters were subjected to tear gas and other uses of force. *See* Am. Compl. ¶¶ 4, 15, 45, 4848-49, 116, 121, 158, 163, 170, 208-09. Nowhere does the Complaint allege that the entirety of the crowds protesting in downtown Portland were peaceful and devoid of violence, vandalism, or other unlawful behavior. Indeed, the complaint implicitly acknowledges that not all protesters remained peaceful. *Id.* ¶ 170 ("[F]ederal officers have used tear gas and less-lethal weapons indiscriminately at the crowd—even against peaceful protesters who are not on federal property."); *see also* PPB, *Fires and Criminal Activity*

*Outside the Federal Courthouse* (July 24, 2020), *supra*. As such, the federal agents were justified in dispersing the entire crowd, including violent and nonviolent protesters, and Plaintiffs have not plausibly alleged that the use of crowd-control devices was excessive under the circumstances.

Plaintiffs also claim that the federal agents violated the Fourth Amendment by arresting protesters without a warrant and without probable cause. *See id.* ¶¶ 101, 108-16, 204. This claim fails because the only seizure alleged in the Amended Complaint was of one individual—Mark Pettibone—who is not a Plaintiff in this case. *See id.* ¶¶ 109--11. There is no allegation that federal officers arrested any Plaintiff. The Amended Complaint states that some Plaintiffs fear being seized in the future, *see id.* ¶¶ 165, 167, 169, 171, 204, but as with the excessive force claims, fear of merely *possible* future harm is insufficient to establish standing, *see Lyons*, 461 U.S. at 107 n.8.

Plaintiffs also appear to assert a claim stemming from the "surveillance" of protesters. *See* Compl. ¶¶ 101, 105--07. Nevertheless, the Amended Complaint does not allege that any Plaintiff was surveilled, nor does it allege that such surveillance would be an unconstitutional "search" in violation of the Fourth Amendment. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404–11 (2012). The threadbare allegations in the Amended Complaint therefore do not state a plausible claim for relief on this theory.

Finally, Plaintiffs' invocation of an "alternative" claim under the Fifth Amendment's Due Process Clause adds nothing to the foregoing Fourth Amendment analysis. *See* Am. Compl. ¶¶ 206-10 (Count 5). The Amended Complaint cites *City of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), for the proposition that the "[u]s[e of] physical force . . . violates Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution to be free from arbitrary government action." Am. Compl. ¶ 209. *Lewis*, however, did not involve allegations of excessive use of force, but rather dealt with high-speed chases. *Lewis*, 523 U.S. at 842. The Supreme Court in that case noted that "[s]ubstantive due process analysis is . . . inappropriate . . . if [the] claim is 'covered by' the Fourth Amendment." *Id.* at 843. Count 5 focuses only on use of force, which is covered by the Fourth Amendment. "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the

more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *See Graham*, 490 U.S. 395. Count 5 should therefore be dismissed.

*    *    *

Because none of Counts 3-6 states a constitutional claim for relief that is plausible on its face, Count 6 (alleging that the same actions violate the APA as "contrary to constitutional right, power, privilege, or immunity") must also be dismissed.

### D.    Mr. Wolf Lawfully Served as Acting Secretary Under the HSA and Relevant Agency Orders of Succession.[20]

Plaintiffs claim that Mr. Wolf's service as Acting Secretary violated the Homeland Security Act ("HSA"), Am. Compl. ¶¶ 224-29, and that his exercise of the functions and duties of the Secretary of Homeland Security violated the Appointments Clause of the Constitution because he

---

[20] After the Amended Complaint was filed, on January 11, 2021, Acting Secretary Wolf designated a new order of succession for the position of Acting Secretary under 6 U.S.C. § 113(g)(2). Order Designating the Order of Succession for the Secretary of Homeland Security (Jan. 11, 2021), https://www.dhs.gov/sites/default/files/publications/20_0111_order-of-succession-secretary-of-homeland-security.pdf. Peter Gaynor, the Senate-confirmed Administrator of the Federal Emergency Management Agency, is the most senior official in that order of succession. Although Mr. Wolf is no longer Acting Secretary, he retains his Senate-confirmed position as Under Secretary for Strategy, Policy, and Plans. DHS's website states that "[o]n January 11, 2021, Peter T. Gaynor was designated as Acting Secretary of Homeland Security." https://www.dhs.gov/person/peter-t-gaynor. On January 15, 2021, DHS submitted notice to Congress that Mr. Gaynor began serving as Acting Secretary on January 12, 2021. *See* Swartz Decl. ¶ 8, Ex. 2, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Jan. 14, 2021).

On January 12, 2021, Mr. Gaynor exercised his authority as Acting Secretary to issue an order delegating certain of the Secretary's authorities to Mr. Wolf in his capacity as Under Secretary for Strategy, Policy, and Plans, expressly including the authority to "ratify any prior regulatory actions of the Department of Homeland Security." *Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules, Regulations, and Other Matters*, DHS Delegation No. 23028, Revision No. 00 (Jan. 12, 2021), https://www.dhs.gov/sites/default/files/publications/20_0112_delegation-23028-final-rules-regulations-other-matters.pdf. Two days later, Mr. Wolf issued an order "affirm[ing] and ratify[ing] any and all regulatory actions involving delegable duties that [he] t[ook] from November 13, 2019, through January 11, 2021," which includes any actions that Plaintiffs challenge here. Ratification (Jan. 14, 2021), https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratification-delegable-prior-actions.pdf.

had not been confirmed by the Senate to serve in that position and because "there [was] no legal basis for him to exercise the functions and duties of that office," *id.* ¶¶ 220-23. Accordingly, Plaintiffs allege that Mr. Wolf "lacked authority to promulgate the Policy or to designate and deploy DHS employees as FPS agents," *id.* ¶ 134, and therefore claim that his alleged attempts to do so were unlawful, *id.* ¶¶ 223, 229. Similarly, Plaintiffs claim that, because Mr. Wolf was not lawfully serving as Acting Secretary, those same alleged actions were unlawful under the APA. *Id.* ¶ 231. These claims rest upon the allegation that when the last Senate-confirmed Secretary of Homeland Security, Kirstjen Nielsen, resigned her position, Kevin McAleenan unlawfully assumed the position of Acting Secretary and thus had no authority to designate the order of succession under which he served. *See id.* ¶¶ 144, 147, 150-54.

Because Plaintiffs have not plausibly alleged that any "policy" exists, the actions that Mr. Wolf allegedly took as part of that "policy" are irrelevant to Plaintiffs' claims. But regardless, Plaintiffs' claims fail. The very documents they reference in their Amended Complaint show that Mr. Wolf lawfully served as Acting Secretary. On April 9, 2019, then-Secretary of Homeland Security Nielsen exercised her authority under the HSA, 6 U.S.C. § 113(g)(2), to designate a new order of succession that governed all vacancies in the office of Secretary. *See* Third Decl. of Juliana Blackwell ("Blackwell Decl.") ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order"). Under that order, Mr. McAleenan, as the Senate-confirmed CBP Commissioner, began serving as Acting Secretary when Ms. Nielsen resigned. *See* April 2019 Order at 2 (listing the CBP Commissioner third in line, behind the Deputy Secretary and Under Secretary for Management); Second Decl. of Neal Swartz ("Swartz Decl.") ¶ 5 (explaining that the offices of Deputy Secretary and Under Secretary for Management were vacant when Ms. Nielsen resigned). In turn, Acting Secretary McAleenan later exercised his authority under § 113(g)(2) and amended the succession order. *See* Blackwell Decl. ¶ 4, Ex. 3, Amendment to the Order of Succession for the Secretary (Nov. 8, 2019) ("November 2019 Order"). Under that order, Mr. Wolf, as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans, began serving as Acting Secretary when Mr. McAleenan resigned. Mr. Wolf thus lawfully served as Acting

Secretary and would have had authority to take the specific actions that Plaintiffs challenge.

> ### 1. Former Secretary Nielsen's April 9 Order Designated an Order of Succession That Applied When She Resigned.

Under the HSA, when both the office of the Secretary and the office of the Deputy Secretary are vacant, "the Under Secretary for Management shall serve as the Acting Secretary." *See* 6 U.S.C. § 113(g)(1). The HSA then allows the Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2). Plaintiffs concede that the Secretary has this power, *see* Am. Compl. ¶ 138, and they agree that the CBP Commissioner was listed third (behind the Deputy Secretary and Under Secretary for Management) in the list of officials that Ms. Nielsen set out in her April 9 order, *see id.* ¶ 145. Plaintiffs instead allege that Executive Order ("EO") 13753—and not the order that Ms. Nielsen designated on April 9—controlled the order of succession applicable when a Secretary resigned. *See id.* ¶ 146. And because Mr. McAleenan was not next in line under EO 13753, Plaintiffs allege that he had no authority to designate the order of succession that Mr. Wolf served under. *Id.* ¶¶ 147-54. That argument is incorrect—Ms. Nielsen designated the first-ever § 113(g)(2) order of succession on April 9, and it superseded EO 13753 as a matter of law.

Plaintiffs allege that Ms. Nielsen amended only Annex A, which sets the order of *delegation* of authority under certain circumstances; Plaintiffs claim that Ms. Nielsen did not, however, separately designate an order of succession that applied when a Secretary resigned. *Id.* ¶¶ 145-46. Plaintiffs' allegations about the legal effect of Ms. Nielsen's April 9 order are legal conclusions, and the Court should disregard those allegations. *See Iqbal*, 556 U.S. at 678. By its plain terms, the April 9 order—which designated an order of succession under 6 U.S.C. § 113(g)(2)—applies to more than the limited circumstances under Annex A, and it governed the order of succession when Ms. Nielsen resigned.

In the April 9 order, Ms. Nielsen designated an order of succession that applied to all vacancies regardless of reason. *See generally* April 2019 Order. The order says five times that Ms. Nielsen was designating an order of succession for the office of the Secretary, including in the

subject line of the memorandum, the title of the order, and the text of each. *Id.* at 1-2. The order's unqualified language shows that it applied to all vacancies. Thus, Ms. Nielsen's April 2019 signed order—not EO 13753, as Plaintiffs allege—controlled the succession order when Ms. Nielsen resigned.

Beyond the unqualified language in the April 9 order, the provision she relied on (§ 113(g)(2)) shows that she changed more than just the delegation of authority that applied "in the event of disaster or catastrophic emergency," which is when Annex A applies. Section 113(g)(2) empowers the Secretary to designate an "order of succession" for officers to serve as Acting Secretary in the event of a vacancy. Ms. Nielsen's order expressly cites this statutory authority three times. *See* April 2019 Order at 1-2. Crucially, an *order of succession* is different from a *delegation of authority*. The HSA reflects this: a different provision, 6 U.S.C. § 112(b)(1), empowers the Secretary to delegate her authority to other officials in the agency even when the Secretary continues to occupy her office. Further, Plaintiffs state no reason that Ms. Nielsen would have invoked her § 113(g)(2) authority to designate the order of succession (and repeatedly stated that she was doing so) if she was merely amending the order for delegated authority during an emergency.

The legal effect of the April 9 order is even clearer when it is read in the context of earlier revisions to DHS Delegation 00106, which is an administrative document that is periodically updated and meant to consolidate and maintain in a single document the orders of succession and delegations of authority for many senior positions in DHS. *See* Swartz Decl. ¶ 4. Plaintiffs rely on the structure of DHS Delegation 00106 in arguing that EO 13753 controlled the order of succession when Ms. Nielsen resigned. *See* Am. Compl. ¶ 139 (alleging that § II.A of DHS Delegation 00106 provided that EO 13753 controlled the order of succession when a Secretary resigned); *id.* ¶ 142 (alleging that § II.B of DHS Delegation 00106 set out a list of officials—in Annex A—who would exercise the Secretary's delegated authority when the Secretary was unavailable to act during a disaster or catastrophic emergency); *id.* ¶¶ 145-46 (alleging that the April 9 order only amended Annex A, and thus § II.B of DHS Delegation 00106, without altering § II.A, meaning EO 13753

still controlled the order of succession when a Secretary resigned).[21] That same structure and context of DHS Delegation 00106, as well as a congressional amendment to the HSA, makes clear that Ms. Nielsen did more than amend Annex A.

On December 15, 2016, then-Secretary Jeh Johnson signed Revision 8 to DHS Delegation 00106. *See* Blackwell Decl. ¶ 5, Ex. 4, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) ("Revision 8") (signed at page 3). This signed revision addressed two different kinds of orders: (1) an order of succession, meaning a list of officials who could become Acting Secretary in the event of a vacancy, and (2) an order for delegating authority, meaning a list of officials who could exercise the Secretary's authority during a disaster or catastrophic emergency. *Id.* at 1, § II.A-B.

*First*, § II.A of Revision 8 explained that, "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession would be governed by EO 13753. This was not an order of the Secretary and did not invoke any authority vested in the Secretary, because under the HSA that existed at that time, the Secretary had no authority to designate an order of succession. At that time, only the President had the authority (under the FVRA) to designate an order of succession. *See* 5 U.S.C. § 3345(a)(2)-(3). Section II.A thus expressly tracked the FVRA: it noted that the President's order of succession in EO 13753 would apply to a vacancy covered by the FVRA. Section II.A even listed the same triggering events as the FVRA. *Compare* 5 U.S.C. § 3345(a), *with* Revision 8 at 1, § II.A. After Mr. Johnson signed Revision 8, Congress gave the Secretary the power to designate an order of succession that would

_____

[21] Plaintiffs cite Revision 8.5 to DHS Delegation 00106 and then refer to Revision 8.5 as "DHS Orders." *See* Am. Compl. ¶ 139. Ms. Nielsen never signed Revision 8.5. *See* Blackwell Decl. ¶ 3, Ex. 2, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019). As explained, DHS Delegation was last signed by then-Secretary Johnson on December 16, 2016. On April 10, 2019, DHS Delegation 00106 was updated with Revision 8.5 to reflect Ms. Nielsen's April 9 order, *see* Swartz Decl. ¶ 4, but Revision 8.5 did not accurately capture Ms. Nielsen's order. Rather, in Revision 8.5, § II.A was unchanged and said that EO 13753 would govern the order of succession when the Secretary resigned. But this is irrelevant because Ms. Nielsen's signed order is the controlling document, and that signed order superseded EO 13753 as a matter of law.

apply "[n]otwithstanding" the FVRA. *See* Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)).

*Second*, in § II.B of Revision 8, Mr. Johnson separately exercised his own authority under 6 U.S.C. § 112(b)(1)—authority that the Secretary had long possessed—and delegated the authorities of his office to a list of officials in the event that he was temporarily "unavailable to act during a disaster or catastrophic emergency." That list was set out in Annex A. This was not an order of succession—the circumstances addressed by § II.B are not the kind of vacancy that would trigger the FVRA, and the § II.B delegation would not make someone exercising that authority an Acting Secretary. *Cf. English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018) ("Defendants argue, with some force, that [unavailability to act is] commonly understood to reflect a temporary condition, such as not being reachable due to illness or travel," rather than a permanent condition such as a vacancy.), *appeal dismissed*, 2018 WL 3526296 (D.C. Cir. July 13, 2018). It is clear from the text of federal statutes governing DHS that orders of delegation and succession are distinct, as 6 U.S.C. § 112(b) by its terms addresses delegation but Congress then enacted the separate provision giving the Secretary power to issue succession orders in 6 U.S.C. § 113 on December 23, 2016. Secretary Johnson thus had no statutory authority at the time he issued the delegation order on December 16, 2019, to designate an order of succession.

This context, along with the text of the April 9 order, shows that when then-Secretary Nielsen changed Annex A's list of officers, she also provided that Annex A would now perform two separate roles. It would both (1) designate the agency's first order of succession under § 113(g)(2) and (2) amend the list of officials in the order for delegation of authority. Ms. Nielsen must have been treating pre-existing Annex A as relevant to both delegation and succession, as at the time of the most-recent amendment to Annex A, DHS Secretaries would have had power only to impact delegation orders, and § II.B could not have encompassed succession matters.

As to the first role, Ms. Nielsen established the first order of succession under § 113(g)(2); it would apply in the case of a vacancy that would otherwise have been covered by the FVRA. Before Ms. Nielsen's order, there was no order of succession under § 113(g)(2). Rather, as

acknowledged by § II.A of Revision 8, *the President's* order of succession under EO 13753 governed when the Secretary's office was vacant, because then-Secretary Johnson lacked the authority to create an order of succession. Thus, when Ms. Nielsen *thrice* invoked § 113(g)(2), she exercised the Secretary's authority under that statute and designated an order of succession that applied "[n]otwithstanding" the FVRA. *See* 6 U.S.C. § 113(g)(2). As a matter of law, that order of succession superseded EO 13753's FVRA order. Because § II.A was merely descriptive and was never an order from a Secretary, there was no need for Ms. Nielsen to expressly amend § II.A. Rather, to designate an order of succession for the office of the Secretary, she only needed to exercise her authority under § 113(g)(2), which she did.

The text of Ms. Nielsen's order cited § 113(g)(2) and used that authority to "designate the order of succession for the Secretary of Homeland Security as follows." April 2019 Order at 2. The order that "follows" was the amended list of officials in Annex A. *Id.* Annex A was also introduced with another clause and title showing that it would simultaneously continue to serve its original function as an order for delegation of authority. *Id.* But Annex A's amended list was followed by a new provision that had not appeared in the delegation-only version of Annex A. The new provision noted that "[n]o individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation." *Id.* That reference to a "*designation*"—rather than a "delegation"—is yet another textual and structural acknowledgment that Annex A had executed the Secretary's new authority under § 113(g)(2). *See* 6 U.S.C. § 113(g)(2) (authorizing the Secretary to "designate such other officers . . . in further order of succession to serve as Acting Secretary").

As to the second role, Ms. Nielsen's order changed the order for delegation of authority in the case of a disaster or catastrophic emergency by issuing a new version of Annex A. To do so, Ms. Nielsen did not need to expressly invoke § 112(b)(1), any more than Mr. Johnson had, because Annex A (via § II.B) already was, by its terms, a delegation of authority. Thus, by changing the officials listed in Annex A, she changed the order of delegation. But, by her express invocation of § 113(g)(2), Annex A's list would serve two different functions when Ms. Nielsen resigned: both

the order of succession *and* the order for delegation of authority.

To be sure, when Mr. McAleenan amended the order of succession on November 8, he expressly said that Annex A governs when a Secretary resigns. *See* November 2019 Order; *see also* Am. Compl. ¶ 150. But while this clarified Annex A's role, Mr. McAleenan's order did more than that: it also changed the actual order of succession. Thus, it is not as though the sole purpose of Mr. McAleenan's order was to address when Annex A governs. Nor does this clarifying language change the legal effect of Ms. Nielsen's April 9 order—Ms. Nielsen's order superseded EO 13753 as a matter of law.

As explained, Ms. Nielsen's order designated the order of succession under 6 U.S.C. § 113(g)(2). That is the best reading of the order, which is buttressed by its context and the fact that all officials at the time understood Ms. Nielsen to be amending the succession order to provide that Mr. McAleenan would serve as Acting Secretary upon her resignation. Indeed, on April 10, DHS, through its General Counsel, sent a notice to the Senate as required by the HSA, 6 U.S.C. § 113(g)(3), and the FVRA, 5 U.S.C. § 3345 *et seq.*, stating that the office of the Secretary position had become vacant and listing Kevin McAleenan as the Acting Officer. *See* Swartz Decl. ¶ 7, Ex. 1, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019). The notice listed the authority for the acting designation as 6 U.S.C. § 113(g)(2). *Id.* at 2. If the order is genuinely ambiguous, this Court should give significant weight to the Department's official contemporaneous understanding and implementation of the order. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-18 (2019).

Plaintiffs may rely on other district court decisions that concluded that the list set out in EO 13753—not the list set out in Ms. Nielsen's April 9 order—controlled the order of succession when Ms. Nielsen resigned,[22] but this Court should not follow those decisions. Those courts

---

[22] *Casa de Md. v. Trump*, No. 8:20-cv-02118-PX, 2020 WL 5500165, at *20–23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269, at *7–8 (N.D. Cal. Sept. 29, 2020); *Batalla Vidal v. Wolf*, Nos. 16-CV-4756 (NGG) (VMS), 17-CV-5228 (NGG) (RER), 2020 WL 6695076, at *8–9 (E.D.N.Y. Nov. 14, 2020); *La Clinica de la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313, at *6–7 (N.D. Cal. Nov. 25, 2020); *Pangea*

erroneously confused orders of succession and delegations of authority. Delegations of authority, which simply allow an official to exercise certain powers of the office of the Secretary, are different from orders of succession, which are lists of officials who may become Acting Secretary in the event of a vacancy. As explained, the HSA recognizes that basic proposition. If Secretary Nielsen had intended only to amend the order for delegated authority during an emergency, she would have had no reason to invoke § 113(g)(2). *Compare* 6 U.S.C. § 112(b)(1) (allowing Secretary to delegate authority), *with id.* § 113(g)(2) (allowing Secretary to designate a further order of succession); *see also Stand Up for California! v. DOI*, 298 F. Supp. 3d 136, 141 (D.D.C. 2018) (explaining that "non-exclusive responsibilities [may] be delegated to other appropriate officers and employees in the agency"). These decisions also overlook the context of DHS Delegation 00106—specifically, that § II.A was never an order of the Secretary—and misunderstand the relationship between the HSA and the FVRA—namely, that Ms. Nielsen's first-ever order of succession under § 113(g)(2) superseded EO 13753 as a matter of law.

Because Ms. Nielsen's order applied when she resigned, then-CBP Commissioner McAleenan properly assumed the position of Acting Secretary upon Ms. Nielsen's resignation. *See* Am. Compl. ¶¶ 144, 147; April 2019 Order at 2; Swartz Decl. ¶ 5.

### 2.    Acting Secretary McAleenan Lawfully Amended the Order of Succession.

As the properly serving Acting Secretary, Mr. McAleenan was authorized to exercise all of the Secretary's authority because "an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019); *see also Ryan v. United States*, 136 U.S. 68, 81 (1890) ("[I]n the abs[e]nce of the secretary, the authority with which he was invested could be exercised by the officer who, under the law, became for the time acting secretary . . . ."). This included the Secretary's authority

---

*Legal Servs. v. DHS*, Nos. 20-cv-09253-JD, 20-cv-09258-JD, at *4 (N.D. Cal. Jan. 8, 2021). *See also Nw. Immigrant Rts. Project v. USCIS*, No. CV 19-3283 (RDM), 2020 WL 5995206, at *14 (D.D.C. Oct. 8, 2020) ("assum[ing], without deciding," the same) ("*NWIRP*").

to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *See* 6 U.S.C. § 113(g)(2).

Plaintiffs may attempt to rely on *Northwest Immigrant Rights Project*, which reasoned that an Acting Secretary may not designate an order of succession under § 113(g)(2). 2020 WL 5995206, at *24. But there are several flaws in that decision.

*First*, the decision is at odds with controlling precedent. In *In re Grand Jury Investigation*, the D.C. Circuit held that "an Acting Attorney General becomes the head of the Department when *acting in that capacity* because an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." 916 F.3d at 1055 (emphasis added). The court held that the acting official is vested with any authority the vacant office has, including authority under the Appointments Clause. *See id.* at 1054-55 ("Acting Attorney General Rosenstein was the 'Head of Department' *under the Appointments Clause* as to the matter on which the Attorney General was recused." (emphasis added)). That same reasoning applies to an Acting Secretary under § 113(g)(2). Indeed, it would be unusual if an acting principal officer is vested with every power that the vacant office has *except* the power to appoint inferior officers.

*Second*, the district court misread the FVRA's exclusivity provision, 5 U.S.C. § 3347(a). Relying on the FVRA's requirement that an agency-specific vacancy statute must "expressly" grant the head of a Department the power to designate successors, the court concluded that an Acting Secretary cannot exercise the § 113(g)(2) authority because no statute gives the Acting Secretary this authority. *See NWIRP*, 2020 WL 5995206, at *19. But § 113(g)(2) operates "[n]otwithstanding" the FVRA. Thus, the FVRA, including its exclusivity rule in § 3347(a), does not limit the authority conferred by § 113(g)(2). And even if § 3347 did apply, it does not support the court's conclusion. Section 113(g)(2) expressly authorizes the "head of an Executive department," the Secretary of Homeland Security, to designate an acting official. That is all that is required for § 113(g)(2) to come within the exception to the FVRA's exclusivity. 5 U.S.C. § 3347(a)(1). The court was thus wrong to conclude that "statutory language [must] expressly vest[] the acting official with [the same] authority" held by the Secretary. *See NWIRP*, 2020 WL

5995206, at *19. Indeed, an "acting officer is vested with the same authority that could be exercised by the officer for whom he acts," "by virtue of becoming the [a]cting" official, not because of a separate grant of statutory authority. *See In re Grand Jury*, 916 F.3d at 1055–56.

In sum, as the lawfully serving Acting Secretary, Mr. McAleenan had the power to designate an order of succession under § 113(g)(2), and Mr. Wolf lawfully served under Mr. McAleenan's order. *See* Am. Compl. ¶ 150; *see also* November 2019 Order.

### 3.    Mr. Wolf Lawfully Served as Acting Secretary

Because, as shown above, Mr. McAleenan could lawfully exercise the authority of the Secretary under the HSA, his actions and Mr. Wolf's service as Acting Secretary are consistent with the HSA and relevant agency orders of succession. Plaintiffs' legal conclusions regarding the HSA, phrased as allegations, are simply wrong. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Twombly*, 550 U.S. at 555.

Plaintiffs also claim that Mr. Wolf's service as Acting Secretary violated the Appointments Clause to the Constitution. They allege that because the Secretary is a "principal" (rather than "inferior") Officer, the Appointments Clause requires that the person holding that office be appointed by the President "with the Advice and Consent of the Senate." Am. Compl. ¶¶ 133, 221. But Plaintiffs do not appear to allege that no one can serve as Acting Secretary without nomination and confirmation to that position, but rather that Mr. Wolf's service was unlawful because he was neither appointed and confirmed to the role of Secretary nor otherwise had some lawful basis to hold that position. *See id.* ¶ 223 ("Defendant Wolf's exercise of those functions and duties without having been confirmed by the Senate or otherwise having the legal authority to exercise them violates the Appointments Clause."). That is, Plaintiffs seem to recognize that Congress may authorize an acting official to perform the functions and duties of that position by statute (specifically the HSA), *see id.* ¶¶ 135, 137, and their Appointments Clause argument repackages their argument that Mr. Wolf's service violated the HSA, which is incorrect.

In any event, Mr. Wolf's service was consistent with the Appointments Clause. Although the Secretary of Homeland Security is a principal officer and must be Senate-confirmed, that does not mean that an individual who *temporarily* performs the functions of a principal office in an *acting* capacity must also be appointed as a principal officer. The Supreme Court and lower courts have repeatedly held that a person performing the duties of a vacant principal office is not a principal officer. *See United States v. Eaton*, 169 U.S. 331, 343 (1898). Indeed, courts have acknowledged that "the Supreme Court has repeatedly embraced the government's view that it is the temporary nature of acting duties that permits an individual to perform them without becoming a principal officer under the Appointments Clause." *Guedes v. ATF*, 356 F. Supp. 3d 109, 146 (D.D.C. 2019); *see also id.* ("[T]he Supreme Court has held and subsequently reaffirmed that an official designated to perform the duties of a principal office temporarily, on an acting basis, need not undergo Senate confirmation."); *United States v. Smith*, 962 F.3d 755, 764 (4th Cir. 2020) ("Someone who temporarily performs the duties of a principal officer . . . may occupy that post without having been confirmed with the advice and consent of the Senate.").

These holdings are confirmed by consistent legislative practice. Acts of Congress passed in three different centuries have authorized the designation of non-Senate-confirmed acting principal officers. *See, e.g.*, 5 U.S.C. § 3345(a)(1), (3); Act of July 23, 1868, ch. 227, § 1, 15 Stat. 168; Act of Feb. 13, 1795, 1 Stat. 415; Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281. And the Executive Branch has repeatedly designated non-Senate-confirmed persons to serve as acting agency heads under these statutes. *See Designating an Acting Attorney General*, 2018 WL 6131923, at *8 (OLC Nov. 14, 2018) (identifying over 160 occasions).

Finally, Mr. Wolf's prior confirmation as Under Secretary satisfies any confirmation requirement because the duties of the Secretary are germane to his position as Under Secretary. The Supreme Court has held that officers confirmed by the Senate for one office may serve in a second office that requires Senate confirmation—without a second confirmation—so long as the role of the second office is "germane" to the first office. *Weiss v. United States*, 510 U.S. 163, 176 (1994). Here, the duties of the Secretary are "germane" to Mr. Wolf's position as Under Secretary.

Similarly, the claim that Mr. Wolf violated the APA (Count 9) is the same claim that Mr. Wolf had no authority because he was unlawfully serving, now recast under the APA. *See* Am. Compl. ¶ 231 ("Because Defendant Wolf has been unlawfully serving as Acting Secretary . . . and has had no authority to take any actions in that capacity, his purported change to DHS policy violates the APA and is invalid and void."). It, too, must fail.

Because Mr. Wolf lawfully served as Acting Secretary, Plaintiffs' claims under the Appointments Clause, HSA, and APA regarding Mr. Wolf must be dismissed.

### E. Mr. Wolf's Ratification of His Prior Orders Cures the Alleged Service-Related Defects in the Actions at Issue Here.

If the Court concludes that Plaintiffs' allegations implicate actions that Mr. Wolf took under § 1315, those actions are valid because Mr. Wolf lawfully ratified them.

Under Plaintiffs' theory, there is no § 113(g)(2) order of succession, *see* Am. Compl. ¶ 146, which means the FVRA would apply to the current vacancy in the office of the Secretary. And under the FVRA, an acting official may serve while a nomination is pending, even if the FVRA's initial 210-day limit on acting service has expired. *See* 5 U.S.C. § 3346(a)(2); S. Rep. No. 105-250, at 14 (explaining "the acting officer may serve even if the nomination is submitted after the [initial time limit] has passed"). On September 10, 2020, the President submitted Mr. Wolf's nomination to serve as Secretary of Homeland Security to the Senate,[23] and this nomination created a permissible period for acting service under the FVRA.

Under Plaintiffs' theory, EO 13753 would control who serves as Acting Secretary under the FVRA during this permissible period. *See* Am. Compl. ¶ 146. Under EO 13753, the Senate-confirmed Administrator of the Federal Emergency Management Agency ("FEMA"), Peter T. Gaynor, would have begun serving as Acting Secretary under the FVRA[24] after the President

---

[23] *Two Nominations Sent to the Senate*, White House (Sept. 10, 2020), https://www.whitehouse.gov/presidential-actions/two-nominations-sent-senate-091020/.

[24] The first two positions listed in EO 13753, the Deputy Secretary of Homeland Security and the Under Secretary for Management, were at the time and still are vacant.

submitted Mr. Wolf's nomination.[25] Then, "out of an abundance of caution" and to "minimize any disruption" caused by recent legal challenges, Mr. Gaynor exercised "any authority" he might possess as Acting Secretary to designate an order of succession for the office under § 113(g)(2).[26] Because § 113(g)(2) applies "[n]otwithstanding" the FVRA, the order superseded EO 13753, the only possible source of authority for Gaynor's own service. Mr. Wolf was the most senior official in the line of succession prescribed by Gaynor's order. So if Mr. Wolf was not already validly serving as Acting Secretary under the order of succession that Mr. McAleenan issued, he became Acting Secretary under Mr. Gaynor's succession order.

On November 16, 2020, Acting Secretary Wolf "ratif[ied] any and all actions involving delegable duties that [he had] taken from November 13, 2019, through November 14, 2020." Ratification of Department Actions, 85 Fed. Reg. 75223 (Nov. 16, 2020).[27] In doing so, he confirmed that he had "full and complete knowledge of the contents and purpose of any and all actions taken by [him] since November 13, 2019." *Id.*[28]

---

[25] Plaintiffs' allegation that "when the Office of the DHS Secretary is vacant, the president lacks the authority to select an acting officer under the FVRA," does not change the analysis. *See* Am. Compl. ¶ 137. To begin, this allegation is a legal conclusion that the Court should disregard. It's also inconsistent with the HSA itself, which shows that the FVRA can apply to vacancies in the office of the Secretary. *See* 6 U.S.C. § 113(a)(1)(A) (Deputy Secretary is the Secretary's "first assistant for purposes of" the FVRA). Beyond that, Plaintiffs allege that EO 13753 should control the current vacancy in the office of the Secretary. *See id.* ¶ 146. But they apparently think EO 13753 should control because Revision 8.5 to DHS Delegation 00106 says so. *See id.* That, again, is a legal conclusion that the Court should disregard. And for the reasons explained, that legal conclusion is wrong. Section II.A of DHS Delegation 00106 is not—and never has been—an order of the Secretary. Rather, § II.A simply explained (but did not order) that the President's FVRA designation would control the order of succession when the office of the Secretary was vacant.

[26] *See* Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020), https://www.dhs.gov/sites/default/files/publications/20_1114_gaynor-order.pdf ("Gaynor Order").

[27] Mr. Gaynor initially signed his succession order on September 10, 2020, and Mr. Wolf initially ratified his prior delegable actions on September 17, 2020. *Id.* at 75223 n.2. Due to uncertainties about the timing of Mr. Gaynor's order, Mr. Gaynor reissued his order on November 14, and Mr. Wolf again ratified his actions on November 16. *See id.*

[28] The court in *Batalla Vidal* found the ratification ineffective based on the flawed premise that accepting the ratification argument would require "allow[ing] two different people—Mr. Wolf and

The ratification covered all "delegable" actions, which includes any actions Mr. Wolf would have taken under 40 U.S.C. § 1315. Plaintiffs themselves concede that the Secretary's § 1315 authority is delegable. *See* Am. Compl. ¶ 179 ("Only the Secretary or someone exercising his lawfully delegated authority may [designate] DHS employees to guard federal property."); *see also Stand Up for California!*, 298 F. Supp. 3d at 142 ("As the D.C. Circuit has held, '[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.'" (alteration in original) (citation omitted)). Not only is the Secretary's § 1315 authority delegable, it has been delegated since 2003[29] and was again delegated in 2013.[30]

In sum, even if the Court agrees with Plaintiffs' reading of the April 9 order, there is an alternate basis for Mr. Wolf's service as Acting Secretary. Acting under that alternate basis, Mr. Wolf ratified his prior delegable actions, which would include those actions that Plaintiffs challenge here. That ratification resolves the claims on the merits in Defendants' favor. *See Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) ("[R]atification is generally treated as a disposition on the legal merits of the appointments challenge.").

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.

---

Administrator Gaynor—to simultaneously exercise the Secretary's power." *See* 2020 WL 6695076, at *9. But we have never argued that the two simultaneously exercised the Secretary's power; we have instead made clear that Mr. Gaynor designated an order of succession "out of an abundance of caution," *see* Gaynor Order at 1, and that order comes into play only if the Court finds that Ms. Nielsen did not designate an order of succession. That is exactly what the court in *Batalla Vidal* found, 2020 WL 6695076, at *9, so under its own reasoning, Mr. Wolf never lawfully exercised the Secretary's authority. This means, under that court's decision, only one person—Mr. Gaynor—has ever lawfully served as Acting Secretary. The court in *Pangea Legal Services* rejected the ratification argument, but its decision relied on "counsel['s] state[ment during the hearing] that Gaynor 'never' was the Acting Secretary." *See* 2021 WL 75756, at *5. It thus did not decide the argument that we have presented here. *See id.* (finding that "counsel for the government abandoned this theory at the hearing").

[29] Blackwell Decl. ¶ 6, Ex. 5, *Delegation to Deputy Secretary*, DHS Delegation No. 00100.2, ¶ II.H (June 23, 2003) (delegating "any other duties the Secretary . . . may designate").

[30] *Id.* ¶ 7, Ex. 6, *Delegation to the Under Secretary for National Protection and Programs*, DHS Delegation No. 17001, Revision No. 01, ¶ II.W (Oct. 25, 2013) (delegating authority to "[i]mplement 40 U.S.C. § 1315").

Dated: January 19, 2021                    Respectfully submitted,

                                           JOHN COUGHLIN
                                           Deputy Assistant Attorney General

                                           BRIGHAM J. BOWEN
                                           Assistant Branch Director

                                           */s/ Jason C. Lynch*
                                           JASON C. LYNCH (D.C. Bar No. 1016319)
                                           MICHAEL P. CLENDENEN
                                           JORDAN L. VON BOKERN
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street NW, Rm. 11214
                                           Washington, DC 20005
                                           Tel: (202) 514-1359
                                           Email: Jason.Lynch@usdoj.gov

                                           *Attorneys for Defendants*